



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

CASE NO.: 02-22546 CIV-GOLD

------------------------------------------------------------ x

FAYE L. ROTH REVOCABLE TRUST, et al.,

                       Plaintiffs,

      - against -

UBS PAINEWEBBER INC., et al.,

                       Defendants.

------------------------------------------------------------ x

MAGISTRATE JUDGE SIMONTON

### DEFENDANTS' MOTION AND MEMORANDUM
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
### DISMISSING PLAINTIFFS' SECOND AMENDED COMPLAINT

**CAHILL GORDON & REINDEL LLP**
Charles A. Gilman, Esq.
Leonard A. Spivak, Esq.
Karen L. Kaiser, Esq.
Tammy L. Roy, Esq.
80 Pine Street
New York, New York 10005
(212) 701-3000 Telephone
(212) 269-5420 Facsimile

**TEW CARDENAS LLP**
Counsel for UBSPW Defendants
Thomas Tew, Esq.
Florida Bar No. 098160
John M. Quaranta, Esq.
Florida Bar No. 940641
Miami Center, 26th Floor
201 South Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1112 Telephone
(305) 536-1116 Facsimile



## TABLE OF CONTENTS

Page

MOTION ........................................................................................................... 1

THE GOVERNING LEGAL STANDARDS ..................................................... 1

PLAINTIFFS' ALLEGATIONS ......................................................................... 2

I.   SECTION 12(a)(2) IS NOT APPLICABLE TO A SECURITIES
     OFFERING THAT IS NOT REGISTERED UNDER THE 1933 ACT ..................... 3

     A.   Section 12(a)(1), Not Asserted Here, Provides the Exclusive
          Private Remedy Under the 1933 Act for Sales of Securities in
          Unregistered Offerings ............................................................................. 4

     B.   Section 12(a)(2) Pertains Only to Registered Offerings ................................. 5

          1.   In Gustafson the Court Held that § 12(a)(2) Is Applicable
               Only to Prospectuses Involved in Registered Offerings ...................... 6

          2.   Post-Gustafson Commentary and Decisions Confirm Its
               Holding that Liability Under § 12(a)(2) Is Limited to
               Misstatements in Prospectuses Used in Registered
               Offerings ........................................................................................ 8

     C.   After Gustafson Purchasers Claiming Misrepresentations or
          Omissions in Exempt Private Offerings Are Limited to the
          Assertion of Claims Under § 10(b) of the 1934 Act, Which
          Plaintiffs Here Have Assiduously Avoided and Do Not Assert ................... 10

II.  PLAINTIFFS' § 12(a)(2) CLAIMS ARE TIME BARRED ....................................... 13

     A.   The Applicable One Year Limitations Period ............................................... 13

     B.   Plaintiffs Were on Actual And/Or Inquiry Notice More Than One
          Year Before the Filing of Their Claim of Information
          Inconsistent With Plaintiffs' Principal Allegations ...................................... 13

     C.   Under The Governing Legal Standard of an "Objective
          Reasonable Person," Plaintiffs' Claim Is Time Barred ................................. 14

     D.   Plaintiffs Concede That They Had Actual Notice of the Matters
          of Which They Complain More Than One Year Prior to the
          Commencement of This Action ................................................................... 17

          1.   The Monthly Brokerage Statements Sent To Plaintiffs
               Showed the Decreased Value of their Interests and Thus
               Put Plaintiffs On Inquiry Notice Of Their Claim ............................... 18

Page

2.    Plaintiffs Received Quarterly Letters Which Clearly Set
Forth The Fund's Performance and Investment
Philosophy And Which Further Bar Their Claim ............................ 19

3.    The Semi-Annual Reports, Which Plaintiffs Admit
Receiving, Also Put Plaintiffs On Notice of The Facts On
Which They Now Base Their Claim .................................................. 22

4.    Plaintiffs Received Two Offers to Purchase During The
Relevant Time Period That Clearly Set Forth The Fund's
Performance ........................................................................................ 23

5.    The December 4, 2000 Letter Sent to All Fund Members
Further Put Plaintiffs On Notice That The Fund "Remains
Fully Invested On The Long Side" ................................................... 24

6.    Plaintiffs Received Additional Adverse Information More
Than 12 Months Prior to the Filing of the Complaint That
Further Bars Their Claim ................................................................. 25

III.    THE OFFERING OF INTERESTS IN THE FUND
WAS EXEMPT FROM REGISTRATION UNDER THE 1933 ACT .................... 27

A.    The Caselaw of the 1970s and the Evolution of Regulation D ..................... 27

B.    Rule 506 of Regulation D Creates a Safe Harbor for Offerings
Exempt from Registration Under the 1933 Act Without Any
Regard to Dollar Amount Or Number of Accredited Investors .................... 31

C.    The Offering of Interests in the Fund Complied with Regulation
D in All Material Respects ........................................................................... 34

1.    UBS Required Compliance with Regulation D ................................. 34

2.    There Is No Genuine Issue of Material Fact That UBS
Complied With the Specific Provisions of Rule 506 of
Regulation D ...................................................................................... 36

D.    Plaintiffs' Representations of Their "Accredited Investor" Status
Precludes Their Claim ................................................................................. 44

E.    Rule 508 Provides Exempt Status Where There Is a "Good Faith
and Reasonable Attempt" to Comply with the "Accredited
Investor" Provisions of Regulation D ......................................................... 47

CONCLUSION .............................................................................................................. 49

# TABLE OF AUTHORITIES

**Cases**          <u>Page</u>

<u>Amerifirst Bank</u> v. <u>Bomar</u>, 757 F. Supp. 1365 (S.D. Fla. 1991) ........................... 26n

<u>AIG Global Securities Lending Corp.</u> v. <u>Banc of America Securities LLC</u>, 254 F. Supp. 2d 373 (S.D.N.Y. 2003) ............................................. 30n

<u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) ........................................ 2

<u>Ballay</u> v. <u>Legg Mason Wood Walker, Inc.</u>, 925 F.2d 682 (3d Cir. 1991) ......................................................................................... 5n

<u>Brumbaugh</u> v. <u>Princeton Partners</u>, 985 F.2d 157, 163 (4th Cir. 1993) ................. 15

<u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317 (1986) ................................................... 2

<u>Currie</u> v. <u>Cayman Resources Corp.</u>, 835 F.2d 780 (11th Cir. 1988) ................... 5n

<u>DeBruyne</u> v. <u>Equitable Life Assurance Society of the United States</u>, 920 F.2d 457 (7th Cir. 1990) ............................................................. 15-16

<u>Dodds</u> v. <u>Cigna Securities, Inc.</u>, 12 F.3d 346 (2d Cir. 1993) ............................. 15, 16

<u>Emergent Capital Investment Management, LLC</u> v. <u>Stonepath Group, Inc.</u>, 165 F. Supp. 2d 615 (S.D.N.Y. 2001) ............................................. 10

<u>ESI Montgomery County</u> v. <u>Montenay Intern. Corp.</u>, 899 F. Supp. 1061 (S.D.N.Y. 1995) ........................................................................ 9

<u>Fisk</u> v. <u>Superannuities, Inc.</u>, 927 F. Supp. 718 (S.D.N.Y. 1996) ........................ 10n

<u>Franze</u> v. <u>Equitable Assurance</u>, 296 F.3d 1250 (11th Cir. 2002) ........................ 14-15, 16

<u>Freundt-Alberti</u> v. <u>Merrill, Lynch, Pierce, Fenner & Smith, Inc.</u>, 135 F. Supp. 2d 1298 (S.D. Fla. 2001), aff'd, 2002 WL 187426 (11th Cir. Jan. 18, 2002) ....................................................................... 16

<u>Gaston</u> v. <u>Home Depot USA, Inc.</u>, 129 F. Supp. 2d 1355 (S.D. Fla.), aff'd, 265 F.3d 1066 (11th Cir. 2001) ............................... 1-2

<u>Glamorgan Coal Corp.</u> v. <u>Ratner's Group PLC</u>, No. 93 CIV. 7581 (RO), 1995 WL 406167 (S.D.N.Y. July 10, 1995) ............................... 6n, 9

<u>Goodwin Properties, LLC</u> v. <u>Acadia Group, Inc.</u>, No. 01-49-P-C, 2001 WL 800064 (D. Me. July 17, 2001) ............................................ 46

<u>Gustafson</u> v. <u>Alloyd Co.</u>, 513 U.S. 561 (1995) ................................................... <u>passim</u>

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

|  | Page |
|---|---|
| In re Hayes Lemmerz Inc. Equity Securities Litigation, 271 F. Supp. 2d 1007 (E.D. Mich. 2003) | 10n, 30n |
| In re JWP, Inc. Securities Litigation, 928 F. Supp. 1239 (S.D.N.Y. 1996) | 8 |
| Kainos Laboratories, Inc. v. Beacon Diagnostics, Inc., No. C-97-4618 MHP, 1998 WL 2016634 (N.D. Cal. Sept. 14, 1998) | 9, 10n |
| Kennedy v. Josephthal & Co., 814 F.2d 798 (1st Cir. 1987) | 16 |
| Koke v. Stifel, Nicolaus & Co., 620 F.2d 1340 (8th Cir. 1980) | 16 |
| Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991) | 26 |
| Lennon v. Christoph, No. 94 C 6152, 1997 WL 57150 (N.D. Ill. Feb. 7, 1997) | 9-10 |
| Mark v. FSC Securities Corp., 870 F.2d 331 (6th Cir. 1989) | 39n |
| Mary S. Krech Trust v. Lakes Apartments, 642 F.2d 98 (5th Cir. 1981) | 29 |
| Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239 (3d Cir. 2001) | 15 |
| Noz v. Value Investing Partners, Inc., No. 98 CIV. 6977 (RO), 1999 WL 387400 (S.D.N.Y. June 14, 1999) | 10n, 46-47, 46n |
| In re Nucorp Energy Securities Litigation, No. 82-1796-JLI(M), 1983 WL 1374 (S.D. Cal. Oct. 24, 1983) | 26n |
| Pinter v. Dahl, 486 U.S. 622 (1988) | 5 |
| SEC v. Ralston Purina Co., 346 U.S. 119 (1953) | 47, 47n |
| SEC v. Tuchinsky, No. 89-6488-CivRyskamp, 1992 WL 226302 (S.D. Fla. June 29, 1992) | 29 |
| Securities Industry Association v. Board of Governors of the Federal Reserve System, 807 F.2d 1052 (D.C. Cir. 1986) | 29n |
| Snapp v. Unlimited Concepts, Inc., 208 F.3d 928 (11th Cir. 2000), cert. denied, 535 U.S. 975 (2001) | 5n |
| Swenson v. Engelstad, 626 F.2d 421 (5th Cir. 1980) | 27, 33, 47 |
| Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001) | 14 |
| United States v. O'Hagan, 521 U.S. 642 (1997) | 30 |

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Page

United States v. Steele, 147 F.3d 1316 (11th Cir. 1998) ..................................... 5n

United States v. Uvalde Consolidated Independent School District,
625 F.2d 547 (5th Cir. 1980) ................................................................ 5n

Vannest v. Sage, Rutty & Co., 960 F. Supp. 651 (W.D.N.Y. 1997) ................... 9, 10n

Weprin v. Peterson, 736 F. Supp. 1124 (N.D. Ga. 1988) ..................................... 28, 47

Whirlpool Financial Corp. v. GN Holdings, Inc., 873 F. Supp. 111,
127 (N.D. Ill.), aff'd, 67 F.3d 605 (7th Cir. 1995) ............................... 25-26

Wood v. City of Lakeland, 203 F.3d 1288 (11th Cir. 2000) ................................ 2

In re Worldcom, Inc. Securities Litigation, No. 02 Civ. 3288 (DLC),
03 Civ. 6592, 2003 WL 22738546 (S.D.N.Y. Nov. 21, 2003) ............................ 9

Wright v. National Warranty Co., L.P., 953 F.2d 256 (6th Cir. 1992) ............... 39n, 45-46,
46n

**Books**

Charles Johnson & Joseph McLaughlin, Corporate Finance and the
Securities Laws (2d ed. 1997) ........................................................... 28, 33, 33n,
48

**Congressional Materials**

H.R. Rep. No. 73-85 (1933) ................................................................. 7n

**Periodicals**

Margaret A. Bancroft, Responding to Gustafson: Company Registra-
tion and a New Negligence Standard, 9 InSights No. 7 (1995) ........................... 12

Krista R. Bowen, A Cloudy Prospectus: The Supreme Court's Prob-
lematic Reasoning in Gustafson v. Alloyd Co., 53 Wash. & Lee L.
Rev. 1041 (1996) ................................................................. 12

Stephen J. Choi, Company Registration: Toward a Status-Based
Antifraud Regime, 64 U. Chi. L. Rev. 567 (1997) ................................. 12

John C. Coffee, Jr., Re-engineering Corporate Disclosure: The
Coming Debate Over Company Registration, 52 Wash. & Lee L.
Rev. 1143 (1995) ................................................................. 11, 31

Christopher J. Mailander, Searching for Liquidity: United States Exit
Strategies for Int'l Private Equity Investment, 13 Am. U. Int'l L.
Rev. 71 (1997) ................................................................. 12

Joseph Shade, Financing Exploration: Requirements of Federal and
State Securities Laws, 37 Nat. Resources J. 749 (1997) ........................... 11

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Page

**PLI Materials**

Daniel A. Braverman, U.S. Legal Considerations Affecting Global
Offerings Shares in Foreign Companies, 908 PLI/Corp. 609 (1995)..................  11

Gary M. Brown, Exemptions Under the Securities Act of 1933, 1385
PLI/Corp. 217 (2003) ........................................................................................  10

Thomas S. Loo, Securities Act Registration Exemptions, 1385
PLI/Corp. 169 (2003) ........................................................................................  32, 33

Joseph McLaughlin, The SEC's Coming Regulatory Retreat, 1127
PLI/Corp. 185 (1999) ........................................................................................  11

Rosalind Ramsey Tyson, Regulation D, 1363 PLI/Corp. 605 (2003).................  33

**Regulations**

Reg. D, 17 C.F.R. §§ 230.501-508 (2003) .........................................................  passim

   501 ........................................................................................................................  28, 32, 33,
33n, 36, 38,
40-41

   502 ........................................................................................................................  28, 32, 36,
36n, 37, 38,
43n, 48

   503 ........................................................................................................................  28, 44, 48

   504 ........................................................................................................................  28, 48, 49

   505 ........................................................................................................................  28, 46, 48,
49

   506 ........................................................................................................................  passim

   508 ........................................................................................................................  28, 39n, 40,
44, 46n, 47-
49

Rule 10b-5, 17 C.F.R. § 240.10b-5 (2003).........................................................  5n, 10-12

**Rules**

Fed. R. Civ. P.

   56 ..........................................................................................................................  2

Page

**Statutes**

Securities Act of 1933

    § 3, 15 U.S.C. 77c (2000) ............................................................. 4n, 30

    § 4, 15 U.S.C. 77d (2000) ............................................................. 28, 29, 30, 31, 40

    § 5, 15 U.S.C. § 77e (2000) .......................................................... 4, 4n, 5, 6, 48

    § 7, 15 U.S.C. § 77g (2000) .......................................................... 6

    § 10, 15 U.S.C. § 77j (2000) ......................................................... 4n, 6, 7

    § 11, 15 U.S.C. § 77k (2000) ........................................................ 5n, 6, 7n, 10, 11, 12

    § 12(a)(1), 15 U.S.C. § 77l(a)(1) (2000) ...................................... 4-5, 5n, 6-10, 46

    § 12(a)(2), 15 U.S.C. § 77l(a)(2) (2000) ...................................... <u>passim</u>

    § 13, 15 U.S.C. § 77m (2000) ....................................................... 13

    § 17, 15 U.S.C. § 77q (2000) ........................................................ 5n, 10

Securities Exchange Act of 1934

    § 10(b), 15 U.S.C. § 78j(b) (2000) ............................................... 5n, 10-12, 26n

**Treatises**

2 Harold S. Bloomenthal, <u>Securities Law Handbook</u> (2003) ............. 8

3 Harold S. Bloomenthal & Samuel Wolff, <u>Securities and Federal Corporate Law 2d</u> (2d ed. 2003) ............................................... 48-49

1 Thomas Lee Hazen, <u>Treatise on the Law of Securities Regulation</u> (4th ed. 2002)........................................................................... 11, 29, 40

7A J. William Hicks, <u>Exempted Transactions Under the Securities Act of 1933</u> (2003) ............................................................... 49

Louis Loss & Joel Seligman, <u>Fundamentals of Securities Regulation</u> (4th ed. 2001)........................................................................ 48

3 Louis Loss & Joel Seligman, <u>Securities Regulation</u> (3d ed. 1989) ................... 28-29, 29n, 32

-vii-

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

                                                                                    Page

10 Louis Loss & Joel Seligman, <u>Securities Regulation</u> (3d ed. 1996) .................   26n

Louis Loss & Joel Seligman, <u>Securities Regulation</u> (3d ed. 2003
supp.) ...................................................................................................................   8, 26n

**Other Authorities**

Securities Act Release No. 33-6455 (Mar. 3, 1983)............................................   41

Securities Industry Association, <u>Securities Industry Fact Book</u> (2002)...............   30

-viii-

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

## MOTION

The UBSPW Defendants[1] submit this memorandum in support of their motion for summary judgment dismissing Plaintiffs' Second Amended Complaint ("SAC"):

1.     Section 12(a)(2) of the Securities Act of 1933 is applicable only to offerings registered under that Act, and the offering at issue was not so registered.  See Part I.

2.     Plaintiffs received monthly statements from UBS PaineWebber ("UBS"), quarterly letters from the Fund's Manager, semi-annual reports from the Fund, offers to purchase their interests in the Fund, correspondence from UBS and written materials from their UBS Financial Advisor that put Plaintiffs on notice of the matters of which they complain well before one year prior to the commencement of this action.  Thus, even if § 12(a)(2) of the 1933 Act was applicable to Plaintiffs' claim, that claim is nonetheless time barred.  See Part II.

3.     The offering of interests in the Fund was made through a private placement exempt from registration under the 1933 Act pursuant to and in compliance with SEC Regulation D, and for this reason as well is not subject to § 12(a)(2) of the 1933 Act.  Therefore, assuming arguendo that § 12(a)(2) could apply to an offering that was not registered under the 1933 Act, Plaintiffs still have no claim under § 12(a)(2).  See Part III.

### THE GOVERNING LEGAL STANDARDS

"[S]ummary judgment is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action."  Gaston v. Home Depot USA,

---

1     UBS PaineWebber Inc. (n/k/a UBS Financial Services Inc.), PW Aspen Management, L.L.C. (n/k/a UBS Aspen Management, L.L.C.) and PW Fund Advisor, L.L.C. (n/k/a UBS Fund Advisor, L.L.C.).

Inc., 129 F. Supp. 2d 1355, 1364 (S.D. Fla.) (Gold, J.), aff'd, 265 F.3d 1066 (11th Cir. 2001) (Table).

Summary judgment is granted where there is no genuine issue as to a material fact, and the moving party is entitled to judgment as a matter of law. The burden is initially on the moving party to demonstrate a prima facie entitlement to judgment as a matter of law by tendering sufficient evidence to demonstrate the absence of any material issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If this initial burden has been met, the burden shifts to the party opposing the motion to submit evidentiary proof sufficient to create genuine issues of material fact requiring a trial to resolve. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). See also Fed. R. Civ. P. 56(e). The opponent must submit its facts in evidentiary form. Mere conclusions and unsubstantiated allegations or assertions are insufficient to challenge a Rule 56 motion, as are assertions regarding immaterial facts. Anderson, 477 U.S. at 248-50. See also Wood v. City of Lakeland, 203 F.3d 1288, 1292 (11th Cir. 2000) ("The plaintiff opposing summary judgment has the burden of showing that a genuine dispute on a material issue of fact exists. Conclusory allegations . . . or evidence setting forth legal conclusions are insufficient to meet the plaintiff's burden.") (citations omitted).

## PLAINTIFFS' ALLEGATIONS

Plaintiffs bring this action as a purported class action on behalf of those who purchased interests in the PW Aspen Fund, L.L.C. ("Fund") from December 1, 1999 through December 31, 2001, excluding defendants and their affiliates. (SAC ¶ 1)

Plaintiffs allege that they purchased their interests in the Fund on January 2, 2000. (Id. ¶¶ 9-11) There is no dispute that Plaintiffs received monthly statements, quarterly letters, semi-annual reports, offers to purchase and correspondence which provided them with

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536 1112

information (discussed below) with respect to their interests in the Fund. See Plaintiffs' Response to Rule 36 Request for Admission No. 4 ("Plaintiffs admit they received (a) the monthly statements; (b) the quarterly letters; (c) the semi-annual reports; and (d) the requests for tender.").[2] Plaintiffs first commenced this lawsuit on August 9, 2002. See Docket Sheet Entry No. 1.

Plaintiffs allege that the offering materials associated with the sale of Fund interests were materially false and misleading. (SAC ¶¶ 24-30)  The *only* claim alleged is under § 12(a)(2) of the 1933 Act. (Id. ¶¶ 1, 36)

Plaintiffs allege that the Fund, a "Delaware limited liability company," is a "private investment fund" known as a "hedged fund" (id. ¶¶ 2, 14, 19, 22, 25-27, 29), and that the Fund was "sold . . . as a private investment fund" (id. ¶ 2), by means of a "Private Placement Memorandum" (id. ¶¶ 21, 22, 25-27, 29, 30).  There is no dispute that the offering of interests in the Fund was not registered under the 1933 Act. See Plaintiffs' Response to Rule 36 Request for Admission No. 1 ("Plaintiffs admit that Defendants did not file a registration statement with the Securities and Exchange Commission in connection with their offering and sale of Interests of PW Aspen Fund, L.L.C.."), Gilman Dec. Ex. 1.[3]

## I.

## SECTION 12(a)(2) IS NOT APPLICABLE TO A SECURITIES OFFERING THAT IS NOT REGISTERED UNDER THE 1933 ACT

The *only* claim asserted by Plaintiffs alleges violation of § 12(a)(2) of the 1933 Act. Section 12(a)(2) applies only to offerings that have been registered under the 1933 Act, as

---

2    Plaintiffs' response to Defendants' Rule 36 Discovery Requests is attached as Exhibit 1 to the accompanying Declaration of Charles A. Gilman ("Gilman Dec.").

3    The term "registration" herein refers to a registration under the 1933 Act.

made clear by the structure and express language of that Act, by the Supreme Court of the United States, and by leading commentators and courts that have considered the question.[4]

Whether or not the offering of interests in the Fund should have been registered under the 1933 Act,[5] the undisputed fact is that it was not registered. Thus, § 12(a)(2) is inapplicable and summary judgment is appropriate as a matter of law.[6]

**A.      Section 12(a)(1), Not Asserted Here, Provides the Exclusive Private Remedy Under the 1933 Act for Sales of Securities in Unregistered Offerings**

Section 12(a)(1) — not alleged here — establishes civil liability for "[a]ny person who . . . [o]ffers or sells a security in violation of 77e [§ 5]" of the 1933 Act. 15 U.S.C. § 77l(a)(1). Section 12(a)(1) deals with unregistered offerings. This is made clear by the statutory reference to § 5, which makes it unlawful, absent exemption, for securities to be sold unless a registration statement is "in effect" as to that security.[7] 15 U.S.C. § 77e. If a security is sold without a registration statement being in effect and the security or offering is not properly exempt under the 1933 Act, it is an unlawful act under § 5 of the 1933 Act and

---

4      A singular exception, not applicable here, exists in the case of commercial paper programs which are neither registered nor exempt under Section 3(a)(2) of the 1933 Act.

5      As demonstrated in Part III of this Memorandum, the offering of interests in the Fund was properly exempt from registration under the 1933 Act pursuant to SEC Regulation D.

6      This Court's July 3 Order did not reach this issue now raised by the UBSPW Defendants that § 12(a)(2) does not apply to an unregistered offering. This issue does not rest on an evaluation of the public or private nature of the offering, but on the sole fact that the offering was not registered under the 1933 Act.

7      Section 5(b)(1) makes it unlawful to transmit in interstate commerce "any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of 77j [§ 10 of the 1933 Act]." Section 5(b)(2) makes it unlawful to sell a security as to which a registration statement has been filed unless the security is "accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j [§ 10]." Absent an exemption, a registration statement must be "in effect" and where a registration statement has been filed, prospectuses must be delivered in connection with the sale and the prospectus must contain certain specified information. A prospectus is required to be included in and is an integral part of a registration statement under the 1933 Act. See SEC Form S-1 General Securities Registration Form (Tab A hereto). SEC Form S-1 requires that the prospectus be included as part of the filed registration statement and contains detailed instructions as to what must be included in the prospectus. A prospectus is subject to SEC review the same as any other part of a registration statement.

subjects persons who offer or sell such security to liability under § 12(a)(1).  See Gustafson

v. Alloyd Co., 513 U.S. 561, 571-72 (1995).  Section 12(a)(1) creates a right of action only

for the solicitation or sale of securities in violation of § 5.  Pinter v. Dahl, 486 U.S. 622, 641-

47 (1988).  Section 12(a)(1) is the only provision in the 1933 Act that provides private civil

liability for sales of unregistered securities.[8]  Again, Plaintiffs do not sue under § 12(a)(1).[9]

## B.    Section 12(a)(2) Pertains Only to Registered Offerings

Section 12(a)(2) deals with material misstatements and omissions in and pertaining

to prospectuses distributed as part of 1933 Act registered offerings.[10]  As shown below,

Section 12(a)(2) of the 1933 Act necessarily relates only to registered offerings.[11]

---

[8]     Section 11 of the 1933 Act provides a damage remedy for untrue registration statements and establishes liability on the part of certain persons subject, in some cases, to certain defenses.  Section 17 of the Act does not deal specifically with unregistered offerings and does not give rise to a private cause of action in any event. Currie v. Cayman Resources Corp., 835 F.2d 780, 784-85 (11th Cir. 1988).

[9]     Nor do Plaintiffs sue under the anti-fraud provisions of § 10(b) of the Securities Exchange Act of 1934 or Rule 10b-5 promulgated by the SEC thereunder.  Indeed, on page 3 of Plaintiffs' Opposition to the UBSPW Defendants' Motion to Dismiss the Amended Complaint, Plaintiffs disavowed any intention of alleging fraud under Section 10(b) and Rule 10b-5.

[10]     Section 12(a)(2) establishes civil liability for "[a]ny person who . . . [o]ffers or sells a security . . . by means of a prospectus or oral communication, which contains an untrue statement of material fact or omits to state a material fact . . . ."  15 U.S.C. § 77l(a)(2).  The statutory reference to "oral communication" in § 12(a)(2) refers to oral communications pertaining to prospectuses in registered offerings.  Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 688 (3d Cir. 1991).  Plaintiffs allege misrepresentations in the Confidential Offering Memorandum, Introductory Letter, Investor Application Form, marketing presentation and Manager Profile (materials which Plaintiffs refer to collectively as the "offering materials").  However, as indicated above, under 12(a)(2) it is only statements that are made in a prospectus in an offering registered under the 1933 Act (and oral communications pertaining to that prospectus) that are actionable under § 12(a)(2).

[11]     To find otherwise would render §§ 12(a)(1) and 12(a)(2) of the 1933 Act redundant.  See Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 936 (11th Cir. 2000) ("[W]e should not be quick to conclude that Congress either neglected to consider an issue related to its enactments, or decided to avoid the issue and leave its resolution to the courts . . . . Instead, we should search the statutory language and structure with the assumption that Congress knew what it was doing when it enacted the statute at issue."), cert. denied, 535 U.S. 975 (2001); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) ("[W]e must presume that Congress said what it meant and meant what it said."); United States v. Uvalde Consolidated Independent School District, 625 F.2d 547, 550 (5th Cir. 1980).

TEW CARDENAS REBAK KELLOGG LEHMAN DeMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536-1112

1. **In <u>Gustafson</u> the Court Held that § 12(a)(2) Is Applicable
Only to Prospectuses Involved in Registered Offerings**

In <u>Gustafson</u> v. <u>Alloyd Co.</u>, 513 U.S. 561 (1995), the Court held that a "prospectus"

under the 1933 Act is a document utilized in connection with a registered public offering:

> "[A] document is not a prospectus within the meaning of that section
> [12(a)(2)] if, absent an exemption, it need not comply with § 10's require-
> ments in the first place.
>
> "An examination of § 10 reveals that, whatever else 'prospectus' may
> mean, the term is confined to a document that, absent an overriding exemp-
> tion, must include 'the information contained in the registration statement.'
> By and large, only public offerings by an issuer of a security, or by control-
> ling shareholders of an issuer, require the preparation and filing of registra-
> tion statements. It follows, we conclude, that a prospectus under § 10 is con-
> fined to documents related to public offerings by an issuer or its controlling
> shareholders." 513 U.S. at 569 (citations omitted).[12]

Under § 5(b)(2), there is an obligation to distribute a prospectus only where a regis-

tration statement has been filed. Indeed, the Court could not have made it any clearer that

liability under § 12(a)(2) is unrelated to the "failure to file a registration statement"  a

subject that is the exclusive province of § 12(a)(1):

> "The liability imposed by § [12(a)(2)] has nothing to do with the *fact* of reg-
> istration, that is, with the failure to file a registration statement that complies
> with §§ 7 and 11 of the Act. Instead, the liability imposed by § [12(a)(2)]
> turns on misstatements contained in the prospectus." 513 U.S. at 579 (em-
> phasis in the original).

The Court explained that "[u]nder our interpretation of 'prospectus' [§ 12(a)(2)] in

similar manner is linked to the new duties created by the Act." <u>Id.</u> at 572. These "new du-

ties" imposed by the 1933 Act were described as being "for the most part, registration and

---

12    Gustafson refers to § 12(2), which because of a statutory renumbering occasioned by the Private Litiga-
tion Securities Reform Act of 1995 is now § 12(a)(2). The text of § 12(a)(2) itself makes clear that the "over-
riding exemption" referred to in Gustafson was to certain securities that are exempt from registration. See note
7, supra; see also Glamorgan Coal Corp. v. Ratner's <u>Group PLC</u>, 1995 WL 406167 (S.D.N.Y. July 10, 1995).
The fact that the Court referred to classes of securities that are exempt from registration supports the conclu-
sion that it intended the term "prospectus" under § 12(a)(2) to pertain to registered securities offerings only.

disclosure obligations — in connection with public offerings." <u>Id</u>. at 571-72.[13]   Under <u>Gustafson</u>, the statutory dichotomy is clear:

- o   securities issued in an unregistered offering are subject to civil liability under § 12(a)(1), unless issued pursuant to an exemption under the 1933 Act;

- o   securities issued in a public offering for which a registration statement has been filed and a prospectus distributed are subject to civil liability for material untrue statements and omissions under § 12(a)(2).

<u>Gustafson</u> laid down broad principles of general application based on an analysis of the provisions of the Act:  "The question before us is the coverage of [§ 12(a)(2)]." <u>Id</u>. at 580.  The Court defined "prospectus" under § 12(a)(2) as the term is used in § 10(a) of the 1933 Act     and that use is in connection with the filing of a registration statement.  This is confirmed by Justice Ginsburg's dissent in <u>Gustafson</u>. <u>Id</u>. at 596 (reading the Court's deci-sion as holding that "[c]ommunications during . . . a private placement are not 'prospec-tuses' . . . and thus are not covered by § [12(a)(2)]").

Here, it is undisputed that there was no 1933 Act registration statement filed with re-spect to the offering.  <u>See</u> Plaintiffs' Response to Rule 36 Request for Admission No. 1 ("Plaintiffs admit that Defendants did not file a registration statement with the Securities and Exchange Commission in connection with their offering and sale of Interests of PW Aspen Fund, L.L.C.."), Gilman Dec. Ex. 1.  Therefore, under <u>Gustafson</u>, the "offering materials" "need not comply with § 10's [of the 1933 Act] requirements in the first place," 513 U.S. at

---

13     See H. Rep. No. 73-85, at 9 (1933) (with respect to Sections 11 and 12 of the 1933 Act, "[f]undamentally, these sections entitle the buyer of securities sold upon a registration statement including an untrue statement or omission of material facts, to sue") (emphasis added).

569, and cannot be a prospectus under § 12(a)(2). Because the offering of Fund interests was not registered under the 1933 Act, § 12(a) (2) does not apply.

**2.     Post-Gustafson Commentary and Decisions Confirm Its Holding that Liability Under § 12(a)(2) Is Limited to Misstatements in Prospectuses Used in Registered Offerings**

The leading treatise on securities litigation, Louis Loss & Joel Seligman, Securities Regulation 794 (3d ed. 2003 supp.), confirms that § 12(a)(2) is limited to registered offerings:

> "Since § 12(a)(2) limits liability to sellers who make misrepresentations or omissions 'by means of a prospectus' the Supreme Court held that liability was limited to registered offerings by issuers and their controlling shareholders." (emphasis added)

See also 2 Harold S. Bloomenthal, Securities Law Handbook § 26:14, at 1539 (2003) ("Section 12(a)(2) remains appropriate in connection with registered offerings . . . .") (emphasis added).

In In re JWP Inc. Securities Litigation, 928 F. Supp. 1239 (S.D.N.Y. 1996), the court granted summary judgment dismissing a claim under § 12(a)(2) because: (1) the offering documents, as here, did not describe a public offering; (2) the complaint, as here, alleged the securities were issued privately; and (3) plaintiffs, as here, had not sued under § 12(a)(1).

> "If the AUSA plaintiffs wish to contend that the note offerings should have been registered, however, the appropriate basis for that claim would be § 12[(a)(1)], 15 U.S.C. § 77l(1), which provides for rescission of sales of securities improperly accomplished without registration. The AUSA plaintiffs have not asserted a claim under that provision." (Id. at 1259)

The court in JWP emphasized that the "difficulty in satisfying the standard [of a "prospectus" that was] established in Gustafson lies in the fact that [Defendants'] offering documents did not describe public offerings. Instead, the pertinent information concerning [Defendants'] offerings was set forth in a private placement memoranda . . . ." Id. So too here.

TEW CARDENAS REBAK KELLOGG LEHMAN DeMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536 1112

Similarly, in <u>Vannest</u> v. <u>Sage, Rutty & Co.</u>, 960 F. Supp. 651 (W.D.N.Y. 1997), the court granted summary judgment dismissing a claim under § 12(a)(2), observing that, as here, plaintiffs had not sued under § 12(a)(1) and, as here, their assertion that the offering was not truly a private offering was made for the first time long after the suit had been filed.

In reliance on <u>Gustafson</u>, courts routinely dismiss § 12(a)(2) claims where, as here, the complaint alleges that the securities were sold as part of a private placement or the private placement memorandum states that the offering is unregistered. Most recently, in <u>In re Worldcom, Inc. Securities Litigation</u>, No. 02 Civ. 3288 (DLC), 03 Civ. 6592, 2003 WL 22738546, at *19 (S.D.N.Y. Nov. 21, 2003) the court dismissed a § 12(a)(2) claim where, as here, the "terms of the Offering Memorandum," which clearly stated <u>inter alia</u> that the notes offered had "not been registered under the Securities Act" and thus were subject to "transfer restrictions," "compel[led] the conclusion that the [offering] was a private placement" and allegations that "contradict[ed] the Offering Memorandum (as well as the Complaint) [were] ineffective to convert it into a public offering subject to Section 12(a)(2)." <u>See also Glamorgan Coal Corp.</u> v. <u>Ratner's Group PLC</u>, No. 93 CIV. 7581 (RO), 1995 WL 406167 (S.D.N.Y. July 10, 1995) (complaint dismissed where plaintiff alleged that securities were sold as a "private" placement); <u>ESI Montgomery County</u> v. <u>Montenay International Corp.</u>, 899 F. Supp. 1061, 1065 (S.D.N.Y. 1995) (complaint, as here, failed to allege offering was public and, as here, investment memoranda disclosed that the offering was not registered). In <u>Kainos Laboratories, Inc.</u> v. <u>Beacon Diagnostics, Inc.</u>, No. C-97-4618 MHP, 1998 WL 2016634 (N.D. Cal. Sept. 14, 1998), the court dismissed a § 12(a)(2) claim where, as here, the complaint did not allege that the offering was a public offering and the offering memorandum indicated that the offering was private. <u>See also Lennon</u> v. <u>Christoph</u>, No. 94 C

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536 1112

6152, 1997 WL 57150 (N.D. Ill. Feb. 7, 1997) (summary judgment granted to defendants on

Section 12(a)(2) claim where interests sold pursuant to a Private Placement Memorandum);

Emergent Capital Investment Management, LLC v. Stonepath Group, Inc., 165 F. Supp. 2d

615 (S.D.N.Y. 2001) (summary judgment granted to defendants on § 12(a)(2) claim where

complaint alleged sale by private placement).[14]

**C.      After Gustafson Purchasers Claiming Misrepresentations or
         Omissions in Exempt Private Offerings Are Limited to the
         Assertion of Claims Under § 10(b) of the 1934 Act, Which
         Plaintiffs Here Have Assiduously Avoided and Do Not Assert**

After Gustafson, purchasers in a private placement may not sue for alleged misrepre-

sentations or omissions under §§ 11, 12(a)(1) or 12(a)(2) of the 1933 Act.  Instead, their

remedy lies under § 10(b) of the 1934 Act, a provision that requires allegation and proof of

scienter and compliance with the heightened pleading requirements of the PSLRA.   The

matter could not be clearer.

- Gary M. Brown, Exemptions Under the Securities Act of 1933, 1385 PLI/Corp. 217,
  288 (2003):

  > "The '33 Act's antifraud provisions are Sections 11, 12 and 17(a).  Because
  > Section 17(a) has been interpreted to provide no private right of action, there,
  > in effect, is no effective private remedy under the '33 Act for fraud in connec-
  > tion with exempt transactions due to the United States Supreme Court's deci-
  > sion in Gustafson v. Alloyd Company, 513 U.S. 561 (1995) limiting the appli-
  > cability of Section 12(a)(2) of the '33 Act to public offerings."

---

14      There are a few cases such as Fisk v. Superannuities, Inc., 927 F. Supp. 718 (S.D.N.Y. 1996), that defer
to a fuller development of the record before dismissing such claims.  Fisk was relied on by Plaintiffs in oppo-
sition to the motion to dismiss and is cited at page 10 of the Court's July 1, 2003 Order in this case.  At least
four courts have specifically declined to follow Fisk.  See Vannest, 960 F. Supp. 651; In re Hayes Lemmerz
International Inc. Equity Securities Litigation, 271 F. Supp. 2d 1007, 1027 (E.D. Mich. 2003); Kamos, 1998
WL 2016634; and Noz v. Value Investing Partners, Inc., No. 98 CIV. 6977 (RO), 1999 WL 387400 (S.D.N.Y.
June 14, 1999).  At this point, however, the fuller record is developed (see Part III and Brousseau Dec.) and
shows that because the offering of interests in the Fund did comply with the requirements of Regulation D and
was therefore properly exempt from registration under the 1933 Act, for this reason as well, Plaintiffs cannot
maintain a § 12(a)(2) claim.

- 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation, § 7.6(2)(D), at 636, (4th ed. 2002) (discussing the impact of Gustafson):

  "[I]n those instances where plaintiffs formerly were successful in section 12(a)(2) actions not involving an offering by prospectus, there is still the potential for a Rule 10b-5 action, provided the plaintiff can establish that the defendant acted with scienter in making the material misstatements or omissions."

- Joseph McLaughlin, The SEC's Coming Regulatory Retreat, 1127 PLI/Corp. 185, 191 (1999):

  "[U]nder Gustafson [private placements] are subject only to Rule 10b-5 liability . . . ."

- John C. Coffee, Re-Engineering Corporate Disclosure: The Coming Debate Over Company Registration, 52 Wash. & Lee L. Rev. 1143, 1173 (1995):

  "Initially, issuers' primary concern with company registration might be the risk of '33 Act liabilities. Today, in a private placement or in a Regulation S extraterritorial offering, the issuer may face liability under Rule 10b-5, but need not fear liability under Sections 11 or 12(2) of the '33 Act. [citing Gustafson]."

- Daniel A. Braverman, U.S. Legal Considerations Affecting Global Offerings Shares in Foreign Companies, 908 PLI/Corp. 609, 666-67 (1995):

  "[T]he liability provisions of the securities laws that apply to U.S. private placements are less draconian than those that apply to public offerings. Section 11 of the Securities Act applies only to S.E.C. registered offerings and, in an important recent decision, the U.S. Supreme Court held in Gustafson v. Alloyd Co. that § 12(2) of the Securities Act applies only to public offerings . . . . The Gustafson decision left Rule 10b-5 under the Exchange Act as the principal U.S. federal standard for liability in a private placement."

- Joseph Shade, Financing Exploration: Requirements of Federal and States Securities Laws, 37 Nat. Resources J. 749, 779 (1997):

  "Prior to 1995, if there was fraud in cases involving issuer transactions, where the issuer sold securities in either an exempt or non-exempt transaction, remedies were available under Sections 11 or 12 of the 33 Act, which essentially impose strict liability . . . . In Gustafson, however, the U.S. Supreme Court for purposes of 12(2) liability, limited the meaning of 'prospectus' to documents that describe a public offering. From now on liability in cases involving fraud in connection with private placements will be founded on Rule 10(b)(5). The obvious intent of Gustafson was to make Rule 10b-5 (a scienter based stan-

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

dard) the norm for civil liability in private offerings, because under *Gustafson,* 12(2) now only applies to 'public' offerings." (footnotes omitted)

- Stephen J. Choi, <u>Company Registration: Toward a Status-Based Antifraud Regime</u>, 64 U. Chi. L. Rev. 567, 571 n.23 (1997):

  "Companies going through a public offering potentially face antifraud liability under Sections 11 and 12(a)(2) of the Securities Act as well as under Rule 10b-5. Private placements, on the other hand, only must endure Rule 10b-5 antifraud liability." (citations omitted)

- Krista R. Bowen, <u>A Cloudy Prospectus: The Supreme Court's Problematic Reasoning in Gustafson v. Alloyd Co.</u>, 53 Wash. & Lee L. Rev. 1041, 1093 (1996):

  "Clearly, civil fraud liability under Section 11 fails to extend to private placements because private placements do not require registration statements. Thus, Section 10(b) of the 1934 Act emerges as the only alternative civil liability provision available to private placement investors." (footnotes omitted)

- Christopher J. Mailander, <u>Searching for Liquidity: United States Exit Strategies for International Private Equity Investment</u>, 13 Am. U. Int'l L. Rev. 71, 92 (1997):

  "Only Section 10(b) and Rule 10b-5 . . . assert liability for material misstatements or failure to state a material fact made as part of the private placement offering."

- Margaret A. Bancroft, <u>Responding to Gustafson: Company Registration and a New Negligence Standard</u>, 9 InSights No. 7, at 14 (1995):

  "In determining that the negligence standard of Section 12[(a)](2) of the Securities Act applies only to public offerings . . . [<u>Gustafson</u>] puts private placements outside the discipline provided by a negligence standard just as private placements . . . have become an increasingly important means of raising capital."

While Plaintiffs' complaint should be dismissed for each of the reasons addressed below in Parts II and III of this Memorandum, the Court need proceed no further. The undisputed fact that the offering of interests in the Fund was not a registered offering compels dismissal of Plaintiffs' claim under § 12(a)(2) of the 1933 Act.

## II.

### PLAINTIFFS' § 12(a)(2) CLAIMS ARE TIME BARRED

Even if § 12(a)(2) could apply to an unregistered offering, Plaintiffs' claim here would be time barred.

#### A.    The Applicable One Year Limitatoins Period

Section 13 of the 1933 Act provides the statute of limitations for alleged violation of § 12(a)(2):

> "No action shall be maintained to enforce any liability created under section 77k [11] or 77l(a)(2) [12(a)(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . . "
> 15 U.S.C. § 77m.

This action was commenced on August 9, 2002.   As demonstrated below, it was not "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  Id.

#### B.    Plaintiffs Were on Actual And/Or Inquiry Notice More Than One Year Before the Filing of Their Claim of Information Inconsistent With Plaintiffs' Principal Allegations

The principal allegations set forth in Plaintiffs' complaint concern (1) hedging through short selling; (2) conservative management and loss protection; and (3) substantial portfolio diversification.

Plaintiffs allege that the offering materials inaccurately represented that the Fund would be hedged. (SAC ¶ 2)  Plaintiffs allege that "[i]n the securities market, hedging is accomplished by selling short, which results in a profit when the value of what is sold short declines." (Id. ¶ 19)  Plaintiffs further allege that portions of the "offering materials" represented that the Fund "would be hedging its positions by selling short certain securities or

market indices at the same time it owned the individual stocks." (Id. ¶ 20; see also id. ¶¶ 22(b), 22(c), 22(d), 25, 26 and 29)  Plaintiffs suggest that representations were made that the Fund would be 30% short.  (Id. ¶¶ 22(a), 22(b), 25 and 29)

Plaintiffs allege that it was misrepresented to them that the Fund would be conservatively managed, and through short sale hedges would "make profits in a market downturn" (id. ¶ 2), "minimize losses in both market downturns as well as rising markets" (id. ¶ 19), could "help *protect* assets during difficult markets" (id. ¶¶ 22(a), 26) (emphasis in original), and would preserve capital under various economic conditions (id. ¶¶ 22(b) and 29).

Plaintiffs allege that the offering materials misrepresented that the Fund's portfolio would be diversified across market segments and themes and that no more than 25% of the value of its net assets would be invested in any one industry.  (Id. ¶¶ 19, 22(b), 22(c), 22(d), 27 and 29)

There are other allegations of misrepresentation and omission but they are derivative of these three principal allegations.

## C.   Under The Governing Legal Standard of an "Objective Reasonable Person," Plaintiffs' Claim Is Time Barred

The discovery by a plaintiff necessary to trigger the commencement of the running of the statute of limitations occurs upon "inquiry notice" of a violation, i.e. "'knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed.'" Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002) (plaintiffs lacked standing to assert § 12(a)(2) claim where, as here, they had inquiry notice of the alleged fraud more than one year before they filed suit); see also Theoharous v.

Fong, 256 F.3d 1219, 1228 (11th Cir. 2001). The test of what puts a plaintiff on inquiry notice is the "objective reasonable person standard." Franze, 296 F.3d at 1254:

> "In the present case, applying an objective reasonable person standard, we conclude that both Franze and Busher were put on inquiry notice well over one year before they filed suit. Franze purchased his VLI policy and received his prospectus on July 10, 1993, and received his policy on August 3, 1993. Busher purchased his VLI policy and received his prospectus on July 27, 1993, and received his VLI policy on August 13, 1993. Franze and Busher could have discovered the alleged misrepresentations simply by reading these documents. Therefore, they were put on inquiry notice despite the fact that they both testified that they did not read any of the documents that Equitable gave them. It was their responsibility to read these documents, and, had they done so, they could have discovered the alleged misrepresentations. See Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001) (holding that for inquiry notice, 'investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments,' in the context of a Racketeer Influence and Corrupt Organizations Act (RICO) claim for securities fraud); Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350-51 (2d Cir. 1993 ) (holding that an investor's failure to read the documents is not excused by the documents' length, when determining whether the investor was on constructive notice for purposes of triggering the statute of limitations); Brumbaugh v. Princeton Partners, 985 F.2d 157, 163 (4th Cir. 1993) (holding that 'when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims . . .'); DeBruyne v. Equitable Life Assur. Soc. of U.S., 920 F.2d 457, 466 n.18 (7th Cir. 1990) (noting that 'plaintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice')."

In DeBruyne v. Equitable Life Assurance Society of the United States, 920 F.2d 457, 462, 467 (7th Cir. 1990), cited by the Eleventh Circuit in Franze, the Seventh Circuit affirmed summary judgment for defendants on a § 12(a)(2) claim where plaintiffs asserted that defendants "fail[ed] to manage the Balanced Fund 'in accordance with the documents and instruments governing the plan,'" but yet "selectively ignore[d] [defendant's] continued and open disclosures as to the percentage composition of the Balanced Fund." The Court of Appeals explained:

> "[Plaintiffs] now complain that the Balanced Fund was imbalanced, and therefore more risky and volatile, because it did not have a sufficient invest-

ment in long-term bonds.   They stated in deposition that they invested in the Balanced Fund because they thought that it would hold no less than 20% and as high as 50% of its assets in nonconvertible debt.   But if that is the case, then basic logic leads us to the conclusion that an investor reading with reasonable care would have been suspicious, if not enraged, when Equitable openly stated prior to November 30, 1987, that the Balanced Fund was made up of only .3% nonconvertible debt on September 30, 1987;  4% nonconvertible debt on June 30, 1987;  2.3% nonconvertible debt on March 31, 1987;  and 6.78% nonconvertible debt on September 30, 1986 . . . .  [T]hat constant contradiction is sufficient to allow us to conclude, for summary judgment purposes, that plaintiffs were on inquiry notice at least one year prior to the time in which they filed their complaint." Id. at 467.

Similarly in Dodds v. Cigna Securities, Inc., 12 F.3d 346, 351, 352 (2d Cir. 1993), cited by the Eleventh Circuit in Franze, the Second Circuit affirmed the dismissal of a § 12(a)(2) claim as time-barred where "[c]onstructive knowledge that roughly a quarter of her assets was being invested in risky, illiquid ventures surely constituted at least a 'storm warning[]' to a reasonable investor with conservative instincts sufficient to raise a duty to inquire further." See also Kennedy v. Josephthal & Co., 814 F.2d 798, 803 (1st Cir. 1987) (affirming summary judgment dismissing § 12(a)(2) claim as time-barred); Koke v. Stifel, Nicolaus & Co., 620 F.2d 1340, 1343-44 (8th Cir. 1980) (affirming summary judgment where account statements reflecting losses "were sufficient to require the initiation of an inquiry . . . [and investor] was not free to ignore them").

Where "[t]here is no disputed issue of fact for a jury to resolve with respect to whether Plaintiffs were on inquiry notice more than one year prior to initiating the instant lawsuit," summary judgment is appropriate.  Freundt-Alberti v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 135 F. Supp. 2d 1298, 1302 (S.D. Fla. 2001) (granting defendants summary judgment where there were "more than sufficient 'storm warnings' to trigger Plaintiffs' duty to investigate"), aff'd, 2002 WL 187426 (11th Cir. Jan. 18, 2002) (Table).

**D.     Plaintiffs Concede That They Had Actual Notice of the Matters of Which They Complain More Than One Year Prior to the Commencement of This Action[15]**

As shown below, from February 2000 (the month following that in which Plaintiffs first acquired their interests in the Fund), Plaintiffs were repeatedly provided with detailed written information concerning the performance of the Fund, including the substantial loss of net asset value over a relatively short period of time, the fact that the Fund engaged in minimal, if any, short selling, the fact that its investment philosophy was that of "long term investment," i.e., buy and hold rather than trade long and short, and detailed information concerning the composition of the Fund's portfolio (by industry and individual company).

**In testifying on behalf of all three Plaintiffs, Jeffrey C. Roth conceded that by no later than December 2000, if not as early as June 2000 (more than 20 and 26 months, respectively, before Plaintiffs commenced their lawsuit), he believed that the "huge" losses in net asset value on Plaintiffs' investments in the Aspen Fund were "inconsistent" with the representations that Plaintiffs allege were made to them in connection with their purchase of Fund interests. (Roth. 144:20-145:11; 145:12-146:6, Gilman Dec. Ex. 3)[16]**

Plaintiffs admit receiving from UBS a letter dated December 4, 2000 (Gilman Dec. Ex. 5) that expressly informed them that the Fund's portfolio value was down almost 50% and "remains fully invested on the long side"     i.e., that it was not hedged.  (Roth 126:2-126:14, Gilman Dec. Ex. 3)  Roth testified as follows:

---

[15]     For purposes of this motion, we need not address the inaccuracy of Plaintiffs' allegations, or the myriad and prominent statements in the Confidential Offering Memorandum and Investor Application Form that laid out the risks of investing in the Aspen Fund.  See Brousseau Dec. Ex. D, p. 2-4.

[16]     The transcript of the Roth deposition is attached as Exhibit 3 to the Gilman Dec.

"A.    . . . I got an inch thick stack of marketing materials that presented something wholly inconsistent with the results.

"Q.    By 'results' are you referring to the results that were reported in the December 4, 2000 letter to you which show that the value of your investment in the fund was down by at least 50 percent?

"A.    That's one of the results." (Roth. 144:20-145:11; 145:12-146:6, Gilman Dec. Ex. 3)

Reading the December 4, 2000 letter 20 months prior to filing suit, Roth testified that it occurred to him that "a loss of more than 40% of the value of his Aspen Fund Investments within an eleven month period was inconsistent with the representations [he] claimed were made to [him] concerning the Fund's investment strategy." He was "very alarmed." (Roth 126:10-128:9)

Thus, admittedly by December 2000, Plaintiffs concede that they were aware that the value of their investment in the Aspen Fund was down substantially and were further aware (as any reasonable person would have been) that such results were "inconsistent" with what Plaintiffs allege was represented to them. Plaintiffs saw that the portfolio was not being protected from the market's downward movement, as they claim it was represented to them it would be. (Roth 134:8-134:15, Gilman Dec. Ex. 3)

1.    **The Monthly Brokerage Statements Sent To Plaintiffs Showed the Decreased Value of their Interests and Thus Put Plaintiffs On Inquiry Notice Of Their Claim**

Each month, Plaintiffs received brokerage statements from UBS which showed the value of their interests in the Fund. See Plaintiffs' Response to Request for Admission No. 4 ("Plaintiffs admit they received . . . the monthly statements"), Gilman Dec. Ex. 1, p. 2. Plaintiffs' monthly statements showed monthly values for Plaintiffs' interests in the Aspen Fund (Roth 147:6-9, Gilman Dec. Ex. 3) to the point where for the July 2001 statements more than a year before suit was filed the value of Plaintiffs' investments in the Fund had

dropped from an initial aggregate investment of $640,000 to $333,522. See Brousseau Dec. Ex. O, p. 2; Id. Ex. P, p. 3; Id. Ex. Q, p. 3. These results were "wholly inconsistent" with what Plaintiffs allege had been represented to them. (Roth 144:20-145:11; 145:12-146:6, Gilman Dec. Ex. 3) Accordingly, Plaintiffs' claims are time barred.

**2.      Plaintiffs Received Quarterly Letters Which Clearly Set Forth The Fund's Performance and Investment Philosophy And Which Further Bar Their Claim**

Commencing January 2000, Plaintiffs received quarterly letters from PW Aspen Management which reflected the Fund's performance and management's "long term investor" investment philosophy and that its investments were based on "fundamental research." See Plaintiffs' Response to Request for Admission No. 4 ("Plaintiffs admit they received . . . the quarterly letters"), Gilman Dec. Ex. 1, p. 2. Plaintiffs concede that these performance results showed, "very soon after the investment," that the value of their investments in the Fund was "dropping like a stone" which was inconsistent with the alleged representations they claim were made to them. (Roth 123:10-124:2; 130:4-130:20, Gilman Dec. Ex. 3) The quarterly letters discuss an investment philosophy that did not rely on the use of hedging or short sales and plainly put Plaintiffs on actual notice of the matters of which they now complain. The letters are annexed to the Brousseau Dec. as Ex. F.

| Letter | Quarterly Results Reported | Relevant Text |
|---|---|---|
| April 2000 (27 months prior to suit) | loss of (-2.4%) for first quarter of 2000 | "[o]ur basic investment strategy continues to be longer-term oriented equity investing" |

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

| Letter | Quarterly Results Reported | Relevant Text |
|---|---|---|
| | | "[A]s long-term investors, we are even more focused on the funda- mentals of business value and, equally important, the basic funda- mental environment that will define long-term economic growth and the value of businesses in which we presently or will invest. Simply put, we are — and will continue to be — sensitive to existing investor con- cerns, yet we believe we should re- main much more focused on eco- nomic and investment fundamen- tals." |
| July 2000 (24 months prior to suit) | loss of (-13.7%) for the second quarter of 2000 | "We would be remiss, however, not to be mindful of the fact that we are long-term equity investors. We un- derstand our positions. We consis- tently evaluate and monitor them. We know what we own and why we own it, and we do not react solely to market volatility."<br><br>"Our long-term investment strategy continues to focus on owning good businesses that are attractively val- ued." |
| October 2000 (21 months prior to suit) | loss of (-2.1%) for the third quarter of 2000 | "We like what we own, and we are generally optimistic on the invest- ment outlook. Our investments are in good businesses, and represent very good values at what we believe are very attractive valuations."<br><br>"However, as fundamentally oriented longer-term investors, we believe that it is important to evaluate these risks with a sense of balanced per- spective." |

| Letter | Quarterly Results Reported | Relevant Text |
|---|---|---|
| January 2001 (18 months prior to suit) | loss of (-28.8%) for the fourth quarter. For the year, the Fund is reported to have finished down (-41.3%), compared with (-9.1%) for the S&P Index and (-39.3%) for the NASDAQ. | "Our basic discipline remains that of being longer-term investment oriented and seeking to generate capital appreciation through the ownership of interests in good businesses whose values, over time, we believe will increase at a well above average rate. Also, as always, our professional approach will be guided and determined by the effective utilization of fundamental research."<br><br>"It is also important to point out that my family and I are, and will continue to be, substantial investors in the Aspen strategy through a number of related entities. This certainly provides us with an ongoing and intense commitment to our long-term investment success and performance. In other words, in very real terms, we are your partners and coinvestors and we will continue to work together to build our long-term equity value." |
| April 2001 (15 months prior to suit) | loss of (-15.8%) for the first quarter of 2001. (At this point Plaintiffs had actual knowledge that they had lost more than 57% of their initial investment.) | "While we would and have maintained a moderate level of cash reserves, as longer-term oriented investors, we decided not to sell most of our holdings."<br><br>"We are certainly mindful of the near-term earnings risks associated with the current environment. However, as long-term investors confronting these risks, we have decided to either retain and/or add to most of our investments for the following reasons . . . ." |

At deposition Plaintiffs conceded that by April 2001 they knew that whatever the Fund's manager was doing he was not managing the portfolio in a manner that protected it from loss. Roth testified:

"Q.     By the time you received this letter, you knew that whatever he was doing, whether he was hedging or not hedging or selling short or not selling short, he was

not managing the portfolio in a manner which protected it from loss in a down market; correct?

"A.        Correct." (Roth 164:20-165:1, Gilman Dec. Ex. 3)

As noted below, Plaintiffs were aware of this fact as early as June 15, 2000.  Accordingly,

Plaintiffs' claims are time barred.

### 3.  The Semi-Annual Reports, Which Plaintiffs Admit Receiving, Also Put Plaintiffs On Notice of The Facts On Which They Now Base Their Claim

Short sales are described in the Confidential Offering Memorandum as the sale of a

security not yet owned: "[t]o effect a short sale, the Fund will borrow a security from a bro-

kerage firm or other permissible financial intermediary to make delivery to the buyer."

Brousseau Dec. Ex. D, p. 18.  In addition to the monthly statements and quarterly letters

which disclosed that the Fund was not avoiding substantial portfolio losses through the use

of short sales or otherwise, Plaintiffs were provided on a semi-annual basis with reports

which explicitly stated that the Fund engaged in only minimal, if any, short selling.  See

Plaintiffs' Response to Request for Admission No. 4 ("Plaintiffs admit they received . . . the

semi-annual reports"), Gilman Dec. Ex. 1, p. 2; Brousseau Dec. Exs. G, H and I:

| Period Ended | Brousseau Dec. | Text |
|---|---|---|
| 12/31/99 (Received 30 months prior to suit) | Ex. G, p. 16 | "During the period ended December 31, 1999, the Fund did not trade any forward or futures contracts, or sell securities not yet purchased . . . ." |
| 6/30/00 (Received 24 months prior to suit) | Ex. H, p. 9 | "During the period ended June 30, 2000, the Fund did not trade any forward or futures contracts, or sell securities not yet purchased . . . ." |
| 12/31/00 (Received 18 months prior to suit) | Ex. I, p. 9 | "Aggregate purchases and proceeds from sales of common stocks for the year ended December 31, 2000, amounted to $328,032,542 and $164,025,890, respectively.  Included in these amounts are pro- |

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L. L. P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

| Period Ended | Brousseau Dec. | Text |
|---|---|---|
| | | ceeds from securities sold, not yet purchased amounting to $135,072 . . . ." |

These statements reflect that there was no shorting of stock (or virtually none of it) for the entire period from inception of the Fund in 1999 through December 31, 2000. This information provided Plaintiffs with actual notice that short selling was not being employed by the Fund at all or, if so, only to a *de minimus* extent.[17]

Plaintiffs were also aware of the precise investments in the Fund's portfolio. The three semi-annual reports received by Plaintiffs prior to August 9, 2001 list each and every investment in the portfolio grouped by industry, showing the individual company invested in, and the market value of the investment percentages by industry. The industry concentration of which they now complain was made known to them periodically and well prior to a year before suit was filed. See Brousseau Dec. Ex. G, pp. 5-10 (as of 12/31/99); Id. Ex. H, pp. 10-17 (as of 6/30/00); Id. Ex. I, pp. 12-18 (as of 12/31/00).[18] Accordingly, Plaintiffs' claims are time barred.

### 4. Plaintiffs Received Two Offers to Purchase During The Relevant Time Period That Clearly Set Forth The Fund's Performance

Pursuant to the terms of the Confidential Offering Memorandum, prior to August 9, 2001 (one year prior to the filing of Plaintiffs' initial complaint), Plaintiffs received two of-

17 Nothing prevented Plaintiffs from reading these semi-annual reports. (Roth 125:2-125:9, Gilman Dec. Ex. 3) But Plaintiffs did not need to read them to know that there was either no or minimal shorting. The quarterly letters discussed above showed that the Aspen Fund was underperforming the NASDAQ and S&P 500 in a down market. This could not have occurred if shorting was significantly utilized. (Brousseau 22:14-25:2, Gilman Dec. Ex. 4)

18 Even at August 9, 2002 when Plaintiffs filed their first complaint, the industry concentration of which Plaintiffs complain was either non-existent or apparent to them. See Fund's June 30, 2002 financial statements (no industry accounted for 20% of Fund assets and only two exceeded 10%), Brousseau Dec. Ex. J.

fers to purchase pursuant to which they could have redeemed their Fund interests. See Plaintiffs' Response to Request for Admission No. 4 ("Plaintiffs admit they received . . . the requests for tender"), Gilman Dec. Ex. 1, p. 2. Each of those offers (Brousseau Dec. Exs. E and F) provided Plaintiffs with specific information on the value of an interest in the Fund purchased on January 1, 2000, when Plaintiffs purchased their interests in the Fund, showing the value of a $250,000 investment in the Fund.

| Date | Value of $250,000 Investment in Fund | Percent Decline | Brousseau Dec. |
|---|---|---|---|
| Nov. 13, 2000 (20 months prior to suit) | $173,900 | 31% | Ex. K, p. 6 |
| May 23, 2001 (14 months prior to suit) | $131,406 | 48% | Ex. L, p. 6 |

Accordingly, Plaintiffs' claims are time barred.

### 5. The December 4, 2000 Letter Sent to All Fund Members Further Put Plaintiffs On Notice That The Fund "Remains Fully Invested On The Long Side"

UBS sent a letter to all Fund investors on December 4, 2000 (20 months prior to suit) stating that the Fund "remains fully invested on the long side," i.e., that it continues to carry no short positions. (Brousseau 22:14-25:2, Gilman Dec. Ex. 4). The letter (Brousseau Dec. Ex. M) also expressly stated that the Fund was down 41.8% for the year through November 30, 2000, and down 44.6% for investors like Plaintiffs, who invested on January 1, 2000. Plaintiffs received it. See Doc. No. Roth 1256, Gilman Dec. Ex. 5; Roth 126:2-126:14, Gilman Dec. Ex. 3.

Upon being shown this letter at deposition, Plaintiffs conceded that at least by this time, 20 months prior to suit, they had recognized that the manner in which the Fund was

being invested and managed was not consistent with how they claim it was represented to them it would be invested and managed. (Roth 144:20-145:11, Gilman Dec. Ex. 3)  Significantly, the December 4th letter was received during a tender period.  Plaintiffs concede that they received the November 13, 2000 Offer to Purchase (see Gilman Dec. Ex. 1, p. 2) and thus admittedly had an opportunity to sell their interests in the Fund if they chose to do so. Plaintiffs did not avail themselves of this opportunity.  In fact, Plaintiffs did not file suit until August 9, 2002.  Accordingly, Plaintiffs' claims are time barred.

### 6. Plaintiffs Received Additional Adverse Information More Than 12 Months Prior to the Filing of the Complaint That Further Bars Their Claim

Plaintiffs not only received the foregoing documents which, as Plaintiffs admit, disclosed an "inconsistency" between what they claim was represented to them concerning how the Fund's portfolio would be invested and managed, but they had an arrangement with their individual UBS FA pursuant to which the FA would prepare a valuation of Plaintiffs' individual investments, including their interests in the Aspen Fund, approximately every other day.  (Roth 145:15-146:18, Gilman Dec. Ex. 3)  A copy of such a valuation is annexed to the Gilman Dec. as Ex. 6.  Plaintiffs did not ask his FA whether hedging or short sales were being used to protect the portfolio.  (Roth 165:18-165:23, Gilman Dec. Ex. 3)

These documents together with the quarterly letters and UBS monthly account statements, described above, led Plaintiffs to question as early as June 15, 2000 (less than six months after investing and 26 months prior to their filing suit) whether the Aspen Fund was a "sinking ship" and to inquire of their UBS FA whether they should "get out."  See June 15, 2000 email by J. Roth, Gilman Dec. Ex. 7; Roth 146:20-147:5, Gilman Dec. Ex. 3. "Any assurances by [defendant] that the industry would recover in the *future* could not stuff

the bullet back into the muzzle — those assurances could not excuse [plaintiff's] failure to inquire at that point whether it had been lied to in the *past*. And again that duty to inquire is what started the one-year time clock ticking well over a year before the Complaint was filed." Whirlpool Financial Corp. v. GN Holdings, Inc., 873 F. Supp. 111, 127 (N.D. Ill.) (emphasis in original) (rejecting plaintiffs' argument that assurances by defendant entitled plaintiff to an equitable tolling of statute of limitations period), aff'd, 67 F.3d 605, 610 n.3 (7th Cir. 1995) ("[T]he plain import of the Supreme Court's decision in Lampf, Pleva, Lip-kind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991), is that 'when knowledge or no-tice is required to start the statute of limitations running, there is no room for equitable *toll-ing*.'").

Finally, Plaintiffs allege that they purchased their interests in the Fund on January 2, 2000. (SAC ¶¶ 9-11) Plaintiffs allege that the Faye L. Roth Revocable Trust acquired its interest in the Fund by "assignment" as between Plaintiffs. (Id.) Mrs. Roth signed the In-vestor Application Form (described below) for her Revocable Trust in June 2001. Brous-seau Dec. Ex. E-4. For the Trust to be a proper plaintiff in this action, that security transfer must also have involved an express assignment of the § 12(a)(2) claim being asserted herein because such claims are personal to the initial purchaser and do not automatically follow a security upon later sale or transfer.[19] If Plaintiffs expressly assigned securities claims

---

19      "The majority of courts considering whether federal securities claims asserted under § 10(b) are auto-matically assignable have held that they are not. Because a § 10(b) claim is personal to the one actually de-frauded, these courts have found it inappropriate to permit a claim to travel with the security [absent an express assignment of claims]." Amerifirst Bank v. Bomar, 757 F. Supp. 1365, 1371 (S.D. Fla. 1991) (citations omit-ted). There is no reason for any different result with respect to claims under § 12(a)(2). See In re Nucorp En-ergy Securities Litigation, No. 82-1796-JLI(M), 1983 WL 1374, at *1 (S.D. Cal. Oct. 24, 1983) ("'While a security is of course transferred by its sale, the causes of action belonging to a prior holder do not pass with the transfer of the security.'"); see generally 10 Louis Loss & Joel Seligman, Securities Regulation 4669-75 (3d ed. 1996 and 2003 supp.).

among and between themselves in June 2001, it is a conclusive admission of Plaintiffs' actual knowledge of the existence of a claim more than 12 months before their initial complaint was filed on August 9, 2002.  Accordingly, Plaintiffs' claims are time barred.

## III.

## THE OFFERING OF INTERESTS IN THE FUND
## WAS EXEMPT FROM REGISTRATION UNDER THE 1933 ACT

As addressed in Part I above, § 12(a)(2) does not apply here because the offering of interests in the Fund was not registered under the 1933 Act.  Interests in the Fund were offered instead through a private placement. Whether or not the offering was properly exempt from registration under the 1933 Act, § 12(a)(2) simply does not apply.  In any event, UBS properly and in good faith conducted the offering of interests in the Aspen Fund pursuant to and in compliance with Rule 506 of SEC Regulation D, which provides a non-exclusive method of establishing exemption from registration under the 1933 Act and which allows the sale of interests to an unlimited number of "accredited investors."   This exemption precludes Plaintiffs' claim under § 12(a)(2).

**A.**     **The Caselaw of the 1970s and the Evolution of Regulation D**

Swenson v. Engelstad, 626 F.2d 421 (5th Cir. 1980), the principal case relied on by Plaintiffs (and cited by the Court in its July 1, 2003 Order), involved an offering made prior to 1975 and was consistent with the caselaw arising out of offerings in the 1970s.  At that time, there were no SEC Regulations setting forth objective criteria for private placement transactions exempt from registration under the 1933 Act and the courts were left to fashion in a generalized way what constituted a public versus private offering.  As outlined in Swenson, courts of the time looked generally to the size of the offering, the number of offerees

and the manner of solicitation, without fashioning bright-line rules and without providing specific guidance to the financial community.

The result was that the financial community was left with the risk of uncertainty in the offering and sale of unregistered securities. This attracted the attention of the United States Securities and Exchange Commission, which stepped in to provide guidance and clarification to the unregistered offering process. See Charles Johnson & Joseph McLaughlin, Corporate Finance and the Securities Laws 400, 402, 404-05 (2d ed. 1997):

> "Pressure from the financial community, which believed that the judicial trend [in the early 1970s] had impaired the ability of issuers to safely effect private placements, led the SEC in 1974 to adopt Rule 146, which was designed to provide a safe harbor for reliance on the private placement exemption. Rule 146 was designed to create greater certainty in the application of the Section 4(2) exemption . . . . Two years after the effectiveness of Rule 146, the SEC made a public request for empirical information regarding its operation . . . . In view of mixed comments regarding Rule 146, the SEC proposed in 1981 that the rule be superseded by a new Regulation D. Seven months later, Regulation D was adopted in substantially the form originally proposed. Since its adoption, Regulation D has been amended on several occasions to broaden its scope and improve its operation, and it continues to operate as an important safe harbor under Section 4(2)."

Since 1982, SEC Regulation D, 17 C.F.R. §§ 230.501-508, has codified criteria for securities offerings that are exempt from registration under § 4(2) of the 1933 Act. "Regulation D promulgated by the SEC provides a 'safe harbor' from the registration provisions of Section 5 of the 1933 Act. See 17 C.F.R. § 230.500-506. It is a series of six rules designated 501-506 [prior to 1989] that establish three separate, distinct exemptions from the registration requirements of the 1933 Act. Rules 501-503 set forth general definitions, terms and conditions. The exemptions are contained in Rules 504-506." Weprin v. Peterson, 736 F. Supp. 1124, 1130 (N.D. Ga. 1988). Further, Rule 508, added in 1989, excuses a failure to comply with the requirements of Rules 504-506, upon a showing that "[a] good faith and reasonable attempt was made to comply." See 17 C.F.R. § 230.508. "The Commission has

-28-

emphasized that Regulation D is a 'safe harbor.'" 3 Louis Loss & Joel Seligman, Securities Regulation 1406-07 (3d ed. 1989) (footnote omitted); see also SEC v. Tuchinsky, No. 89-6488-CivRyskamp, 1992 WL 226302, at *4 (S.D. Fla. June 29, 1992) (referring to "Regulation D's safe harbor").[20]

The purpose of these regulations is to provide objective criteria that can be relied upon by issuers in determining whether a securities offering is exempt from registration under the 1933 Act.[21] Compliance with Regulation D is an alternate route to establishing the exempt status of a securities offering. See 1 Thomas Hazen, Treatise on the Law of Securities Regulation, § 4.25 at 416 (4th ed. 2002):

> "As was the case with its predecessor (former Rule 146), Rule 506 is a 'safe harbor' rule. If an offering of securities fails to meet the requirements of Rule 506, the issuer may still qualify for a § 4(2) exemption if it conforms to requirements developed through cases and SEC releases."

Accord 3 Louis Loss & Joel Seligman, Securities Regulation 1407 (3d ed. 1989). Thus, in Mary S. Krech Trust v. Lakes Apartments, 642 F.2d 98, 102 (5th Cir. 1981), the Court of Appeals observed with respect to Rule 146 (the predecessor to Regulation D):

> "The Preliminary Notes to the Rule make it clear that the purpose is to provide objective standards upon which businessmen may rely in raising capital under the 4(2) exemption, 15 U.S.C. § 77d(2), but failure to satisfy all conditions of the Rule does not raise the presumption that the offering cannot be exempt."

---

[20]     See also Securities Industry Ass'n v. Board of Governors of the Federal Reserve System, 807 F.2d 1052, 1064 (D.C. Cir. 1986) (Regulation D operates as a "safe harbor" that "guarantees non-public offering status" to an offering of securities that complies with its terms).

[21]     See 3 Louis Loss & Joel Seligman, Securities Regulation 1389-1406 (3d ed. 1989) (tracing history of the promulgation of Regulation D and demonstrating that the purpose of Regulation D was to provide objective criteria for exemption from 1933 Act registration, and a safe harbor and thus certainty to the financial community).

Since its promulgation, Regulation D has become the security industry's polestar with respect to private placements and compliance with its provisions has created a legitimate expectation of exemption from registration.  With the certainty provided by Regulation D, unregistered private placements have grown to play a critically important role in this country's capital markets.  See Securities Industry Association, Securities Industry Fact Book 10 (2002) (noting that in the year 2001 there was over $581 **billion** raised in domestic U.S. private placements).

Regulation D thus provides a non-exclusive method of establishing an exemption from registration under the 1933 Act.  Regulation D was promulgated by the SEC pursuant to express rule-making authority delegated under § 3(b) and 4(2) of the 1933 Act.  It is thus to be given "controlling weight."  United States v. O'Hagan, 521 U.S. 642, 673 (1997).  In conducting the Aspen Fund offering, UBS relied on the safe harbor provided to all issuers through the SEC's promulgation of Regulation D.  Consequently, the issue of whether the offering of Fund interests was properly exempt from registration under the 1933 Act should be evaluated under the criteria set forth in that safe harbor.  UBS properly and in good faith conducted the offering of interests pursuant to and in compliance with Rule 506 of Regulation D and accordingly, Plaintiffs may not maintain a claim under § 12(a)(2).[22]

---

22    See In re Hayes, 271 F. Supp. 2d 1007 (§ 12(a)(2) claim dismissed where, as here, plaintiffs failed to allege that private, unregistered offering was distributed to unaccredited investors even though complaint alleged offering was widely distributed); AIG Global Securities Lending Corp. v. Banc of America Securities LLC, 254 F. Supp. 2d 373, 389 (S.D.N.Y. 2003) (§ 12(a)(2) claim dismissed where securities sold through private offerings made pursuant to Rule 144A, which provides an exemption from registration, and rejecting plaintiffs' argument that the offerings were "'public style' private offerings").

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536-1112

**B.     Rule 506 of Regulation D Creates a Safe Harbor for Offerings Exempt from Registration Under the 1933 Act Without Any Regard to Dollar Amount Or Number of Accredited Investors**

Rule 506 of Regulation D codifies criteria for securities offerings that are exempt from registration under § 4(2) of the 1933 Act without *any* dollar limitation on the size of the unregistered offering, and without *any* numerical limitation on the number of accredited investors who may purchase the securities sold without registration. As shown below, the offering and sales procedures with respect to the Aspen Fund were tailored to the criteria specified in Rule 506 of Regulation D and complied with such criteria in all material respects. See John C. Coffee, Re-engineering Corporate Disclosure: The Coming Debate Over Company Registration, 52 Wash. & Lee L. Rev. 1143, 1177 & n.94 (1995):

> "[A]n issuer who conducts a private placement in conformity with Regulation D . . . thereby avoids the prospect of potential liability under . . . Section 12[(a)](2) . . . . Until recently, private placements were subject to § 12[(a)](2). However, in [Gustafson], the Supreme Court found that § 12[(a)](2) applies only to the prospectus contained within the registration statement."

Rule 506(a) of Regulation D provides that offers and sales of securities by an issuer that satisfy the conditions of Rule 506(b) are exempt from registration "without regard to dollar amount of offering" and shall be deemed to be transactions not involving any public offering within the meaning of section 4(2) of the 1933 Act. See Rule 506(a), 17 C.F.R. § 230.506(a):

> "Exemption for limited offers and sales without regard to dollar amount of offering.
>
> "(a) Exemption. Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) of this section [§ 230.506] shall be deemed to be transactions not involving any public offering within the meaning of section 4(2) of the Act." (emphasis added)

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Under Rule 506 "there is no limitation with respect to aggregate offering price." 3 Louis

Loss & Joel Seligman, Securities Regulation 1413 (3d ed. 1989); see also Thomas S. Loo,

Securities Act Registration Exemptions, 1385 PLI/Corp. 169, 176 (2003) ("Rule 506 permits

the issuer to issue an unlimited dollar amount of securities during any twelve month pe-

riod.").

The "conditions to be met" of Rule 506(b) make clear that securities may be sold to

an unlimited number of "accredited investors" and up to 35 non-accredited investors, and that

each non-accredited investor, either alone or through a purchaser representative, must meet a

"sophistication" requirement. See Rule 506(b), 17 C.F.R. § 230.506(b):

> "(b) Conditions to be met.
>
> "(1) General conditions. To qualify for exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.
>
> "(2) Specific conditions.
>
> "(i) Limitation on number of purchasers. [T]he issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer in any offering under this section.
>
> "**Note:** See § 230.501(e) for the calculation of the number of purchasers and § 230.502(a) for what may or may not constitute an offering under this section.
>
> "(ii) Nature of purchasers. Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment . . . . "

The statutory "**Note**" referring to § 501(e) of Regulation D is critically important because § 501(e) excludes from the calculation of the number of permitted "purchasers" under Rule 506, any "accredited investor."[23]

Simply stated, under Rule 506 there is no limit to the number of "accredited investors" to whom a private placement may be sold. As noted by Rosalind Ramsey Tyson, Associate Regional Director for Regulation, SEC Pacific Regional Office, Rule 506 permits "*unlimited accredited investors.*" Rosalind Ramsey Tyson, Regulation D, 1363 PLI/Corp. 605, 622 (2003) (emphasis added). See also Charles Johnson & Joseph McLaughlin, Corporate Finance and the Securities Laws 409 (2d ed. 1997) (Rule 506 permits "offers and sales to a potentially indefinite number of persons so long as they are 'accredited investors.'"); Thomas S. Loo, Securities Act Registration Exemptions, 1385 PLI/Corp. 169, 176 (2003) (Rule 506 permits the issuer to sell to "an unlimited number of accredited investors").

An offering may be a "private" offering, exempt from the registration provisions of the 1933 Act and exempt from liability under § 12(a) of the Act if it has 5 or 500 or 5,000 investors, provided all but 35 of them are "accredited investors." The SEC has thus created an alternative to the criteria that existed at the time of the Swenson decision     an alternative that UBS chose and by which UBS, in good faith, conducted the offering of interests in the Fund. It is under the standards of Regulation D that the private placement of the Aspen Fund offering should be evaluated.

---

23     The term "accredited investor," in turn, is defined in § 501(a) of Regulation D. See Discussion in Part C & D, below. See also Charles Johnson & Joseph McLaughlin, Corporate Finance and the Securities Laws 409 (2d ed. 1997) ("The term 'accredited investor' is defined to include virtually every type of institution that participates in the private placement market, as well as individual investors with substantial income or a large net worth.").

Accordingly, Plaintiffs' emphasis here on the number of purchasers or the dollar size of the offering as purportedly rebutting the private nature of the offering of interests in the Fund is simply not relevant under Regulation D.  As demonstrated below, the offering of interests in the Aspen Fund complied with the safe harbor provisions of SEC Regulation D and was thus exempt from the registration provisions of the 1933 Act.

## C.    The Offering of Interests in the Fund Complied with Regulation D in All Material Respects

As shown below, the offering of interests in the Fund complied with Rule 506 in all material respects.

### 1.    UBS Required Compliance with Regulation D

UBS trained its financial advisors in the sale of interests in privately placed invest-ment funds through, inter alia, a booklet titled "Investment Executive Guide to Alternative Investments." (Brousseau Dec. Ex. A)[24]  This Guide (in effect at the time of the offering of interests in the Fund) explicitly lays out UBS's procedures for complying with the provi-sions of Regulation D.  The Guide sets forth in a block letter heading:

> "THE FOLLOWING GUIDELINES AND PROCEDURES HAVE BEEN PREPARED TO HELP ASSURE COMPLIANCE WITH U.S. AND FOR-EIGN SECURITIES LAW REQUIREMENTS IMPOSED UPON NON-PUBLIC OFFERINGS OF SECURITIES TO QUALIFIED INVESTORS AND MUST BE FOLLOWED BY INVESTMENT EXECUTIVES."

Page 12 of the Guide illustrates a 10-step process from the completion of a Client Eligibility Form to acceptance of an investor as a Member of the Fund: (1) Financial Advisor obtains and completes client eligibility form; (2) Branch Manager signs off on client eligibility form; (3) Financial Advisor faxes client eligibility form to Administrator; (4) Administrator

---

24    An Investment Executive is now known as a Financial Advisor or "FA."  In the past such persons were known as stock brokers.

mails client marketing kit to client; (5) Client completes Subscription Documents; (6) Client returns Subscription Documents and payment; (7) Financial Advisor reviews Subscription Documents; (8) Branch Manager signs off on Subscription Documents; (9) Financial Advisor mails in Subscription Documents; and (10) Client accepted. (Id. at 12)

The Guide expressly made it clear to the UBS Financial Advisors that "cold calling, prospecting by mail, or any form of general solicitation [was] strictly prohibited." (Id.) Further, the FA was to have a "substantive pre-existing relationship" with the customer, defined as a "prior relationship with the prospective investor that would enable [the FA] to be aware of and document the financial circumstances or sophistication of the prospective investor or is otherwise of some substance and duration." (Id.) These admonitions are repeated on p. 14 of the Guide: "No cold calling; no publicity; no general solicitation, advertising, prospecting by mail or talking to the press; no invitation seminars; market only to prospective investors with whom you have a substantive pre-existing relationship; confirm that appropriate **Branch Supervisory Personnel have approved the Client Eligibility Form** prior to the Form being forwarded to the Administrator; confirm that appropriate **Branch Supervisory Personnel have reviewed and acknowledged the Subscription Documents** prior to the documents being forwarded to the Alternative Investment Group." (bold in original) They were repeated in the Client Literature Request Form discussed below. These admonitions dovetail precisely with the provisions of Regulation D.[25]

---

25   These admonitions were communicated to FA's in other UBS internal documents.  (Brousseau Dec. Ex. B)

The USBPW Defendants are not aware of any respect in which the offering of interests in the Aspen Fund did not comply with Regulation D. (Brousseau 166:18-167:6, Gilman Dec. Ex. 4; Brousseau Dec. ¶¶ 3, 9, 15)

### 2.   There Is No Genuine Issue of Material Fact That UBS Complied With the Specific Provisions of Rule 506 of Regulation D

There is no genuine issue of material fact that UBS did in fact comply with the requirements of Regulation D. Plaintiffs have not alleged, and cannot show, otherwise.

The first requirement, under Rule 506(b)(1), is that the "general conditions" in Rules 501 and 502 must be satisfied. Rule 501 is the definitional section of Regulation D and contains, inter alia, the definition of "accredited investor" (Rule 501(a)) and the formula for calculating the number of "purchasers" of an offering (Rule 501(e)) which excludes "accredited investors" (Rule 501(e)(1)(iv)).

Rule 502 of Regulation D is entitled "General Conditions To be Met." Rule 502(a), dealing with "integrated" offerings (where an issuer makes several offerings in close temporal proximity), is not relevant here. Rule 502(b) pertains to "information requirements." As is clear from Rule 502(b)(1) and (b)(iv), there is no requirement that any information be provided to "accredited investors." Nevertheless, all of the prospective investors here were provided with the Confidential Offering Memorandum, the Investor Application Form and the other documents referred to in Plaintiffs' SAC as the "offering materials." (Brousseau 35:13-38:22, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 8)[26]

---

26    Because the Fund clearly disclosed that it was a start-up entity (Brousseau Dec. Ex. D, pp. 1, 3), most of the specific provisions of Rule 502(b) are not applicable to the Fund. However, because Mark Advisors advised other funds that were substantially similar to the PW Aspen Fund's expected investment program, the performance history of funds managed by the Mark Advisors L.L.C. and Mark Asset Management Fund were set forth in Appendix B of the PW Aspen Fund Confidential Offering Memorandum. (Id.) The Confidential Offering Memorandum, in great detail, described the Fund, the proposed Investment Program, included a de-

*Footnote continued on next page.*

Rule 502(c) pertains to limitations on the manner of offering, and provides that "neither the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to:

> "(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and
>
> "(2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising . . . . "

There was, in fact, no general solicitation or advertising concerning the offering of interests in the Fund. UBS did not publish any article, notice or other communication concerning offerings of interests in the Fund via any newspaper, magazine, television, radio or other media, and no investments were solicited at seminars whose attendees were invited by any general solicitation or advertising. (Brousseau 164:11-165:17, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 9) In addition to the Guidelines quoted above which expressly prohibited such activities, UBS's procedures required that there be a "substantive pre-existing relationship" between each person who was solicited with respect to private offerings and his or her UBS FA or other appropriate UBS personnel (such as a member of the UBS Alternative Investment Group). The existence of a pre-existing substantive relationship precludes the concept of a general solicitation. Each Confidential Offering Memorandum and Investor Application Form included in the investor packet was numbered and records were kept of their distribution by PFPC (a subsidiary of PNC Bank), the Fund's outside administrator. (Brousseau Dec. ¶ 10) Of UBS's 1.5 to 2 million clients, only 6,100 investor packets were distrib-

_Continued from previous page._

tailed discussion of the Risk Factors involved in investing in the Fund, emphasized restrictions on transfer of interests in the Fund, and set forth "Eligibility Criteria" consistent with the "accredited investor" provisions of Regulation D. (Id. at 1-4, 7, 13 and 40)

-37-

uted to prospective investors in the Fund.  (Brousseau 162:22-163:8; 38:23-40:6, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 10)

The requirement of a pre-existing substantive relationship between an offeree of a UBS private offering and a UBS FA or other appropriate UBS personnel is expressly set forth in the UBS Guidelines quoted above and in the Client Literature Request Form ("CLRF") (Brousseau Dec. Ex. C).  A CLRF was required for each offeree and expressly reminded the FA:  "Note:  General solicitation cold calling, prospecting by mail and advertising are strictly prohibited."  (Id. at 2) (emphasis in original)  For each prospective investor who was a UBS client for six months, the CLRF expressly required a representation that the UBS FA is "aware of and can document the prospective investor's net-worth, risk tolerance, investment objectives and experience . . . ."  (Id.) For all other prospective investors, the CLRF required the FA to expressly state the offeree's net worth, investment objectives and sophistication.  The Branch Office Manager or other appropriately licensed supervisory personnel was also required to sign this Form.  (Brousseau Dec. ¶ 7)  Only after this Form was received in good order and appropriately reviewed for completeness by PFPC, would the outside administrator for the Fund send an investor packet containing the Confidential Offering Memorandum, Investor Application Form, Manager Profile and other documents to the offeree.

Rule 502(d) pertains to limitations on resale or transfer and particularly the requirement of making the restrictions on resale or transfer clear to "purchasers." Clause II A of the Investor Application Form, Brousseau Dec. Ex. E, p. 3, contains a specific representation and covenant by each investor that he or she agreed not to sell or transfer his or her interest in the Fund and "must bear the economic risk of its investment for an indefinite period . . .

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536-1112

because . . . the Interest has not been registered under the Securities Act . . . ." The Investor Application Form, clause II E at p. 4, also contains a representation by each investor that he or she is aware of the restrictions on transferability, "can afford the complete loss of the investment and can afford to hold the investment for an indefinite period of time." The Confidential Offering Memorandum contains extensive disclosures concerning restrictions on resale and transferability. (Id. Ex. D, 2d unnumbered page, pp. 3, 7, 24, 40 and 42-45) The signature page of the Investor Application Form, Id. Ex. E, p. 13, requires the investor to initial that he or she is aware of the limitations on transferability and withdrawal.

Rule 506(b)(2), concerns the number of persons to whom an offering exempt from 1933 Act registration may be sold. It has two provisions: (i) a limitation on the number of "purchasers" (no more than 35) and (ii) the nature of "purchasers." Under Rule 501(e), "purchaser" does not include "accredited investors."

It was UBS's policy with respect to private offerings intended to be exempt from registration under the 1933 Act to sell interests only to potential investors who reasonably were believed to qualify as "accredited investors," and who thus would not be counted as "purchasers" under Rule 506. (Brousseau 165:18-167:6, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 3)[27] That policy was strictly adhered to with respect to the offering of interests in the Aspen Fund and the UBSPW Defendants are not aware of any investor in the Aspen Fund who was not an accredited investor. (Brousseau 170:20-171:12, Gilman Dec. Ex. 4)

---

[27]   Compare Mark v. FSC Securities Corp., 870 F.2d 331 (6th Cir. 1989), a pre-Rule 508 decision where the Court of Appeals reversed summary judgment in favor of the issuer, noting that Regulation D may have been satisfied if the issuer had introduced evidence that its policy was to sell only to accredited investors. Wright v. National Warranty Co., L.P., 953 F.2d 256 (6th Cir. 1992), also a Sixth Circuit decision, but decided after the promulgation of Rule 508, reflects the much more liberal policy of the SEC and the Courts where reasonable good faith attempts at compliance with Regulation D are shown.

The requirements concerning "accredited investors" under Regulation D pertain only to persons/entities that *actually acquire* interests in the offering and not to all prospective investors.  This was a change from Rule 146, predecessor of Regulation D.  The specific criteria of Rule 506 of Regulation D require satisfaction only as to each "purchaser" (defined to exclude "accredited investors").  See 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation, § 4.25, at 419-20 ("Rule 506 does not include any offeree qualification requirements such as those found in its predecessor or the cases interpreting the section 4(2) nonpublic offering exemption.").

The term "accredited investor" as defined in Rule 501(a) consists of persons or entities who it is "reasonably believed" at the time of the sale of the interests fall within eight categories. The "reasonably believed" language in the introduction portion of Rule 501(a) is important particularly in conjunction with the provisions of Rule 508, discussed below. What is required are "good faith reasonable attempts" to sell only to "accredited investors" based on "reasonable beliefs" concerning "accredited investor" status held at the time of sale.  The sale of interests in the Fund satisfied this criterion.

The principal provisions of the definition of "accredited investor" applicable here are Rules 501(a)(5)-(7):

> "(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

> "(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

"(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); . . . ."[28]

In addition, the SEC has issued an interpretive release which provides that revocable trusts and Individual Retirement Accounts are "accredited" if the grantor or participant is "accredited." See Securities Act Release No. 33-6455, question 30 (Mar. 3, 1983), Tab C hereto.[29]

Consistent with its policy to sell interests in exempt offerings only to "accredited investors," UBS made a reasonable attempt to assure itself, based on reasonable belief, that sales of interests in the Fund were made only to "accredited investors" in two separate ways. First, there is the offeree pre-selection and CLRF process described above and in ¶¶ 7-8 of the Brousseau Dec. See also Brousseau 34:10-36:12; 50:14-52:9, Gilman Dec. Ex. 4. Second, each investor was required to fill out and sign a detailed Investor Application Form, in which the text set forth the eligibility requirements for "accredited investor" status and required the investor to expressly represent that he or she met the relevant applicable requirement (for individuals, trusts, corporations, etc.). (Brousseau 170:20-171:12, Gilman Dec. Ex. 4; Brousseau Dec. Ex. E, p. 11, 14-15) By his or her signature on the Investor Application Form each investor expressly represented and covenanted that the information he or she had provided concerning his or her financial position was correct and complete. (Id. ¶ K, p. 5) The investor also represented and covenanted that he or she understood that the representations, warranties, etc. the investor made by signing the Form would be relied on by UBS in determining his or her "suitability" for investment in the Fund. (Id. ¶ I(3), p. 5) As

---

28    All eight categories are set forth in Tab B hereto.

29    The Interpretive Release makes clear that pass-through entities such as the Faye L. Roth Revocable Trust, the Jeffrey Roth IRA and the Jeffrey Roth Retirement Plan are treated as individuals for Regulation D purposes.

noted below, the courts permit issuers to rely on these representations by investors and have dismissed complaints challenging the exempt status of offerings under the 1933 Act where such representations were made.  See Part III.D below.   But that is not all.  The UBS Financial Advisor having the pre-existing substantive relationship with the prospective investor as well as the Financial Advisor's Branch Manager or other appropriately licensed supervisory personnel were also required to sign the Investor Application Form signifying their reasonable belief as to the "accredited investor" status of the applicant.  (Brousseau 176:14-176:25, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 12 and Ex. E, p. 13)

Consistent with UBS's policy, each of the Investor Application Forms with respect to the offering of interests in the Fund was reviewed by the UBS Alternative Investment Group for completeness, including the presence of all required signatures, so that only persons or entities that were reasonably believed to satisfy the "accredited investor" criteria would acquire interests in the Fund.  (Brousseau 165:18-166:17, Gilman Dec. Ex. 4)   Only after this review were investors admitted as investors in the Fund.  (Id.)[30]  A total of 1,150 investors, including a limited number of transferees, purchased interests in the Fund.  (Brousseau Dec. ¶ 12)[31]  Copies of 99.7% of the client eligibility and signature pages of the Investor Application Forms (i.e., all but four of the 1,150 investors in the Fund) have been

30      While the vast majority of members of the Fund were UBS clients, there is nothing in Regulation D or the Fund literature that precludes interests being offered to non-clients who were reasonably believed to satisfy the "accredited investor" criteria.  All such persons were subject to the CLRF process and were required to sign the Investor Application Form.  (Brousseau 51:21-52:9; 170:14-171:12, Gilman Dec. Ex. 4; Brousseau Dec. ¶¶ 7-8)

31      During the relevant time frame, between 1.5 and 2 million investors (including both individual households and businesses) maintained accounts with UBS.  (Brousseau 162:22-163:8, Gilman Dec. Ex. 4)

produced to Plaintiffs' counsel and are proffered to the Court as part of the record in this motion.[32]

There is no suggestion that interests in the Fund were sold to any non-accredited investors.  In the event that, notwithstanding the foregoing procedures, somehow an interest in the Fund was sold to an investor who was not an "accredited investor," and who was thus a "purchaser" under Rule 506, the procedures employed were intended to provide a "reasonable belief," in accordance with the requirements of Rule 506(b)(2)(ii), that the purchaser had sufficient "knowledge and experience in business and financial matters to be capable of evaluating the risks of the prospective investment."[33]  This was accomplished through the pre-selection and CLRF process described above, and ¶¶ 7 and 8 of the Brousseau Dec., as well as through furnishing every offeree with a copy of the Confidential Offering Memorandum and the Investor Application Form.  (Brousseau 35:13-38:5, Gilman Dec. Ex. 4; Brousseau Dec. ¶ 8)  The Investor Application Form contained a representation by each investor that he/she has "received, carefully read and understands" the Confidential Offering Memorandum (Brousseau Dec. Ex. D, p. 3), and that he/she "has such knowledge and experience in financial and business matters" that he/she "is capable of evaluating the merits and risks

--------------------------------------------------

32      Mark Advisors, L.L.C. and PW Fund Advisor, L.L.C. (n/k/a UBS Fund Advisor, L.L.C.) were invested in the Aspen Fund L.L.C. through their investments in P.W. Aspen Management, L.L.C. (the managing member of the Aspen Fund, L.L.C.) and were not required to submit Investor Application Forms.  (Brousseau Dec. ¶ 13)  With regard to the remaining four investors, UBS has reason to believe that such investors were accredited investors.  Moreover, Plaintiffs do not allege in the SAC that interests were sold to any unaccredited investor.  Nonetheless, even if all four signature pages yet to be located represented non-accredited investors (a statistical improbability), four is less than 35 and Rule 502(c) is still satisfied.

33      Under Rule 506(b)(2)(ii), a "purchaser" who is not an "accredited investor" must satisfy the following criteria:

        "(ii) Nature of purchasers.  Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description."

of [his/her] investments in the Fund and is able to bear such risks . . . ." (Id.)  If these representations were not true, then the prospective investor should not have signed the Investor Application Form and should be precluded from asserting a claim for relief.  See Part III.D below.

On the basis of the foregoing, there can be no genuine issue as to any material fact concerning compliance with Rule 506(b)(2) — limitation on the number of "purchasers" — in connection with the offering of interests in the Fund.  Moreover, as discussed below, Rule 508, promulgated in 1989, requires only that "[a] good faith and reasonable attempt . . . [be] made to comply with all applicable terms, conditions and requirements of . . . § 230.506" (provided there are no more than 35 "purchasers" and there is no general solicitation).

Finally, Rule 503 of Regulation D requires that five copies of a notice on Form D be filed with the Commission no later than five days after the first sale of securities, one copy of which shall be manually signed by a person authorized by the issuer.  This was done.  (Brousseau Dec. Ex. N)  Thus, each and every requirement set forth in Regulation D was satisfied and accordingly the offering of interests in the Fund was exempt from registration under the 1933 Act.

## D.  Plaintiffs' Representations of Their "Accredited Investor" Status Precludes Their Claim

The Confidential Offering Memorandum here specifically disclosed that the interests in the Fund were not registered under the 1933 Act.  (Brousseau Dec. Ex. D, inside cover)  To become investors in the Fund, Plaintiffs were each required to submit a signed Investor Application (Brousseau Dec. Ex. E and E-1 - E-4), wherein they each acknowledged, among other things:

Tew Cardenas Rebak Kellogg Lehman DeMaria Tague Raymond & Levine, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305 536 1112

o   that the interest in the Fund being purchased "has not been registered under the [1933] Act" (Brousseau Dec. Ex. E, p. 3);

o   that each investor "received, carefully read and understands the [Confidential Offering Memorandum] outlining, among other things, the organization and investment objective and policies of, and the risks and expenses of an investment in, the Fund" (Id.);

o   that "[i]n making its decision to purchase the Interest, [he/she/it] has relied solely upon its own independent investigations" (Id.);

o   that they have "not reproduced, duplicated or delivered the [Confidential Offering Memorandum] to any other person . . . ." (Id.);

o   that they have "such knowledge and experience in financial and business matters that the Undersigned is capable of evaluating the merits and risks of the Undersigned's investment in the Fund . . .[and] [t]he Undersigned has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of an Interest, and has determined that the Interest is a suitable investment for the Undersigned." (Id.);

o   that they were "aware of the limited provisions for transferability and withdrawal . . . ." from the Fund (Id. at 4, 13);

o   that they were "acquiring the Interest for its own account, for investment purposes only and not with a view toward distributing or reselling the Interest in whole or in part" (Id. at 4); and

o   **that they were each "an 'accredited investor' under Regulation D . . . as set forth on Schedule 1 hereto"** (Id. at 11, 14-16) (emphasis added).

Plaintiffs were each told to "[r]ead Schedule 1 carefully and check the appropriate [accredited investor representation] box." (Brousseau Dec. Ex. E, p.11)  The referenced Schedule 1 is a three-page discussion of "accredited investor status." (Id. at 14-16)  Plaintiffs each agreed "to indemnify and hold harmless the Fund, the Manager, and each Director and officer of the Fund, the Placement Agent, and each of their affiliates . . . against any and all loss [etc.] arising out of or based upon (i) any false representation or warranty made by [Plaintiffs] . . . ." (Id. at 6)  Plaintiffs are bound by these representations.

Courts routinely dismiss claims such as those alleged here because of similar plaintiff representations of accredited investor status.  Thus, in <u>Wright</u> v. <u>National Warranty Co.</u>,

953 F.2d 256 (6th Cir. 1992), the court upheld the granting of summary judgment under Rule 505 of Regulation D which pertains to offerings not exceeding $5,000,000. Except for the size of the offering, the requirements of Rule 505 are the same as those under Rule 506 which is the portion of Regulation D relied on in connection with the offering of interests in the Fund.[34] The Wright Court emphasized the plaintiffs' representations that they were "accredited investors" as that is defined in Regulation D.[35]

In Goodwin Properties, LLC v. Acadia Group, Inc., No. 01-49-P-C, 2001 WL 800064, at *7 (D. Me. July 17, 2001), the Magistrate Judge recommended dismissal of a complaint where, as here, the offering documents annexed to the pleadings showed that the offering was intended to be exempt, relying, in part, on the plaintiffs' representation that they satisfied the "accredited investor" criteria, which the Court would not permit the plaintiffs to disavow. By Order entered September 5, 2001, the District Court affirmed the Magistrate Judge's Report and Recommendation and dismissed the action.

In Noz v. Value Investing Partners, Inc., 1999 WL 387400, at *1 (S.D.N.Y. June 14, 1999), the court dismissed a § 12(a)(1) claim where the investors acknowledged that they were "accredited investors" as defined, where the subscription agreement specifically warned that the securities offered were "non-marketable," "restricted" and may not yield a return and where the investor represented "that he has the ability to bear the economic risk

---

34     The discussion of § 12(a)(2) in Wright predates the Supreme Court's decision in Gustafson and no longer constitutes good law.

35     Here, any alleged failure to comply with the "accredited investor" requirements of Rule 506 could not have pertained to a term or condition directly intended particularly to protect Plaintiffs under Rule 508(a)(1). Plaintiffs were among 1,150 Members of the Fund and who, with knowledge of the applicable criteria, represented that they met the "accredited investor" requirements of Regulation D. Investor Applications Forms signed by the named Plaintiffs here, containing their specific representations that they satisfied the "accredited investor" criteria are submitted as Ex. E-1 - E-4 to the Brousseau Dec. Plaintiffs have not, thus far, contended that their own representations were false. But any such contention would be "destructive of their claim." See

*Footnote continued on next page.*

of this investment and can afford the complete loss of the purchase price." The court also emphasized the investors' acknowledgment that the issuer's reliance on the availability of the exemption from registration was based, in part, on the investors' representations. Plaintiffs' representations were "destructive of their claim." Id. So too here.

### E.   Rule 508 Provides Exempt Status Where There Is a "Good Faith and Reasonable Attempt" to Comply with the "Accredited Investor" Provisions of Regulation D

As demonstrated above, interests in the Aspen Fund were sold to "accredited investors" in compliance with SEC Regulation D. Plaintiffs have not alleged anything to the contrary. Moreover, even if Plaintiffs did so allege, the policies and procedures instituted and followed by UBS with the intent to so comply would protect the Fund's exempt status. Rule 508 provides exempt status to an issuer where there is a "good faith and reasonable attempt" to comply with the "accredited investor" provisions of Regulation D.

Early decisions involving claimed exemptions from the registration requirements of the 1933 Act based on compliance with Rule 146 and Regulation D required "strict compliance," i.e., it was held that the requirements of Regulation D had to be satisfied as to each purchaser.[16] For example, in Weprin v. Peterson, the court held that the offering of securities was exempt from registration because it satisfied the criteria under Ralston Purina[17] and Swenson. The court declined, however, to find the offering exempt under Regulation D even though it agreed that defendants had "substantially complied with Regulation D" because "it appears that strict compliance is required." Weprin, 736 F. Supp. at 1130. The

_Continued from previous page._

Noz, 1999 WL 387400, at *1.

36      As noted above, one way in which Regulation D is different than its Rule 146 predecessor is that the provisions of Rule 146 applied to each "offeree."

next year, "Rule 508 was adopted to prevent insignificant, isolated or minor deviations from the requirements of regulation [D] from destroying the exemption." Louis Loss & Joel Seligman, Fundamentals of Securities Regulation, 369 (4th ed. 2001). See also Charles Johnson & Joseph McLaughlin, Corporate Finance and the Securities Laws 418 (2d ed. 1997) (Rule 508 "provides in effect that minor failures to comply with the technical requirements of Regulation D will not necessarily cause a loss of the exemption.").

Rule 508 of Regulation D, which requires only a "good faith and reasonable attempt" to comply with Regulation D (subject to certain provisions that must be complied with), became effective in 1989 and provides:

> "(a)   A failure to comply with a term, condition or requirement of § 230.504, § 230.505 or § 230.506 will not result in the loss of the exemption from the requirements of section 5 of the Act for any offer or sale to a particular individual or entity, if the person relying on the exemption shows:
>
> "(1)   The failure to comply did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity; and
>
> "(2)   The failure to comply was insignificant with respect to the offering as a whole, provided that any failure to comply with paragraph (c) of § 230.502 [general solicitation], paragraph (b)(2) of § 230.504, paragraphs (b)(2)(i) and (ii) of § 230.505 and paragraph (b)(2)(i) of § 230.506 [number of "purchasers"] shall be deemed to be significant to the offering as a whole; and
>
> "(3)   A good faith and reasonable attempt was made to comply with all applicable terms, conditions and requirements of § 230.504, § 230.505 or § 230.506."

As explained in 3 Harold S. Bloomenthal & Samuel Wolff, Securities and Federal Corporate Law § 3:30, at 3-42 (2d ed. 2003):

---

*Continued from previous page.*

37      SEC v. Ralston Purina Co., 346 U.S. 119 (1953).

TEW CARDENAS REBAK KELLOGG LEHMAN DEMARIA TAGUE RAYMOND & LEVINE, L. L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

"Prior to the 1989 amendments, the Regulation D exemption required compliance with all the terms and conditions of Rules 501 through 503, and of the specific Rule (504, 505, or 506) upon which reliance is being placed.

\*     \*     \*

"Rule 508, as adopted, provides that failure to comply with a condition or requirement of the rule will not result in a loss of the exemption as to any specific offer or sale if the person relying on the exemption demonstrates that (1) that condition or requirement was not directly intended to protect the complaining party, (2) the failure to comply was 'insignificant to the offering as a whole,' and (3) a good faith and reasonable attempt was made to comply. Specifically, Rule 508 provides that failure to comply with the dollar limitations of Rules 504 and 505; the number of purchasers limitations of Rules 505 and 506, and the limitations, to the extent applicable, on general solicitations or general advertising, 'shall be deemed to be significant to the offering as a whole.' Rule 508 also provides that nothing in the Rule excuses the failure to comply in an action brought by the Commission." (footnotes omitted)

7A J. William Hicks, Exempted Transactions Under the Securities Act of 1933 § 7:34, at 7-37 (2003), a standard practitioner's guide, states:

"The Commission's adoption of Rules 507 and 508 represents a major change in Regulation D.

\*     \*     \*

"Rule 508 is even more dramatic. It provides that an exemption from the Section 5 requirements will be available despite failure to comply with certain conditions of Regulation D. This safe harbor rule tests the significance of a deviation with respect to both the offering as a whole and an offer or sale to a particular person."

In sum, UBS properly and in good faith relied on and conducted the Fund offering pursuant to and in compliance with Regulation D. Compliance with Regulation D, an alternative method of establishing an exemption from registration under the 1933 Act, precludes Plaintiffs' § 12(a)(2) claim.

## CONCLUSION

Plaintiffs sued only under § 12(a)(2) of the 1933 Act. Section 12(a)(2) applies to the sale of securities in offerings that are registered under the 1933 Act. The offering at issue

was not so registered.  If § 12(a)(2) were applicable to the securities at issue, Plaintiffs' claims would be time barred.  Assuming arguendo that § 12(a)(2) could apply to an unregistered offering, the interests in the Fund were exempt from registration under Regulation D. Section 12(a)(2) does not apply.  Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

**CAHILL GORDON & REINDEL LLP**
Charles A. Gilman
Leonard A. Spivak
Karen I. Kaiser
Tammy L. Roy
80 Pine Street
New York, New York  10005
(212) 701-3000 Telephone
(212) 269-5420 Facsimile

**TEW CARDENAS, L.L.P.**
Counsel for UBSPW Defendants
Miami Center, 26th Floor
201 South Biscayne Boulevard
Miami, Florida  33131-4336
(305) 536-1112 Telephone
(305) 536-1116 Facsimile

By: _____
Thomas Tew
Florida Bar No. 098160
John M. Quaranta
Florida Bar No. 940641
Daniel S. Newman
Florida Bar No. 0962767

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was served via facsimile (Motion only) and FedEx hard copy of motion along with exhibits and appendix on this 8th day of December, 2003 on: **Curtis Carlson, Esq.**, Payton & Carlson, P.A., Counsel for Roth, 1200 SunTrust International Center, One Southeast Third Avenue, Miami, Florida 33131; **Jonathan L. Greenblatt, Esq.**, Sherman and Sterling, Counsel for Mark Advisors, LLC, 801 Pennsylvania Avenue, N.W., Suite 900, Washington, D.C. 20004-2604; and **Brian F. Spector, Esq.**, Kenny Nachwalter Seymour Arnold Critchlow & Spector, P.A., Counsel for Mark Advisors, LLC, Miami Center, Suite 1100, 201 South Biscayne Boulevard, Miami, Florida 33131-4327.

_____
Daniel S. Newman



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0065 |
| Expires: | February 28, 2006 |
| Estimated average burden hours per response . . . 432.00 | |

# FORM S-1

## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

_____

(Exact name of registrant as specified in its charter)

_____

(State or other jurisdiction of incorporation or organization)

_____

(Primary Standard Industrial Classification Code Number)

_____

(I.R.S. Employer Identification Number)

_____

(Address, including zip code, and telephone number,
including area code, of registrant's principal executive offices)

_____

(Name, address, including zip code, and telephone number,
including area code, of agent for service)

_____

(Approximate date of commencement of proposed sale to the public)

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering ☐

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

SEC 870 (10-03)

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

**Calculation of Registration Fee**

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| | | | | |

Note:    Specific details relating to the fee calculation shall be furnished in notes to the table, including references to provisions of Rule 457 (§230.457 of this chapter) relied upon, if the basis of the calculation is not otherwise evident from the information presented in the table.  If the filing fee is calculated pursuant to Rule 457(o) under the Securities Act, only the title of the class of securities to be registered, the proposed maximum aggregate offering price for that class of securities and the amount of registration fee need to appear in the Calculation of Registration Fee table.  Any difference between the dollar amount of securities registered for such offerings and the dollar amount of securities sold may be carried forward on a future registration statement pursuant to Rule 429 under the Securities Act.

## GENERAL INSTRUCTIONS

**I.    Eligibility Requirements for Use of Form S-1**

This Form shall be used for the registration under the Securities Act of 1933 ("Securities Act") of securities of all registrants for which no other form is authorized or prescribed, except that this Form shall not be used for securities of foreign governments or political subdivisions thereof.

**II.   Application of General Rules and Regulations**

A.   Attention is directed to the General Rules and Regulations under the Securities Act, particularly those comprising Regulation C (17 CFR 230.400 to 230.494) thereunder. That Regulation contains general requirements regarding the preparation and filing of the registration statement.

B.   Attention is directed to Regulation S-K (17 CFR Part 229) for the requirements applicable to the content of the non-financial statement portions of registration statements under the Securities Act. Where this Form directs the registrant to furnish information required by Regulation S-K and the item of Regulation S-K so provides, information need only be furnished to the extent appropriate.

**III.  Exchange Offers**

If any of the securities being registered are to be offered in exchange for securities of any other issuer, the prospectus shall also include the information which would be required by Item 11 if the securities of such other issuer were registered on this Form. There shall also be included the information concerning such securities of such other issuer which would be called for by Item 9 if such securities were being registered. In connection with this instruction, reference is made to Rule 409.

**IV.  Roll-up Transactions**

If the securities to be registered on this Form will be issued in a roll-up transaction as defined in Item 901(c) of Regulation S-K (17 CFR 229.901(c)), attention is directed to the requirements of Form S-4 applicable to roll-up transactions, including, but not limited to, General Instruction I.

**V.   Registration of Additional Securities**

With respect to the registration of additional securities for an offering pursuant to Rule 462(b) under the Securities Act, the registrant may file a registration statement consisting only of the following: the facing page; a statement that the contents of the earlier registration statement, identified by file number, are incorporated by reference; required opinions and consents; the signature page; and any price-related information omitted from the earlier registration statement in reliance on Rule 430A that the

2

registrant chooses to include in the new registration statement. The information contained in such a Rule 462(b) registration statement shall be deemed to be a part of the earlier registration statement as of the date of effectiveness of the Rule 462(b) registration statement. Any opinion or consent required in the Rule 462(b) registration statement may be incorporated by reference from the earlier registration statement with respect to the offering, if: (i) such opinion or consent expressly provides for such incorporation; and (ii) such opinion relates to the securities registered pursuant to Rule 462(b). *See* Rule 411(c) and Rule 439(b) under the Securities Act.

## PART I—INFORMATION REQUIRED IN PROSPECTUS

**Item 1.    Forepart of the Registration Statement and Outside Front Cover Page of Prospectus.**

Set forth in the forepart of the registration statement and on the outside front cover page of the prospectus the information required by Item 501 of Regulation S-K (§229.501 of this chapter).

**Item 2.    Inside Front and Outside Back Cover Pages of Prospectus.**

Set forth on the inside front cover page of the prospectus or, where permitted, on the outside back cover page, the information required by Item 502 of Regulation S-K (§229.502 of this chapter).

**Item 3.    Summary Information, Risk Factors and Ratio of Earnings to Fixed Charges.**

Furnish the information required by Item 503 of Regulation S-K (§229.503 of this chapter).

**Item 4.    Use of Proceeds.**

Furnish the information required by Item 504 of Regulation S-K (§229.504 of this chapter).

**Item 5.    Determination of Offering Price.**

Furnish the information required by Item 505 of Regulation S-K (§229.505 of this chapter).

**Item 6.    Dilution.**

Furnish the information required by Item 506 of Regulation S-K (§229.506 of this chapter).

**Item 7.    Selling Security Holders.**

Furnish the information required by Item 507 of Regulation S-K (§229.507 of this chapter).

**Item 8.    Plan of Distribution.**

Furnish the information required by Item 508 of Regulation S-K (§229.508 of this chapter).

**Item 9.    Description of Securities to be Registered.**

Furnish the information required by Item 202 of Regulation S-K (§229.202 of this chapter).

**Item 10.   Interests of Named Experts and Counsel.**

Furnish the information required by Item 509 of Regulation S-K (§229.509 of this chapter).

**Item 11.   Information with Respect to the Registrant.**

Furnish the following information with respect to the registrant:

(a)   Information required by Item 101 of Regulation S-K (§229.101 of this chapter), description of business;

(b)   Information required by Item 102 of Regulation S-K (§229.102 of this chapter), description of property;

(c)   Information required by Item 103 of Regulation S-K (§229.103 of this chapter), legal proceedings;

(d) Where common equity securities are being offered, information required by Item 201 of Regulation S-K (§229.201 of this chapter), market price of and dividends on the registrant's common equity and related stockholder matters;

(e) Financial statements meeting the requirements of Regulation S-X (17 CFR Part 210) (Schedules required under Regulation S-X shall be filed as "Financial Statement Schedules" pursuant to Item 15, Exhibits and Financial Statement Schedules, of this Form), as well as any financial information required by Rule 3-05 and Article 11 of Regulation S-X;

(f) Information required by Item 301 of Regulation S-K (§229.301 of this chapter), selected financial data;

(g) Information required by Item 302 of Regulation S-K (§229.302 of this chapter), supplementary financial in formation;

(h) Information required by Item 303 of Regulation S-K (§229.303 of this chapter), management's discussion and analysis of financial condition and results of operations;

(i) Information required by Item 304 of Regulation S-K (§229.304 of this chapter), changes in and disagreements with accountants on accounting and financial disclosure;

(j) Information required by Item 305 of Regulation S-K (§229.305 of this chapter), quantitative and qualitative disclosures about market risk.

(k) Information required by Item 401 of Regulation S-K (§229.401 of this chapter), directors and executive officers;

(l) Information required by Item 402 of Regulation S-K (§229.402 of this chapter), executive compensation;

(m) Information required by Item 403 of Regulation S-K (§229.403 of this chapter), security ownership of certain beneficial owners and management; and

(n) Information required by Item 404 of Regulation S-K (§229.404 of this chapter), certain relationships and related transactions.

**Item 12. Disclosure of Commission Position on Indemnification for Securities Act Liabilities.**

Furnish the information required by Item 510 of Regulation S-K (§229.510 of this chapter).

## PART II—INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 13. Other Expenses of Issuance and Distribution.**

Furnish the information required by Item 511 of Regulation S-K (§229.511 of this chapter).

**Item 14. Indemnification of Directors and Officers.**

Furnish the information required by Item 702 of Regulation S-X (§229.702 of this chapter).

**Item 15. Recent Sales of Unregistered Securities.**

Furnish the information required by Item 701 of Regulation S-K (§229.701 of this chapter).

**Item 16. Exhibits and Financial Statement Schedules.**

(a) Subject to the rules regarding incorporation by reference, furnish the exhibits as required by Item 601 of Regulation S-K (§229.601 of this chapter).

(b) Furnish the financial statement schedules required by Regulation S-X (17 CFR Part 210) and Item 11(e) of this Form. These schedules shall be lettered or numbered in the manner described for exhibits in paragraph (a).

**Item 17. Undertakings.**

Furnish the undertakings required by Item 312 of Regulation S-K (§229.512 of this chapter).

4

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of _____, State of _____ _____, on _____ _____, 20___.

_____
(Registrant)

_____
By (Signature and Title)

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

_____
(Signature)

_____
(Title)

_____
(Date)

Instructions.

1.  The registration statement shall be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer and by at least a majority of the board of directors or persons performing similar functions. If the registrant is a foreign person, the registration statement shall also be signed by its authorized representative in the United States. Where the registrant is a limited partnership, the registration statement shall be signed by a majority of the board of directors of any corporate general partner signing the registration statement.

2.  The name of each person who signs the registration statement shall be typed or printed beneath his signature. Any person who occupies more than one of the specified positions shall indicate each capacity in which he signs the registration statement. Attention is directed to Rule 402 concerning manual signatures and to Item 601 of Regulation S-K concerning signatures pursuant to powers of attorney.

### INSTRUCTIONS AS TO SUMMARY PROSPECTUSES

1.  A summary prospectus used pursuant to Rule 431 (§230.431 of this chapter), shall at the time of its use contain much of the information specified below as is then included in the registration statement. All other information and documents contained in the registration statement may be omitted.

    (a)  As to Item 1, the aggregate offering price to the public, the aggregate underwriting discounts and commissions and the offering price per unit to the public;

    (b)  As to Item 4, a brief statement of the principal purposes for which the proceeds are to be used;

    (c)  As to Item 7, a statement as to the amount of the offering, if any, to be made for the account of security holders;

    (d)  As to Item 8, the name of the managing underwriter or underwriters and a brief statement as to the nature of the underwriter's obligation to take the securities; if any securities to be registered are to be offered otherwise than through underwriters, a brief statement as to the manner of distribution; and, if securities are to be offered otherwise than for cash, a brief statement as to the general purposes of the distribution, the basis upon which the securities are to be offered, the amount of compensation and other expenses of distribution, and by whom they are to be borne;

    (e)  As to Item 9, a brief statement as to dividend rights, voting rights, conversion rights, interest, maturity;

    (f)  As to Item 11, a brief statement of the general character of the business done and intended to be done, the selected financial data (Item 301 of Regulation S-K (§229.301 of this chapter)) and a brief statement of the nature and present status of any material pending legal proceedings; and

(g)   A tabular presentation of notes payable, long term debt, deferred credits, minority interests, if material, and the equity section of the latest balance sheet filed, as may be appropriate.

2.   The summary prospectus shall not contain a summary or condensation of any other required financial information except as provided above.

3.   Where securities being registered are to be offered in exchange for securities of any other issuer, the summary prospectus also shall contain that information as to Items 9 and 11 specified in paragraphs (e) and (f) above which would be required if the securities of such other issuer were registered on this Form.

4.   The Commission may, upon the request of the registrant, and where consistent with the protection of investors, permit the omission of any of the information herein required or the furnishing in substitution therefor of appropriate information of comparable character. The Commission may also require the inclusion of other information in addition to, or in substitution for, the information herein required in any case where such information is necessary or appropriate for the protection of investors.

B

17 CFR S 230.501
17 C.F.R. § 230.501
<KeyCite Citations>

**Page   1**

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS. SECURITIES ACT OF 1933
REGULATION D--RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.501 Definitions and terms used in
Regulation D.

As used in Regulation D (§§ 230.501-230.508),
the following terms shall have the meaning
indicated:

(a) Accredited investor. Accredited investor
shall mean any person who comes within any
of the following categories, or who the issuer
reasonably believes comes within any of the
following categories, at the time of the sale of
the securities to that person:

(1) Any bank as defined in section 3(a)(2) of
the Act, or any savings and loan association or
other institution as defined in section
3(a)(5)(A) whether acting in its
individual or fiduciary capacity; any broker or
dealer registered pursuant to section 15 of the
Securities Exchange Act of 1934; any
insurance company as defined in section 2(13)
of the Act; any investment company
registered under the Investment Company Act
of 1940 or a business development company as
defined in section 2(a)(48) of that Act; any
Small Business Investment Company licensed
by the U.S. Small Business Administration
under section 301(c) or (d) of the Small
Business Investment Act of 1958; any plan
established and maintained by a state, its
political subdivisions, or any agency or
instrumentality of a state or its political
subdivisions, for the benefit of its employees,
if such plan has total assets in excess of
$5,000,000; any employee benefit plan within

the meaning of the Employee Retirement
Income Security Act of 1974 if the investment
decision is made by a plan fiduciary, as
defined in section 3(21) of such act, which is
either a bank, savings and loan association,
insurance company, or registered investment
adviser, or if the employee benefit plan has
total assets in excess of $5,000,000 or, if a self-
directed plan, with investment decisions made
solely by persons that are accredited investors;

(2) Any private business development
company as defined in section 202(a)(22) of the
Investment Advisers Act of 1940;

(3) Any organization described in section
501(c)(3) of the Internal Revenue Code,
corporation, Massachusetts or similar business
trust, or partnership, not formed for the
specific purpose of acquiring the securities
offered, with total assets in excess of
$5,000,000;

(4) Any director, executive officer, or general
partner of the issuer of the securities being
offered or sold, or any director, executive
officer, or general partner of a general partner
of that issuer;

(5) Any natural person whose individual net
worth, or joint net worth with that person's
spouse, at the time of his purchase exceeds
$1,000,000;

(6) Any natural person who had an individual
income in excess of $200,000 in each of the
two most recent years or joint income with
that person's spouse in excess of $300,000 in
each of those years and has a reasonable
expectation of reaching the same income level
in the current year;

(7) Any trust, with total assets in excess of
$5,000,000, not formed for the specific purpose
of acquiring the securities offered, whose
purchase is directed by a sophisticated person
as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity
owners are accredited investors.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



(b) Affiliate.    An affiliate of, or person affiliated with, a specified person shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

(c) Aggregate offering price.    Aggregate offering price shall mean the sum of all cash, services, property, notes, cancellation of debt, or other consideration to be received by an issuer for issuance of its securities. Where securities are being offered for both cash and non-cash consideration, the aggregate offering price shall be based on the price at which the securities are offered for cash.  Any portion of the aggregate offering price attributable to cash received in a foreign currency shall be translated into United States currency at the currency exchange rate in effect at a reasonable time prior to or on the date of the sale of the securities.  If securities are not offered for cash, the aggregate offering price shall be based on the value of the consideration as established by bona fide sales of that consideration made within a reasonable time, or, in the absence of sales, on the fair value as determined by an accepted standard.    Such valuations of non-cash consideration must be reasonable at the time made.

(d)   Business   combination.    Business combination shall mean any transaction of the type specified in paragraph (a) of rule 145 under the Act (17 CFR 230.145) and any transaction involving the acquisition by one issuer, in exchange for all or a part of its own or its parent's stock, of stock of another issuer if, immediately after the acquisition, the acquiring issuer has control of the other issuer (whether or not it had control before the acquisition).

(e) Calculation of number of purchasers.  For purposes of calculating the number of purchasers under §§ 230.505(b) and 230.506(b) only, the following shall apply:

(1)   The   following   purchasers   shall   be excluded:

(i)  Any  relative,  spouse  or  relative  of  the

spouse of a purchaser who has the same principal residence as the purchaser;

(ii) Any trust or estate in which a purchaser and any of the persons related to him as specified in paragraph (e)(1)(i) or (e)(1)(iii) of this section collectively have more than 50 percent of the beneficial interest (excluding contingent interests);

(iii) Any corporation or other organization of which a purchaser and any of the persons related to him as specified in paragraph (e)(1)(i) or (e)(1)(ii) of this section collectively are beneficial owners of more than 50 percent of the equity securities (excluding directors' qualifying shares) or equity interests; and

(iv) Any accredited investor.

(2) A corporation, partnership or other entity shall be counted as one purchaser.  If, however, that entity is organized for the specific purpose of acquiring the securities offered and is not an accredited investor under paragraph (a)(8) of this section, then each beneficial owner of equity securities or equity interests in the entity shall count as a separate purchaser for all provisions of Regulation D (§§ 230.501-230.508), except to the extent provided in paragraph (e)(1) of this section.

(3) A non-contributory employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 shall be counted as one purchaser where the trustee makes all investment decisions for the plan.

(f) Executive officer.  Executive officer shall mean the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer.    Executive officers of subsidiaries may be deemed executive officers of the issuer if they perform such policy making functions for the issuer.

(g) Issuer.  The definition of the term issuer in section 2(4) of the Act shall apply, except that

Copr. ⁿ West 2003 No Claim to Orig. U.S. Govt. Works



in the case of a proceeding under the Federal Bankruptcy Code (11 U.S.C. 101 et seq.), the trustee or debtor in possession shall be considered the issuer in an offering under a plan or reorganization, if the securities are to be issued under the plan.

(h) *Purchaser representative.* Purchaser representative shall mean any person who satisfies all of the following conditions or who the issuer reasonably believes satisfies all of the following conditions:

(1) Is not an affiliate, director, officer or other employee of the issuer, or beneficial owner of 10 percent or more of any class of the equity securities or 10 percent or more of the equity interest in the issuer, except where the purchaser is:

(i) A relative of the purchaser representative by blood, marriage or adoption and not more remote than a first cousin;

(ii) A trust or estate in which the purchaser representative and any persons related to him as specified in paragraph (h)(1)(i) or (h)(1)(iii) of this section collectively have more than 50 percent of the beneficial interest (excluding contingent interest) or of which the purchaser representative serves as trustee, executor, or in any similar capacity; or

(iii) A corporation or other organization of which the purchaser representative and any persons related to him as specified in paragraph (h)(1)(i) or (h)(1)(ii) of this section collectively are the beneficial owners of more than 50 percent of the equity securities (excluding directors' qualifying shares) or equity interests;

(2) Has such knowledge and experience in financial and business matters that he is capable of evaluating, alone, or together with other purchaser representatives of the purchaser, or together with the purchaser, the merits and risks of the prospective investment;

(3) Is acknowledged by the purchaser in writing, during the course of the transaction, to be his purchaser representative in

connection with evaluating the merits and risks of the prospective investment; and

(4) Discloses to the purchaser in writing a reasonable time prior to the sale of securities to that purchaser any material relationship between himself or his affiliates and the issuer or its affiliates that then exists, that is mutually understood to be contemplated, or that has existed at any time during the previous two years, and any compensation received or to be received as a result of such relationship.

NOTE 1: A person acting as a purchaser representative should consider the applicability of the registration and antifraud provisions relating to brokers and dealers under the Securities Exchange Act of 1934 (Exchange Act) (15 U.S.C. 78a et seq., as amended) and relating to investment advisers under the Investment Advisers Act of 1940.

NOTE 2: The acknowledgment required by paragraph (h)(3) and the disclosure required by paragraph (h)(4) of this section must be made with specific reference to each prospective investment. Advance blanket acknowledgment, such as for all securities transactions or all private placements, is not sufficient.

NOTE 3: Disclosure of any material relationships between the purchaser representative or his affiliates and the issuer or its affiliates does not relieve the purchaser representative of his obligation to act in the interest of the purchaser.

[53 FR 7868, March 10, 1988; 54 FR 11372, March 20, 1989]

< General Materials (GM) References, Annotations, or Tables >

17 C. F. R. § 230.501

17 CFR § 230.501

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.502                                                                  **Page    1**
17 C.F.R. § 230.502
**< KeyCite Citations >**

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D--RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.502 General conditions to be met.

The following conditions shall be applicable
to offers and sales made under Regulation D (§
§ 230.501 230.508):

(a) Integration.  All sales that are part of the
same regulation D offering must meet all of
the terms and conditions of regulation D.
Offers and sales that are made more than six
months before the start of a regulation D
offering or **are made more than six months**
after completion of a regulation D offering will
not be considered part of that regulation D
offering, so long as during those six month
periods there are no offers or sales of securities
by or for the issuer that are of the same or a
similar class as those offered or sold under
regulation D, other than those offers or sales
of securities under an employee benefit plan
as defined in rule 405 under the Act (17 CFR
230.405).

Note: The term "offering" is not defined in
the Act or in Regulation D. If the issuer offers
or sells securities for which the safe harbor
rule in paragraph (a) of this § 230.502 is
unavailable, the determination as to whether
separate sales of securities are part of the
same offering (i.e. are considered "integrated")
depends on the particular facts and
circumstances.  Generally, transactions
otherwise meeting the requirements of an
exemption will not be integrated with
simultaneous offerings being made outside the
United States in compliance with Regulation

S. See Release No. 33 6863.

The following factors should be considered in
determining whether offers and sales should
be integrated for purposes of the exemptions
under Regulation D:

(a) Whether the sales are part of a single plan
of financing;

(b) Whether the sales involve issuance of the
same class of securities;

(c) Whether the sales have been made at or
about the same time;

(d) Whether the same type of consideration is
being received; and

(e) Whether the sales are made for the same
general purpose.

See Release 33 4552 (November 6, 1962) [27
FR 11316].

(b) Information requirements

(1) When information must be furnished.  If
the issuer sells securities under § 230.505 or §
230.506 to any purchaser that is not an
accredited investor, the issuer shall furnish
the information specified in paragraph (b)(2) of
this section to such purchaser a reasonable
time prior to sale.  The issuer is not required
to furnish the specified information to
purchasers when it sells securities under §
230.504, or to any accredited investor.

Note:  When an issuer provides information
to investors pursuant to paragraph (b)(1), it
should consider providing such information to
accredited investors as well, in view of the
anti fraud provisions of the federal securities
laws.

(2) Type of information to be furnished.

(i) If the issuer is not subject to the reporting
requirements of section 13 or 15(d) of the
Exchange Act, at a reasonable time prior to
the sale of securities the issuer shall furnish to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.502                                                             **Page   2**

the purchaser, to the extent material to an understanding of the issuer, its business and the securities being offered:

(A) Non-financial statement information.  If the issuer is eligible to use Regulation A (§ 230.251 263), the same kind of information as would be required in Part II of Form 1-A (§ 239.90 of this chapter).  If the issuer is not eligible to use Regulation A, the same kind of information as required in Part I of a registration statement filed under the Securities Act on the form that the issuer would be entitled to use.

(B) Financial statement information.

(1) Offerings up to $2,000,000.  The information required in Item 310 of Regulation S-B (§ 228.310 of this chapter), except that only the issuer's balance sheet, which shall be dated within 120 days of the start of the offering, must be audited.

(2) Offerings up to $7,500,000.  The financial statement information required in Form SB-2 (§ 239.10 of this chapter).  If an issuer, other than a limited partnership, cannot obtain audited financial statements without unreasonable effort or expense, then only the issuer's balance sheet, which shall be dated within 120 days of the start of the offering, must be audited.  If the issuer is a limited partnership and cannot obtain the required financial statements without unreasonable effort or expense, it may furnish financial statements that have been prepared on the basis of Federal income tax requirements and examined and reported on in accordance with generally accepted auditing standards by an independent public or certified accountant.

(3) Offerings over $7,500,000.  The financial statement as would be required in a registration statement filed under the Act on the form that the issuer would be entitled to use.  If an issuer, other than a limited partnership, cannot obtain audited financial statements without unreasonable effort or expense, then only the issuer's balance sheet, which shall be dated within 120 days of the start of the offering, must be audited.  If the issuer is a limited partnership and cannot

obtain the required financial statements without unreasonable effort or expense, it may furnish financial statements that have been prepared on the basis of Federal income tax requirements and examined and reported on in accordance with generally accepted auditing standards by an independent public or certified accountant.

(C) If the issuer is a foreign private issuer eligible to use Form 20-F (§ 249.220f of this chapter), the issuer shall disclose the same kind of information required to be included in a registration statement filed under the Act on the form that the issuer would be entitled to use.   The financial statements need be certified only to the extent required by paragraph (b)(2)(i) (B) (1), (2) or (3) of this section, as appropriate.

(ii) If the issuer is subject to the reporting requirements of section 13 or 15(d) of the Exchange Act, at a reasonable time prior to the sale of securities the issuer shall furnish to the purchaser the information specified in paragraph (b)(2)(ii)(A) or (B) of this section, and in either event the information specified in paragraph (b)(2)(ii)(C) of this section:

(A) The issuer's annual report to shareholders for the most recent fiscal year, if such annual report meets the requirements of § 240.14a-3 or 240.14c-3 under the Exchange Act, the definitive proxy statement filed in connection with that annual report, and, if requested by the purchaser in writing, a copy of the issuer's most recent Form 10-K and Form 10-KSB (17 CFR 249.310) under the Exchange Act.

(B) The information contained in an annual report on Form 10-K (§ 249.310 of this chapter) or 10-KSB (§ 249.310b of this chapter) under the Exchange Act or in a registration statement on Form S-1 (§ 239.11 of this chapter), SB-1 (§ 239.9 of this chapter), SB-2 (§ 239.10 of this chapter) or S-11 (§ 239.18 of this chapter) under the Act or on Form 10 (§ 249.210 of this chapter) or Form 10-SB (§ 249.210b of this chapter) under the Exchange Act, whichever filing is the most recent required to be filed.

(C) The information contained in any reports

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.502                                                                      **Page   3**

or documents required to be filed by the issuer under sections 13(a), 14(a), 14(c), and 15(d) of the Exchange Act since the distribution or filing of the report or registration statement specified in paragraph (b)(2)(ii)(A) or (B), and a brief description of the securities being offered, the use of the proceeds from the offering, and any material changes in the issuer's affairs that are not disclosed in the documents furnished.

(D) If the issuer is a foreign private issuer, the issuer may provide in lieu of the information specified in paragraph (b)(2)(ii) (A) or (B) of this section, the information contained in its most recent filing on Form 20 F or Form F 1 (§ 239.31 of the chapter).

(iii) Exhibits required to be filed with the Commission as part of a registration statement or report, other than an annual report to shareholders or parts of that report incorporated by reference in a Form 10 K and Form 10 KSB report, need not be furnished to each purchaser that is not an accredited investor if the contents of material exhibits are identified and such exhibits are made available to a purchaser, upon his written request, a reasonable time prior to his purchase.

(iv) At a reasonable time prior to the sale of securities to any purchaser that is not an accredited investor in a transaction under § 230.505 or § 230.506, the issuer shall furnish to the purchaser a brief description in writing of any material written information concerning the offering that has been provided by the issuer to any accredited investor but not previously delivered to such unaccredited purchaser.   The issuer shall furnish any portion or all of this information to the purchaser, upon his written request a reasonable time prior to his purchase.

(v) The issuer shall also make available to each purchaser at a reasonable time prior to his purchase of securities in a transaction under § 230.505 or 230.506 the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the issuer possesses or can acquire without

unreasonable effort or expense that is necessary to verify the accuracy of information furnished under paragraph (b)(2)(i) or (ii) of this section.

(vi) For business combinations or exchange offers, in addition to information required by Form S 4 [17 CFR 239.25], the issuer shall provide to each purchaser at the time the plan is submitted to security holders, or, with an exchange, during the course of the transaction and prior to sale, written information about any terms or arrangements of the proposed transactions that are materially different from those for all other security holders.   For purposes of this subsection, an issuer which is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may satisfy the requirements of Part I.B. or C. of Form S 4 by compliance with paragraph (b)(2)(i) of this § 230.502.

(vii) At a reasonable time prior to the sale of securities to any purchaser that is not an accredited investor in a transaction under § 230.505 or § 230.506, the issuer shall advise the purchaser of the limitations on resale in the manner contained in paragraph (d)(2) of this section. Such disclosure may be contained in other materials required to be provided by this paragraph.

(c) Limitation on manner of offering.   Except as provided in § 230.504(b)(1), neither the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to, the following:

(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and

(2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising;

Provided, however, that publication by an issuer of a notice in accordance with § 230.135c shall not be deemed to constitute general solicitation or general advertising for purposes of this section;   Provided further,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.502

**Page 4**

that, if the requirements of § 230.135e are satisfied, providing any journalist with access to press conferences held outside of the United States, to meetings with issuer or selling security holder representatives conducted outside of the United States, or to written press-related materials released outside the United States, at or in which a present or proposed offering of securities is discussed, will not be deemed to constitute general solicitation or general advertising for purposes of this section.

(d) Limitations on resale. Except as provided in § 230.504(b)(1), securities acquired in a transaction under Regulation D shall have the status of securities acquired in a transaction under section 4(2) of the Act and cannot be resold without registration under the Act or an exemption therefrom. The issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(11) of the Act, which reasonable care may be demonstrated by the following:

(1) Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;

(2) Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available; and

(3) Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities.

While taking these actions will establish the requisite reasonable care, it is not the exclusive method to demonstrate such care. Other actions by the issuer may satisfy this provision. In addition, §§ 230.502(b)(2)(vii) requires the delivery of written disclosure of the limitations on resale to investors in certain instances.

[47 FR 11262, March 16, 1982, as amended at 47 FR 54771, Dec. 6, 1982; 53 FR 7869, March 10, 1988; 54 FR 11372, March 20, 1989; 55 FR 18322, May 2, 1990; 56 FR 30054, 30055, July 1, 1991; 57 FR 36473, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR 26514, May 4, 1993; 59 FR 21650, April 26, 1994; 62 FR 53954, Oct. 17, 1997]

< General Materials (GM) - References, Annotations, or Tables >

17 C. F. R. § 230.502

17 CFR § 230.502

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.503
17 C.F.R. § 230.503
< KeyCite Citations >

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D--RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.503 Filing of notice of sales.

(a) An issuer offering or selling securities in reliance on § 230.504, § 230.505 or § 230.506 shall file with the Commission five copies of a notice on Form D (17 CFR 239.500) no later than 15 days after the first sale of securities.

(b) One copy of every notice on Form D shall be manually signed by a person duly authorized by the issuer.

(c) If sales are made under § 230.505, the notice shall contain an undertaking by the issuer to furnish to the Commission, upon the written request of its staff, the information furnished by the issuer under § 230.502(b)(2) to any purchaser that is not an accredited investor.

(d) Amendments to notices filed under paragraph (a) of this section need only report the issuer's name and the information required by Part C and any material change in the facts from those set forth in Parts A and B.

(e) A notice on Form D shall be considered filed with the Commission under paragraph (a) of this section.

(1) As of the date on which it is received at the Commission's principal office in Washington, DC; or

(2) As of the date on which the notice is mailed by means of United States registered or certified mail to the Commission's principal office in Washington, DC, if the notice is delivered to such office after the date on which it is required to be filed.

[51 FR 36386, Oct. 10, 1986;  54 FR 11372, March 20, 1989]

< General Materials (GM)  References, Annotations, or Tables >

17 C. F. R. § 230.503

17 CFR § 230.503

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Page   1



17 CFR S 230.504                                                 **Page   1**
17 C.F.R. § 230.504
**< KeyCite Citations >**

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D  RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.504 Exemption for limited offerings and
sales of securities not exceeding $1,000,000.

(a) Exemption.  Offers and sales of securities
that satisfy the conditions in paragraph (b) of
this § 230.504 by an issuer that is not:

(1) subject to the reporting requirements of
section 13 or 15(d) of the Exchange Act;

(2) an investment company; or

(3) a **development stage company that either**
has no **specific business plan or purpose** or has
indicated that its business plan is to engage in
a merger or acquisition with an unidentified
company or companies, or other entity or
person, shall be exempt from the provision of
section 5 of the **Act under section 3(b)** of the
Act.

(b) Conditions to be met.

(1) General conditions.   To qualify for
exemption under this § 230.504, offers and
sales must satisfy the terms and conditions of
§§ 230.501 and 230.502(a), (c) and (d), except
that the provisions of § 230.502(c) and (d) will
not apply to offers and sales of securities
under this § 230.504 that are made:

(i) Exclusively in one or more states that
provide for the registration of the securities,
and require the public filing and delivery to
investors of a substantive disclosure document
before sale, and are made in accordance with

those state provisions;

(ii) In one or more states that have no
provision for the registration of the securities
or the public filing or delivery of a disclosure
document before sale, if the securities have
been registered in at least one state that
provides for such registration, public filing
and delivery before sale, offers and sales are
made in that state in accordance with such
provisions, and the disclosure document is
delivered before sale to all purchasers
(including those in the states that have no
such procedure); or

(iii) Exclusively according to state law
exemptions from registration that permit
general solicitation and general advertising so
long as sales are made only to "accredited
investors" as defined in § 230.501(a).

(2) The aggregate offering price for an
offering of securities under this § 230.504, as
defined in § 230.501(c), shall not exceed
$1,000,000, less the aggregate offering price
for all securities sold within the twelve
months before the start of and during the
offering of securities under this § 230.504, in
reliance on any exemption under section 3(b),
or in violation of section 5(a) of the Securities
Act.

Note 1:  The calculation of the aggregate
offering price is illustrated as follows:

If an issuer sold $900,000 on June 1, 1987
under this § 230.504 and an additional
$4,100,000 on December 1, 1987 under §
230.505, the issuer could not sell any of its
securities under this § 230.504 until December
1, 1988. Until then the issuer must count the
December 1, 1987 sale towards the $1,000,000
limit within the preceding twelve months.

Note 2:  If a transaction under § 230.504 fails
to meet the limitation on the aggregate
offering price, it does not affect the
availability of this § 230.504 for the other
transactions considered in applying such
limitation.  For example, if an issuer sold
$1,000,000 worth of its securities on January

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

17 CFR S 230.504                                                                        **Page  2**

1, 1988 under this § 230.504 and an additional $500,000 worth on July 1, 1988, this § 230.504 would not be available for the later sale, but would still be applicable to the January 1, 1988 sale.

[57 FR 36473, Aug. 13, 1992;  61 FR 30402, June 14, 1996;  64 FR 11094, March 8, 1999]

      < General Materials (GM)   References, Annotations, or Tables >

17 C. F. R. § 230.504

17 CFR § 230.504

END OF DOCUMENT

Copr. ⌐ West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

17 CFR S 230.505                                                    **Page    1**
17 C.F.R. § 230.505
< KeyCite Citations >

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D--RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.505 Exemption for limited offers and
sales of securities not exceeding $5,000,000.

(a) Exemption. Offers and sales of securities
that satisfy the conditions in paragraph (b) of
this section by an issuer that is not an
investment company shall be exempt from the
provisions of section 5 of the Act under section
3(b) of the Act.

(b) Conditions to be met

(1) General conditions.    To qualify for
exemption under this section, offers and sales
must satisfy the terms and conditions of §§
230.501 and 230.502.

(2) Specific conditions

(i) Limitation on aggregate offering price.
The aggregate offering price for an offering of
securities under this § 230.505, as defined in §
203.501(c), shall not exceed $5,000,000, less
the aggregate offering price for all securities
sold within the twelve months before the start
of and during the offering of securities under
this section in reliance on any exemption
under section 3(b) of the Act or in violation of
section 5(a) of the Act.

NOTE:    The calculation of the aggregate
offering price is illustrated as follows:

EXAMPLE 1:   If an issuer sold $2,000,000 of
its securities on June 1, 1982 under this §
230.505 and an additional $1,000,000 on

September 1, 1982, the issuer would be
permitted to sell only $2,000,000 more under
this § 230.505 until June 1, 1983. Until that
date the issuer must count both prior sales
towards the $5,000,000 limit. However, if the
issuer made its third sale on June 1, 1983, the
issuer could then sell $4,000,000 of its
securities because the June 1, 1982 sale would
not be within the preceding twelve months.

EXAMPLE 2. If an issuer sold $500,000 of its
securities on June 1, 1982 under§ 230.504 and
an additional $4,500,000 on December 1, 1982
under this section, then the issuer could not
sell any of its securities under this section
until June 1, 1983. At that time it could sell
an additional $500,000 of its securities.

(ii) Limitation on number of purchasers.
There are no more than or the issuer
reasonably believes that there are no more
than 35 purchasers of securities from the
issuer in any offering under this section.

(iii) Disqualifications.  No exemption under
this section shall be available for the
securities of any issuer described in § 230.262
of Regulation A, except that for purposes of
this section only:

(A) The term "filing of the offering statement
required by § 230.252" as used in § 230.262(a),
(b) and (c) shall mean the first sale of
securities under this section;

(B) The term "underwriter" as used in §
230.262 (b) and (c) shall mean a person that
has been or will be paid directly or indirectly
remuneration for solicitation of purchasers in
connection with sales of securities under this
section; and

(C) Paragraph (b)(2)(iii) of this section shall
not apply to any issuer if the Commission
determines, upon a showing of good cause,
that it is not necessary under the
circumstances that the exemption be denied.
Any such determination shall be without
prejudice to any other action by the
Commission in any other proceeding or matter
with respect to the issuer or any other person.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

17 CFR S 230.505

[54 FR 11372, March 20, 1989;  57 FR 36473,
Aug. 13, 1992]

&lt; General Materials (GM) · References,
        Annotations, or Tables &gt;

17 C. F. R. § 230.505

17 CFR § 230.505

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

17 CFR S 230.506
17 C.F.R. § 230.506

**Page   1**

< KeyCite Citations >

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D  RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.506 Exemption for limited offers and
sales without regard to dollar amount of
offering.

(a) Exemption.  Offers and sales of securities
by an issuer that satisfy the conditions in
paragraph (b) of this section shall be deemed
to be transactions not involving any public
offering within the meaning of section 4(2) of
the Act.

(b) Conditions to be met

(1) General conditions.   To qualify for an
exemption under this section, offers and sales
must satisfy all the terms and conditions of §§
230.501 and 230.502.

(2) Specific Conditions

(i) Limitation on number of purchasers.
There are no more than or the issuer
reasonably believes that there are no more
than 35 purchasers of securities from the
issuer in any offering under this section.

NOTE  See § 230.501(e) for the calculation of
the number of purchasers and § 230.502(a) for
what may or may not constitute an offering
under this section.

(ii) Nature of purchasers.   Each purchaser
who is not an accredited investor either alone
or with his purchaser representative(s) has
such knowledge and experience in financial
and business matters that he is capable of

evaluating the merits and risks of the
prospective investment, or the issuer
reasonably believes immediately prior to
making any sale that such purchaser comes
within this description.

[54 FR 11372, March 20, 1989]

< General Materials (GM) - References,
Annotations, or Tables >

17 C. F. R. § 230.506

17 CFR § 230.506

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



17 CFR S 230.507                                                  **Page    1**
17 C.F.R. § 230.507
< KeyCite Citations >

CODE OF FEDERAL REGULATIONS
TITLE 17--COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II--SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D  RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.507 Disqualifying provision relating to
exemptions under §§ 230.504, 230.505 and
230.506.

(a) No exemption under § 230.505, § 230.505
or § 230.506 shall be available for an issuer if
such issuer, any of its predecessors or affiliates
have been subject to any order, judgment, or
decree of any court of competent jurisdiction
temporarily, preliminary or **permanently**
enjoining such person for failure to comply
with § 230.503.

(b) Paragraph (a) of this section shall not
apply if the Commission determines, upon a
showing of good cause, that it is not necessary
under the circumstances that the exemption
be denied.

[54 FR 11374, March 20, 1989]

< General Materials (GM)  References,
Annotations, or Tables >

17 C. F. R. § 230.507

17 CFR § 230.507

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

17 CFR S 230.508
17 C.F.R. § 230.508
< KeyCite Citations >

CODE OF FEDERAL REGULATIONS
TITLE 17 COMMODITY AND SECURITIES
EXCHANGES
CHAPTER II-SECURITIES AND
EXCHANGE COMMISSION
PART 230--GENERAL RULES AND
REGULATIONS, SECURITIES ACT OF 1933
REGULATION D RULES GOVERNING
THE LIMITED OFFER AND SALE OF
SECURITIES
WITHOUT REGISTRATION UNDER THE
SECURITIES ACT OF 1933
Current through November 14, 2003; 68 FR
64725

§ 230.508 Insignificant deviations from a
term, condition or requirement of Regulation
D.

(a) A failure to comply with a term, condition
or requirement of § 230.504, § 230.505 or §
230.506 will not result in the loss of the
exemption from the requirements of section 5
of the Act for any offer or sale to a particular
individual or entity, if the person relying on
the exemption shows:

(1) The failure to comply did not pertain to a
term, condition or requirement directly
intended to protect that particular individual
or entity; and

(2) The failure to comply was insignificant
with respect to the offering as a whole,
provided that any failure to comply with
paragraph (c) of § 230.502, paragraph (b)(2) of
§ 230.504, paragraphs (b)(2)(i) and (ii) of §
230.505 and paragraph (b)(2)(i) of § 230.506
shall be deemed to be significant to the
offering as a whole; and

(3) A good faith and reasonable attempt was
made to comply with all applicable terms,
conditions and requirements of § 230.504, §
230.505 or § 230.506.

(b) A transaction made in reliance on §
230.504, § 230.505 or § 230.506 shall comply
with all applicable terms, conditions and
requirements of Regulation D. Where an
exemption is established only through reliance

**Page   1**

upon paragraph (a) of this section, the failure
to comply shall nonetheless be actionable by
the Commission under section 20 of the Act.

[54 FR 11374, March 20, 1989;  57 FR 36473,
Aug. 13, 1992]

< General Materials (GM)   References,
Annotations, or Tables >

17 C. F. R. § 230.508

17 CFR § 230.508

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

C

Found Document                    Rank(R)  1 of 1                    Database
                                                                     FSEC-RELS

Release No. 6455, Release No. 33-6455
**(Cite as: 1983 WL 409415 (S.E.C. Release No.))**
<KeyCite Citations>

*1 17 CFR Part 231

S.E.C. Release No.

Securities Act of 1933

INTERPRETIVE RELEASE ON REGULATION D
March 3, 1983

 AGENCY: Securities and Exchange Commission.
 ACTION: Publication of Staff Interpretations.
 SUMMARY: The Commission has authorized the issuance of this release setting
forth the views of its Division of Corporation Finance on various interpretive
questions regarding the rules contained in Regulation D under the Securities Act
of 1933. These views are being published to answer frequently raised questions
with respect to the regulation.
 FOR FURTHER INFORMATION, CONTACT: David B. H. Martin, Jr., Office of Chief
Counsel, Division of Corporation Finance, Securities and Exchange Commission,
Washington, D.C. 20549; (202) 272-2573.
 SUPPLEMENTARY INFORMATION: In Release No. 33-6389 (March 8, 1982) (47 FR
11251), the Commission adopted Regulation D (17 CFR 230.501-.506) which provides
three exemptions from the registration requirements of the Securities Act of
1933 (the "Securities Act" or the "Act") (15 U.S.C. 77a- 77bbbb (1976 & Supp. IV
1980), as amended by the Bus Regulatory Reform Act of 1982, Pub. L. No. 97-261
section 19(d), 96 Stat. 1121 (1982)). [FN1] Regulation D became effective on
April 15, 1982.
 In the course of administering the regulation, the staff of the Division of
Corporation Finance has answered numerous oral and written requests for
interpretation of the new provisions. This release is intended to assist those
persons who wish to make offerings in reliance on the exemptions in Regulation D
by presenting the staff's views on frequently raised questions. As indicated in
Preliminary Note 3 to the regulation, Regulation D is intended to be a basic
element in a uniform system of federal-state exemptions. As such, aspects of
Regulation D have been incorporated in many state statutes and regulations. The
interpretations set forth in this release relate only to the federal provisions.
 Regulation D is composed of six rules, Rules 501-506. The first three rules
set forth general terms and conditions that apply in whole or in part to the
exemptions. The questions arising under Rules 501-503 fall into four general
categories: definitions, disclosure requirements, operational conditions, and
notice of sale requirements. The exemptions of Regulation D are set forth in
Rules 504-506. Questions concerning those rules usually raise issues pertaining
to more than one exemption. This release, an outline of which follows, is
organized so as to reflect this pattern of inquiries.

I. Definitions--Rule 501

  A. Accredited Investor--Rule 501(a) (Questions 1-30)
  1. General

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

2. Certain Institutional Investors--Rules 501(a)(1)-(3)
3. Insiders--Rule 501(a)(4)
4. $150,000 Purchasers--Rule 501(a)(5)
a. $150,000 Purchase
b. 20 Percent of Net Worth Limitation
5. Natural Persons--Rules 501(a)(6)-(7)
6. Entities Owned By Accredited Investors--Rule 501(a)(8)
7. Trusts as Accredited Investors
B. Aggregate Offering Price--Rule 501(c)  (Questions 31-36)
C. Executive Officer--Rule 501(f)  (Question 37)
D. Purchaser Representative--Rule 501(h)  (Questions 38-39)

II. Disclosure Requirements--Rule 502(b)

A. When Required (Questions 40-41)
B. What Required (Questions 42-51)
1. Non-reporting Issuers--Rule 502(b)(2)(i)
2. Reporting Issuers--Rule 502(b)(2)(ii)
C. General (Question 52)

III. Operational Conditions

A. Integration--Rule 502(a)  (Question 53)
B. Calculation of Number of Purchasers-- Rule 501(e)  (Questions 54-59)
C. Manner of Offering--Rule 502(c)  (Question 60)
D. Limitations on Resale--Rule 502(d)  (Question 61)

IV. Exemptions

A. Rule 504 (Questions 62-65)
B. Rule 505 (Question 66)
C. Questions Relating to Rules 504 and 505 (Questions 67-71)
D. Rule 506 (Questions 72-73)
E. Questions Relating to Rules 504-506 (Questions 74-80)
V. Notice of Sale--Form D (Questions 81-92)

I. Definitions--Rule 501

A. Accredited Investor--Rule 501(a)

  Defined in Rule 501(a), the term "accredited investor" is significant to the
operation of Regulation D. [FN2] Under Rule 501(e), for instance, accredited
investors are not included in computing the number of purchasers in offerings
conducted in reliance on Rules 505 and 506. Also, if accredited investors are
the only purchasers in offerings under Rules 505 and 506, Regulation D does not
require delivery of specific disclosure as a condition of the exemptions.
Finally, in an offering under Rule 506, the issuer's obligation to ensure the
sophistication of purchasers applies to investors that are not accredited. See
Rule 506(b)(2)(ii).
  The definition sets forth eigth categories of investor that may be accredited.
The following questions and answers cover certain issues under various of those

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

categories. Given the frequency of questions regarding the application of the definition to trusts, however, there is a separate section addressing that area.

1. General. The definition of "accredited investor" includes any person who comes within or "who the issuer reasonably believes" comes within one of the enumerated categories "at the time of the sale of the securities to that person." What constitutes "reasonable" belief will depend on the facts of each particular case. For this reason, the staff generally will not be in a position to express views or otherwise endorse any one method for ascertaining whether an investor is accredited.

(1) Question: A director of a corporate issuer purchases securities offered under Rule 505. Two weeks after the purchase, and prior to completion of the offering, the director resigns due to a sudden illness. Is the former director an accredited investor?

Answer: Yes. The preliminary language to Rule 501(a) provides that an investor is accredited if he falls into one of the enumerated categories "at the time of the sale of securities to that person." One such category includes directors of the issuer. See Rule 501(a)(4). The investor in this case had that status at the time of the sale to him. [FN3]

2. Certain Institutional Investors-- Rules 501(a)(1)-(3). (2) Question: A national bank purchases $100,000 of securities from a Regulation D issuer and distributes the securities equally among ten trust accounts for which it acts as trustee. Is the bank an accredited investor?

Answer: Yes. Rule 501(a)(1) accredits a bank acting in a fiduciary capacity. [FN4]

(3) Question: An ERISA employee benefit plan will purchase $200,000 of the securities being offered. The plan has less than $5,000,000 in total assets and its investment decisions are made by a plan trustee who is not a bank, insurance company, or registered investment adviser. Does the plan qualify as an accredited investor?

Answer: Not under Rule 501(a)(1). Rule 501(a)(1) accredits an ERISA plan that has a plan fiduciary which is a bank, insurance company, or registered investment adviser or that has total assets in excess of $5,000,000. The plan, however, may be an accredited investor under Rule 501(a)(5), which accredits certain persons who purchase at least $150,000 of the securities being offered.

(4) Question: A state run, not-for-profit hospital has total assets in excess of $5,000,000. Because it is a state agency, the hospital is exempt from federal income taxation. Rule 501(a)(3) accredits any organization described in section 501(c)(3) of the Internal Revenue Code that has total assets in excess of $5,000,000. Is the hospital accredited under Rule 501(a)(3)?

Answer: Yes. This category does not require that the investor has received a ruling on tax status under section 501(c)(3) of the Internal Revenue Code. Rather, Rule 501(a)(3) accredits an investor that falls within the substantive description in that section. [FN5]

(5) Question: A not-for-profit, tax exempt hospital with total assets of $3,000,000 is purchasing $100,000 of securities in a Regulation D offering. The hospital controls a subsidiary with total assets of $3,000,000. Under generally accepted accounting principles, the hospital may combine its financial statements with that of its subsidiary. Is the hospital accredited?

Answer: Yes, under Rule 501(a)(3). Where the financial statements of the subsidiary may be combined with those of the investor, the assets of the subsidiary may be added to those of the investor in computing total assets for

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

purposes of Rule 501(a)(3). [FN6]

3. Insiders--Rule 501(a)(4). (6) Question: The executive officer of a parent of the corporate general partner of the issuer is investing in the Regulation D offering. Is that individual an accredited investor?

Answer: Rule 501(a)(4) accredits only the directors and executive officers of the general partner itself. Unless the executive officer of the parent can be deemed an executive officer of the subsidiary, [FN7] that individual is not an accredited investor.

4. $150,000 Purchasers--Rule 501(a)(5). This provision accredits any person [FN8] who satisfies two separate tests. To be accredited under Rule 501(a)(5), an investor must purchase at least $150,000 of the securities being offered, by one or a combination of four specific methods: cash, marketable securities, an unconditional obligation to pay cash or marketable securities over not more than five years, and cancellation of indebtedness. The rule also requires that ""the total purchase price" may not exceed 20 percent of the purchaser's net worth. The two tests under Rule 501(a)(5) must be considered separately. Thus, for instance, in computing the "total purchase price" for the 20 percent of net worth limitation, the investor may have to include amounts that could not be included toward the $150,000 purchase test.

a. $150,000 Purchase. (7) Question: Two issuers, a general partner and its limited partnership, are selling their securities simultaneously as units consisting of common stock and limited partnership interests. The issues are part of a plan of financing made for the same general purpose. If an investor purchases $150,000 of these units, would it satisfy the $150,000 purchase element of Rule 501(a)(5)?

Answer: Yes. The issuers are affiliated and the simultaneous sale of their separate securities as units for a single plan of financing would be deemed one integrated offering. Rule 501(a)(5) applies to a purchase "of the securities being offered." The rule thus applies not to the securities of a particular issuer, but to the securities of a particular offering. [FN9]

(8) Question: An investor will purchase securities in cash installments. Each installments payment will include amounts due on the principal as well as interest. If the total of all payments is $150,000, will the investor have purchased "at least $150,000 of the securities being offered" for purposes of Rule 501(a)(5)?

Answer: No. Under Rule 501(a)(5), any amount constituting interest due on the unpaid purchase price is not payment for the "securities being offered."

(9) Question: The installment payments for interests in a limited partnership that will develop commercial real estate will be conditioned upon completion of certain phases of the project. Will the obligation to make those payments be deemed "an unconditional obligation to pay" for purposes of Rule 501(a)(5)?

Answer: Yes, as long as the only conditions relate to completion of successive stages of the development project.

(10) Question: An investor will purchase securities in a Regulation D offering by delivering $75,000 in cash and a letter of credit for $75,000. Will such a purchase satisfy the $150,000 element of Rule 501(a)(5)?

Answer: No. Because there is no assurance that the letter of credit will ever be drawn against, the staff does not deem it to be an unconditional obligation to pay.

(11) Question: In connection with the sale of limited partnership interests in an oil and gas drilling program, an investor in a Regulation D offering commits

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

to pay subsequent assessments that are mandatory, non-contingent, and to which the investor will be personally able. Will the commitment to pay the assessments constitute an unconditional obligation to pay" under Rule 501(a)(5)?

Answer: Yes. The assessments are essentially installment payments for which the investor makes the investment decision at the time the limited partnership interest originally is purchased. [FN10]

(12) Question: If the assessments in question 11 are voluntary, contingent and non-recourse, can they be included determining whether or not the investor has purchased $150,000 of the securities being offered?

Answer: No. Voluntary assessments this nature are not deemed to constitute an unconditional obligation to any. [FN11]

(13) Question: A purchaser of interests is a limited partnership makes a partial own payment and commits conditionally to pay the balance over the years. Formation of the partnership is conditioned upon the sale of a specified number of interests. Under Rule 501(a)(5), when must the five year period for installment payments begin to ??

Answer: Rule 501(a)(5) provides that an unconditional obligation is to be charged "within five years of the sale the securities to the purchaser." For use in the administration of an offering it is conditioned on a certain minimum level of sales, the staff believes it is reasonable to compute the length of installment obligations from same date for the investors involved reaching that minimum. Therefore, without any bearing on when the sale of security actually occurs, the five-year time period of the investor's obligation may be measured from the date such minimum level of sales has been reached. [FN12]. 20 Percent of Net Worth Limitation

(14) Question: Where an investor takes installment payments composed principal and interest, must the interest payments be included in computing the "total purchase price" for purposes of meeting the 20 percent of worth limitation?

Answer: No. The interest is not part of the total purchase price but rather is an exspense associated with financing the actual purchase price.

(15) Question: A corporate investor will purchase $200,000 of the securities being offered for cash. Additionally, the investor will deliver an irrevocable letter of credit for $50,000 which the issuer will use as collateral in connection with a line of credit it will establish with a lending institution. Must the issuer include the $50,000 letter of credit when determining whether or not the purchaser's total purchase price exceeds 20 percent of its net worth under Rule 501(a)(5)?

Answer: Yes. Since the investor has committed to pay the $50,000 at the election of the issuer, that amount must be included with other forms of consideration in order to measure what percentage of the investor's net worth has been committed in the investment. [FN13]

(16) Question: As part of the purchase of an interest in a sale and lease-back program, the purchaser will deliver "non-recourse" debt where the source of payment for the debt is limited exclusively to the income generated by the security being purchased or the assets of the entity in which the security is being purchased. Must the non-recourse debt be included in the total purchase price for purposes of the 20 percent of net worth limitation under Rule 501(a)(5)?

Answer: No. Because the investor has no personal liability for the non-recourse debt, and because no part of the investor's assets at the time of purchase is available as a source of payment for the debt, the debt should not

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

be included as part of the purchase price. [FN14]

(17) Question: Where the purchaser is a natural person, Rule 501(a)(5) provides that the total purchase price may be measured against the purchaser's net worth combined with that of a spouse. Would property held solely by one spouse be available for calculating the net worth of the other spouse who is making the $150,000 investment?

Answer: Yes.

(18) Question: An investment general partnership is purchasing securities in a Regulation D offering. The partnership was not formed for the specific purpose of acquiring the securities being offered. May the issuer consider the aggregate net worth of the general partners in calculating the net worth of the partnership?

Answer: Yes. An investment general partnership is functionally a vehicle in which profits and losses are passed through to general partners and in which the net worths of the general partners are exposed to the risk of partnership investments. [FN15]

(19) Question: A totally held subsidiary [FN16] makes a cash investment of $200,000 in a Regulation D offering. May that subsidiary use the consolidated net worth of its parent in determining whether or not its total purchase price exceeds 20 percent of its net worth?

Answer: Yes. [FN17]

5. Natural Persons--Rules 501(a) (6)- (7). Rules 501(a) (6) and (7) apply only to natural persons. Paragraph (6) accredits any natural person with a net worth at the time of purchase in excess of $1,000,000. If the investor is married, the rule permits the use of joint net worth of the couple. Paragraph (7) accredits any natural person whose income has exceeded $200,000 in each of the two most recent years and is reasonably expected to exceed $200,000 in the year of the investment.

(20) Question: A corporation with a net worth of $2,000,000 purchases securities in a Regulation D offering. Is the corporation an accredited investor under Rule 501(a)(6)?

Answer: No. Rule 501(a)(6) is limited to "natural" persons.

(21) Question: In calculating net worth for purposes of Rule 501(a)(6), may the investor include the estimated fair market value of his principal residence as an asset?

Answer: Yes. Rule 501(a)(6) does not exclude any of the purchaser's assets from the net worth needed to qualify as an accredited investor.

(22) Question: May a purchaser take into account income of a spouse in determining possible accreditation under Rule 501(a)(7)?

Answer: No. Rule 501(a)(7) requires "individual income" over $200,000 in order to qualify as an accredited investor.

(23) Question: May a purchaser include unrealized capital appreciation in calculating income for purposes of Rule 501(a)(7)?

Answer: Generally, no.

6. Entities Owned by Accredited Investors--Rule 501(a)(8). Any entity in which each equity owner is an accredited investor under any of the qualifying categories, except that of the $150,000 purchaser, is accredited under Rule 501(a)(8).

(24) Question: All but one of the shareholders of a corporation are accredited investors by virtue of net worth or income. The unaccredited shareholder is a director who bought one share of stock in order to comply with a requirement

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

that all directors be shareholders of the corporation. Is the corporation an accredited investor under Rule 501(a)(8)?

Answer: No. Rule 501(a)(8) requires "all of the equity owners" to be accredited investors. The director is an equity owner and is not accredited. Note that the director cannot be accredited under Rule 501(a)(4). That provision extends accreditation to a director of the issuer, not of the investor.

(25) Question: Who are the equity owners of a limited partnership?

Answer: The limited partners.

7. Trusts as Accredited Investors.

(26) Question: May a trust qualify as an accredited investor under Rule 501(a)(1)?

Answer: Only in directly. Although a trust standing alone cannot be accredited under Rule 501(a)(1), if a bank is its trustee and makes the investment on behalf of the trust, the trust will in effect be accredited by virtue of the provision in Rule 501(a)(1) that accredits a bank acting in a fiduciary capacity.

(27) Question: May a trust qualify as an accredited investor under Rule 501(a)(5)?

Answer: Yes. The Division interprets "person" in Rule 501(a)(5) to include any trust. [FN18]

(28) Question: In qualifying a trust as an accredited investor under Rule 501(a)(5), whose net worth should be considered in determining whether the total purchase price meets the 20 percent of net worth limitation test?

Answer: The net worth of the trust.

(29) Question: A trustee of a trust has a net worth of $1,500,000. Is the trustee's purchase of securities for the trust that of an accredited investor under Rule 501(a)(6)?

Answer: No. Except where a bank is a trustee, the trust is deemed the purchaser, not the trustee. The trust is not a "natural" person.

(30) Question: May a trust be accredited under Rule 501(a)(8) if all of its beneficiaries are accredited investors?

Answer: Generally, no. Rule 501(a)(8) accredits any entity if all of its ""equity owners" are accredited investors. The staff does not interpret this provision to apply to the beneficiaries of a conventional trust. The result may be different, however, in the case of certain non-conventional trusts where, as a result of powers retained by the grantors, a trust as a legal entity would be deemed not to exist. [FN19] Thus, where the grantors of a revocable trust are accredited investors under Rule 501(a)(6) (i.e. net worth exceeds $1,000,000) and the trust may be amended or revoked at any time by the grantors, the trust is accredited because the grantors will be deemed the equity owners of the trust's assets. [FN20] Similarly, where the purchase of Regulation D securities is made by an Individual Retirement Account and the participant is an accredited investor, the account would be accredited under Rule 501(a)(8).

B. Aggregate Offering Price--Rule 501(c)

The "aggregate offering price," defined in Rule 501(c), is the sum of all proceeds received by the issuer for issuance of its securities. The term is important to the operation of Rules 504 and 505, both of which impose a limitation on the aggregate offering price as a specific condition to the availability of the exemption. [FN21]

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

(Cite as: 1983 WL 409415, *1 (S.E.C. Release No.))

(31) Question: The sole general partner of a real estate limited partnership contributes property to the program. Must that property be valued and included in the overall proceeds of the offering as part of the aggregate offering price?

Answer: No, assuming the property is contributed in exchange for a general partnership interest.

(32) Question: An owner of a mining or oil and gas property is selling interests in the property to investors for cash. The owner will retain a royalty interest in the property. Must any subsequent royalty payments be included in the aggregate offering price of the property interests?

Answer: No. Royalty payments to the seller of the property are treated as operating expenses, rather than capitalized costs for the property. As such, the royalty payments are not part of the consideration received by the issuer for issuance of the securities.

(33) Question: Where the investors pay for their securities in installments and these payments include an interest component, must the issuer include interest payments in the "aggregate offering price?"

Answer: No. The interest payments are not deemed to be consideration for the issuance of the securities. [FN22]

(34) Question: An offering of interests in an oil and gas limited partnership provides for additional voluntary assessments. These assessments, undermined at the time of the offering, may be called at the general partner's discretion for developmental drilling activities. Must the assessments be included in the aggregate offering price, and if so, in what amount?

Answer: Because it is unclear that the assessments will ever be called, and because if they are called, it is unclear at what level, the issuer is not required to include the assessments in the aggregate offering price. In fact, the assessments will be consideration received for the issuance of additional securities in the limited partnership. This issuance will need to be considered along with the original issuance for possible integration, or, if not integrated, must find its own exemption from registration.

(35) Question: In purchasing interests in an oil and gas partnership, investors agree to pay mandatory assessments. The assessments, essentially installment payments, are non-contingent and investors will be personally liable for their payment. Must the issuer include the assessments in the aggregate offering price?

Answer: Yes. [FN23]

(36) Question: As part of their purchase of securities, investors deliver irrevocable letters of credit. Must the letters of credit be included in the aggregate offering price?

Answer: If these letters of credit were drawn against, the amounts involved would be considered part of the aggregate offering price. For this reason, in planning the transaction, the issuer should consider the full amount of the letters of credit in calculating the aggregate offering price.


C. Executive Officer--Rule 501(f)

The definition of executive officer in Rule 501(f) is the same as that in Rule 405 of Regulation C (17 CFR 230.405).

(37) Question: The executive officer of the parent of the Regulation D issuer performs a policy making function for its subsidiary. May that individual be deemed an "executive officer" of the subsidiary?

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

   Answer: Yes.

D. Purchaser Representative--Rule 501(h)

   A purchaser representative is any person who satisfies, or who the issuer reasonably believes statisfies, four conditions enumerated in Rule 501(h). Beyond the obligations imposed by that rule, any person acting as a purchaser representative must consider whether or not he is required to register as a broker-dealer under section 15 of the Securities Exchange Act of 1934 (the ""Exchange Act") (15 U.S.C. 78a-78kk (1976 & Supp. IV 1980)) or as an investment adviser under section 203 of the Investment Advisers Act of 1940 (15 U.S.C. 80b-1- 80b-21 (1976 & Supp. IV 1980)). [FN24]
   (38) Question: May the officer of a corporate general partner of the issuer qualify as a purchaser representative under Rule 501(h)?
   Answer: Rule 501(h) provides that "an affiliate, director, officer or other employee of the issuer" may not be a purchaser representative unless the purchaser has one of three enumerated relationships with the representative. The staff is of the view that an officer or director of a corporate general partner comes within the scope of "affiliate, director, officer or other employee of the issuer."
   (39) Question: May the issuer in a Regulation D offering pay the fees of the purchaser representative?
   Answer: Yes. Nothing in Regulation D prohibits the payment by the issuer of the purchaser representative's fees. Rule 501(h)(4), however, requires disclosure of this fact. [FN25]

II. Disclosure Requirements--Rule 502(b)

A. When Required

   Rule 502(b)(1) sets forth the circumstances when disclosure of the kind specified in the regulation must be delivered to investors. The regulation requires the delivery of certain information "during the course of the offering and prior to sale" if the offering is conducted in reliance on Rule 505 or 506 and if there are unaccredited investors. If the offering is conducted in compliance with Rule 504 or if securities are sold only to accredited investors, Regulation D does not specify the information that must be disclosed to investors. [FN26]
   (40) Question: An issuer furnishes potential investors a short form offering memorandum in anticipation of actual selling activities and the delivery of an expanded disclosure document. Does Regulation D permit the delivery of disclosure in two installments?
   Answer: So long as all the information is delivered prior to sale, the use of a fair and adequate summary followed by a complete disclosure document is not prohibited under Regulation D. Disclosure in such a manner, however, should not obscure material information.
   (41) Question: An issuer commences an offering in reliance on Rule 505 in which the issuer intends to make sales only to accredited investors. The issuer delivers those investors an abbreviated disclosure document. Before the completion of the offering, the issuer changes its intentions and proposes to make sales to non-accredited investors. Would the requirement that the issuer

         Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

deliver the specified information to all purchasers prior to sale if any sales
are made to non-accredited investors preclude application of Rule 505 to the
earlier sales to the accredited investors?
    Answer: No. If the issuer delivers a complete disclosure document to the
accredited investors and agrees to return their funds promptly unless they
should elect to remain in the program, the issuer would not be precluded from
relying on Rule 505.

B. What Required

    Regulation D divides disclosure into two categories: that to be furnished by
non-reporting companies and that required for reporting companies. In either
case, the specified disclosure is required to the extent material to an
understanding of the issuer, its business and the securities being offered.
    1. Non-Reporting Issuers--Rule 502(b)(2)(i). If the issuer is not subject to
the reporting requirements of section 13 or 15(d) of the Exchange Act, [FN27] it
must furnish the specified information "to the extent material to an
understanding of the issuer, its business and the securities being offered." For
offerings up to $5,000,000, the issuer should furnish the "same kind of
information" as would be contained in Part I of Form S-18, [FN28] except that
only the most recent year's financial statements need be certified. For
offerings over $5,000,000, the issuer should furnish "the same kind of
information" as would be required in Part I of an available registration
statement. [FN29]
    (42) Question: When an issuer is required to deliver specific disclosure, must
that disclosure be in written form?
    Answer: Yes.
    (43) Question: Form S-18 requires the issuer's audited balance sheet as of the
end of its most recently completed fiscal year or within 135 days if the issuer
has been in existence for a shorter time. With a limited partnership that has
been formed with minimal capitalization immediately prior to a Regulation D
offering, must the Regulation D disclosure document contain an audited balance
sheet for the issuer?
    Answer: In analyzing this or any other disclosure question under Regulation D,
the issuer starts with the general rule that it is obligated to furnish the
specified information "to the extent material to an understanding of the issuer,
its business, and the securities being offered." Thus, in this particular case,
if an audited balance sheet is not material to the investor's understanding,
then the issuer may elect to present an alternative to its audited balance
sheet.
    (44) Question: Is Securities Act Industry Guide 5 [FN30] applicable in a
$4,000,000 Regulation D offering of interests in a real estate limited
partnership?
    Answer: Rule 502(b)(2)(i)(A) requires the issuer to provide the same kind of
information as that required in Part I of Form S-18. [FN31]
    Form S-18 directs the issuer's attention to the Industry Guides noting that
such guides "represent Division practices with respect to the disclosure to be
provided by the affected industries in registration statements." In preparing
its Regulation D offering material, therefore, an issuer of interests in a real
estate limited partnership should consider Guide 5 in determining the disclosure
that will be material to the investor's understanding of the issuer, its

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

(Cite as: 1983 WL 409415, *1 (S.E.C. Release No.))

business and the securities being offered.

(45) Question: In a $4,000,000 Regulation D offering of interests in an oil and gas limited partnership, what are the issuer's disclosure obligations with respect to financial statements of the general partner?

Answer: Item 21(h) of Form S-18 provides that the issuer should furnish the audited balance sheet as of the end of the most recent fiscal year of any corporation or partnership that is a general partner of the issuer. For any general partner that is a natural person, in lieu of an audited balance sheet, the issuer may furnish a statement of that individual's net worth in the text of the disclosure document, where assets and liabilities are estimated at fair market value with provisions for estimated income taxes on unrealized gains. [FN32]

(46) Question: The issuer in a $3,000,000 Regulation D offering is a limited partnership that will acquire certain real estate operations with the offering proceeds. What is the appropriate consideration for disclosure of the operating history of these operations?

Answer: Item 21(g) of Form S-18, which provides special guidance for such disclosure, calls for the audited income statements of the operations, with certain exclusions, for the two most recent fiscal years. If the issuer can meet certain conditions, however, the instruction reduces that requirement to only one year of audited income statements. [FN33]

Under Regulation D, Rule 502(b)(2)(i)(A) provides that only the financial statements for the issuer's most recent fiscal year must be certified in an offering not in excess of $5,000,000. The staff is of the view that this provision applies to all financial statements in the disclosure document. Thus, in the Regulation D offering described, the following considerations apply. If the issuer can meet the conditions in Item 21(g) of Form S-18, it may present one year of audited income statements on the operations to be acquired. If the issuer cannot meet the conditions in Form S-18, then it should present two years of income statements, only one of which must be audited.

(47) Question: If the issuer in Question 46 cannot obtain the financial statements on the operations to be acquired without unreasonable effort or expense, what further considerations are applicable under Regulation D?

Answer: Rule 502(b)(2)(i)(A) provides that "[i]f the issuer is a limited partnership and cannot obtain the required financial statements without unreasonable effort or expense, it may furnish financial statements that have been prepared on the basis of federal income tax requirements and examined and reported on in accordance with generally accepted auditing standards by an independent public or certified accountant." The staff interprets this provision to apply to all financial statements that the issuer presents in the offering document. Thus, the issuer described above may present tax basis operating statements on the operations to be acquired. [FN34]

(48) Question: Has the Commission defined or will the staff issue interpretations on the term "unreasonable effort or expense?"

Answer: No. The meaning of "unreasonable effort or expense" depends on the particular facts and circumstances attending each case. Only the issuer will know the facts and circumstances and be able to evaluate them with respect to the requirements of the rule.

(49) Question: The issuer in a Regulation D offering of $7,000,000 is a corporation. That corporation is acquiring a business. The issuer is unable to obtain the financial statements for that business without unreasonable effort or

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

expense. [FN35] What are the relevant considerations under Regulation D?
    Answer: Rule 502(b)(2)(i)(B) provides that if the issuer is not a limited
partnership and "cannot obtain audited financial statements without unreasonable
effort or expense, then only the issuer's balance sheet, which shall be dated
within 120 days of the start of the offering, must be audited." The staff has
interpreted this provision in the context of Rule 3-05 of Regulation S-X to
apply to the financial statements of the business being acquired. Thus, if the
business being acquired is other than a limited partnership, and if the issuer
cannot obtain audited financial statements of that business without unreasonable
effort or expense, then the issuer may provide the relevant financial statements
for the business being acquired on and unaudited basis so long as it also
provides an audited **balance sheet** for that business dated within 120 days of the
start of the offering, or, if appropriate, as of the date of acquisition of the
business. [FN36]
    2. Reporting **Issuers--Rule 502(b)(2)(ii)**. If the issuer is subject to the
reporting requirements of section 13 or 15(d) of the Exchange Act, Regulation D
sets forth two alternatives for disclosure: the issuer may deliver certain
recent Exchange Act reports (the annual report, the definitive proxy statement,
and, if requested, the Form 10-K (17 CFR 249.310)) or it may provide a document
containing the same information as in the Form 10-K or Form 10 (17 CFR 249.210)
under the Exchange Act or in a registration statement under the Securities Act.
In either case the rule also calls for the delivery of certain supplemental
information.
    (50) Question: Rule 502(b)(2)(ii)(B) refers to the information contained "in a
registration statement on Form S-1." Does this requirement envision delivery of
Parts I and II of the Form S-1?
    Answer: No. Rule 502(b)(2)(ii)(B) should construed to mean Part I of Form S-
1.
    (51) Question: A reporting company with a fiscal year ending on December 31 is
making a Regulation D offering in February. It does not have an annual report to
shareholders, an associated definitive proxy statement, or a Form 10- K for its
most recently completed fiscal year. The issuer's last registration statement
was filed more than two years ago. What is the appropriate disclosure under
Regulation D?
    Answer: The issuer may base its disclosure on the most recently completed
fiscal year for which an annual report to shareholders on Form 10-K was timely
distributed or filed. The issuer should supplement the information in the report
used with the information contained in any reports or documents required to be
filed under sections 13(a), 14(a), 14(c) and 15(d) of the Exchange Act since the
distribution or filing of that report and with a brief description of the
securities being offered, the use of the proceeds from the offering, and any
material changes in the issuer's affairs that are not disclosed in the documents
furnished. See Rule 502(b)(2)(ii)(C).

C. General

    Rule 502(b)(2) also contains four general provisions applicable to all classes
of issuer in all offerings where specified disclosure is required. These
provisions govern exhibits, disclosure of additional information to non-
accredited investors, the opportunity for further investor inquiries, and
disclosure of certain additional information in business combinations.

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

(52) Question: In a Rule 505 or 506 offering of interests in a limited partnership where certain purchasers are not accredited investors, must the issuer obtain an opinion of counsel regarding the legality of the securities being issued or an opinion regarding the tax consequences of an investment in the offering?

Answer: Rule 502(b)(2)(iii) provides that the issuer is not required to furnish the exhibits that would accompany the form of registration or report governing the issuer's disclosure document if the issuer identifies the contents of those exhibits and makes them available to purchasers upon written request prior to purchase. [FN37] Any form of registration to which the issuer refers in preparing its disclosure document under Regulation D requires that the issuer furnish the exhibits required by Item 601 of Regulation S-K. Item 601 requires that the issuer furnish, among other exhibits, an opinion of counsel as to the legality of the securities being issued. Thus, under Rule 502(b)(2)(iii), the issuer should identify the contents of this opinion of counsel and make it available to purchasers upon written request. Item 601 also sets forth certain requirements for an opinion as to tax matters. Such an opinion is required to support any representations in a prospectus as to material tax consequences. Thus, assuming the Regulation D issuer will make representations in the disclosure document as to material tax consequences of investing in a limited partnership, the issuer should identify the contents of and make available upon request an opinion supporting that discussion. [FN38]

III. Operational Conditions

A. Integration--Rule 502(a)

Rule 502(a) achieves two purposes. First, it explicitly incorporates the doctrine of integration into Regulation D. Second, it establishes an exception to the operation of that doctrine.

Integration operates to identify the scope of a particular offering by considering the relationship between multiple transactions. It is premised on the concept that the Securities Act addresses discrete offerings and on the recognition that not every offering is in fact a discrete transaction. The integration doctrine prevents an issuer from circumventing the registration requirements of the Securities Act by claiming a separate exemption for each part of a series of transactions that comprises a single offering. Because the determination of whether transactions should be integrated into one offering is so dependent on particular facts and circumstances, the staff does not issue interpretations in this area. [FN39] The Note to Rule 502(a), however, does set forth a number of factors that should be considered in making an integration determination.

Rule 502(a) also sets forth an exception to the integration doctrine. It provides that a Regulation D offering will not be integrated with offers or sales that occur more than six months before or after the Regulation D offering. This six month safe harbor rule only applies, however, where there have been no offers or sales (except under an employee benefit plan) of securities similar to those in the Regulation D offering within the applicable six months. [FN40]

(53) Question: An issuer conducts offering (A) under Rule 504 of Regulation D that concludes in January. Seven months later the issuer commences offering (B) under Rule 506. During that seven month period the issuer's only offers or sales

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

of securities are under an employee benefit plan (C). Must the issuer integrate (A) and (B)?

Answer: No. Rule 502(a) specifically provides that (A) and (B) will not be integrated. [FN41]

B. Calculation of the Number of Purchasers--Rule 501(e)

Rule 501(e) governs the calculation of the number of purchasers in offerings that rely either on Rule 505 or 506. Both of these rules limit the number of nonaccredited investors to 35. Rule 501(e) has two parts. The first excludes certain purchasers from the calculation. The second establishes basic principles for counting of corporations, partnerships, or other entities.

(54) Question: One purchaser in a Rule 506 offering is an accredited investor. Another is a first cousin of that investor sharing the same principal residence. Each purchaser is making his own investment decision. How must the issuer count these purchasers for purposes of meeting the 35 purchaser limitation?

Answer: The issuer is not required to count either investor. The accredited investor may be excluded under Rule 501(e)(1)(iv), and the first cousin may then be excluded under Rule 501(e)(1)(i). [FN42]

(55) Question: An accredited investor in a Rule 506 offering will have the securities she acquires placed in her name and that of her spouse. The spouse will not make an investment decision with respect to the acquisition. How many purchasers will be involved?

Answer: The accredited investor may be excluded from the count under Rule 501(e)(1)(iv) and the spouse may be excluded under Rule 501(e)(1)(i). The issuer may also take the position, however, that the spouse should not be deemed a purchaser at all because he did not make any investment decision, and because the placement of the securities in joint name may simply be a tax or estate planning technique.

(56) Question: An offering is conducted in the United States under Rule 505. At the same time certain sales are made overseas. Must the foreign investors be included in calculating the number of purchasers?

Answer: Offers and sales of securities to foreign persons made outside the United States in such a way that the securities come to rest aboard generally do not need to be registered under the Act. This basis for non-registration is separate from Regulation D and offers and sales relying on this interpretation are not required to be integrated with a coincident domestic offering. [FN43] Thus, assuming the sales in this question rely on this interpretation, foreign investors would not be counted.

(57) Question: An investor in a Rule 506 offering is a general partnership that was not organized for the specific purpose of acquiring the securities offered. The partnership has ten partners, five of whom do not qualify as accredited investors. The partnership will make an investment of $100,000. How is the partnership counted and must the issuer make any findings as to the sophistication of the individual partners?

Answer: Rule 501(e)(2) provides that the partnership shall be counted as one purchaser. The issuer is not obligated to consider the sophistication of each individual partner.

(58) Question: If the partnership in Question 57 purchases $200,000 of the securities being offered and if that amount does not exceed 20 percent of the partnership's net worth, how should the partnership be counted?

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

Answer: Rule 501(e)(2), which provides that the partnership shall be counted as one purchaser, operates in tandem with Rule 501(e)(1). Thus, because the partnership is an accredited investor (in this case under Rule 501(a)(5)), the partnership may be exluded from the count under Rule 501(e)(2)(iv).

(59) Question: An investor in a Rule 506 offering is an investment partnership that is not accredited under Rule 501(a)(8). Although the partnership was organized two years earlier and has made investments in a number of offerings, not all the partners have participated in each investment. With each proposed investment by the partnership, individual partners have received a copy of the disclosure document and have made a decision whether or not to participate. How do the provisions of Regulation D apply to the partnership as an investor?

Answer: The partnership may not be treated as a single purchaser. Rule 501(e)(2) provides that if the partnership is organized for the specific purpose of acquiring the securities offered, then each beneficial owner of equity interests should be counted as a separate purchaser. Because the individual partners elect whether or not to particpate in each investment, the partnership is deemed to be reorganized for the specific purpose of acquiring the securities in each investment. [FN44] Thus, the issuer must look through the partnership to the partners participating in the investment. The issuer must satisfy the conditions of Rule 506 as to each partner.

C. Manner of Offering--Rule 502(c)

Rule 502(c) prohibits the issuer or any person acting on the issuer's behalf from offering or selling securities by any form of general solicitation or general advertising. The analysis of facts under Rule 502(c) can be divided into two separate inquiries. First, is the communication in question a general solicitation or general advertisement? Second, if it is, is it being used by the issuer or by someone on the issuer's behalf to offer or sell the securities? If either question can be answered in the negative, then the issuer will not be in violation of Rule 502(c). Questions under Rule 502(c) typically present issues of fact and circumstance that the staff is not in a position to resolve. In several instances, however, the staff has been able to te address questions under the rule.

In analyzing what constitutes a general solicitation, the staff considered a solicitation by the general partner of a limited partnership to limited partners in other active programs sponsored by the same general partner. In determining that this did not constitute a general solicitation the Division underscored the existence and substance of the preexisting business relationship between the general partner and those being solicited. The general partner represented that it believed each of the solicitees had such knowledge and experience in financial and business matters that he or she was capable of evaluating the merits and risks of the prospective investment. See letter re Woodtrails-Seattle, Ltd. dated July 8, 1982.

In analyzing whether or not an issuer was using a general advertisement to offer or sell securities, the staff declined to express an opinion on a proposed tombstone advertisement that would announce the completion of an offering. See letter re Alma Securities Corporation dated July 2, 1982. Because the requesting letter did not describe the proposed use of the tombstone announcement and because the announcement of the completion of one offering could be an indirect solicitation for a new offering, the staff did not express a view. In a latter

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

re Tax Investment Information Corporation dated January 7, 1983, the staff considered whether the publication of a circular analyzing private placement offerings, where the publisher was independent from the issuers and the offerings being analyzed, would violate Rule 502(c). Although Regulation D does not directly prohibit such a third party publication, the staff refused to agree that such a publication would be permitted under Regulation D because of its susceptability to use by participants in an offering. Finally, in the letter re Aspen Grove dated November 8, 1982 the staff expressed the view that the proposed distribution of a promotional brochure to the members of the "Thoroughbred Owners and Breeders Association" and at an annual sale for horse owners and the proposed use of a magazine advertisement for an offering of interests in a limited partnership would not comply with Rule 502(c).

   (60) Question: If a solicitation were limited to accredited investors, would it be deemed in compliance with Rule 502(c)?

   Answer: The mere fact that a solicitation is directed only to accredited investors will not mean that the solicitation is in compliance with Rule 502(c). Rule 502(c) relates to the nature of the offering not the nature of the offerees.

D. Limitations on Resale--Rule 502(d)

   Rule 502(d) makes it clear that Regulation D securities have limitations on transferability and requires that the issuer take certain precautions to restrict the transferability of the securities.

   (61) Question: An investor in a Regulation D offering wishes to resell his securities within a year after the offering. The issuer has agreed to register the securites for resale. Will the proposed resale under the registration statement violate Rule 502(d)?

   Answer: No. The function of Rule 502(d) is to restrict the unregistered resale of securities. Where the resale will be registered, however, such restrictions are unnecessary.

IV. Exemptions

A. Rule 504

   Rule 504 is an exemption under section 3(b) of the Securities Act available to non-reporting and non-investment [FN45] companies for offerings not in excess of $500,000.

   (62) Question: A foreign issuer proposes to use Rule 504. The issuer is not subject to section 15(d) and its securities are exempt from registration under Rule 12g3-2 (17 CFR 240.12g3-2). May this issuer use Rule 504?

   Answer: Yes.

   (63) Question: An issuer proposes to make an offering under Rule 504 in two states. The offering will be registered in one state and the issuer will deliver a disclosure document pursuant to the state's requirements. The offering will be made pursuant to an exemption from registration in the second state. Must the offering satisfy the limitations on the manner of offering and on resale in paragraphs (c) and (d) of Rule 502?

   Answer: Yes. An offering under Rule 504 is exempted from the manner of sale and resale limitations only if it is registered in each state in which it is

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works



(Cite as: 1983 WL 409415, *1 (S.E.C. Release No.))

conducted and only if a disclosure document is required by state law.
   (64) Question: The state in which the offering will take place provides for
""qualification" of any offer or sale of securities. The state statute also
provides that the securities commissioner may condition qualification of an
offering on the delivery of a disclosure document prior to sale. Would the
issuer be making its offering in a state that "provides for registration of the
securities and requires the delivery of a disclosure document before sale" if
its offering were qualified in this state on the condition that it deliver a
disclosure document before sale to each investor?
   Answer: Yes. [FN46]
   (65) Question: If an issuer is registering securities at the state level, are
there any specific requirements as to resales outside of that state if the
issuer is attempting to come within the provision in Rule 504 that waives the
limitations on the manner of offering and on resale in Rules 502(c) and (d)?
   Answer: No. [FN47] The issuer, however, must intend to use Rule 504 to make
bona fide sales in that state and not to evade the policy of Rule 504 by using
sales in one state as a conduit for sales into another state. See Preliminary
Note 6 to Regulation D.

B. Rule 505

   Rule 505 provides an exemption under section 3(b) of the Securities Act for
non-investment companies for offerings not in excess of $5,000,000.
   (66) Question: An issuer is a broker that was censured pursuant to a
Commission order. Does the censure bar the issuer from using Rule 505?
   Answer: No. Rule 505 is not available to any issuer who falls within the
disqualifications for the use of Regulation A (17 CFR 230.251-.264). See Rule
505(b)(2)(iii). One such disqualification occurs when the issuer is subject to a
Commission order under section 15(b) of the Exchange Act. A censure has no
continuing force and thus the issuer is not subject to an order of the
Commission.

C. Questions Relating to Rules 504 and 505

   Both Rules 504(b)(2)(i) and 505(b)(2)(i) require that the offering not exceed
a specified aggregate offering price. The allowed aggregate offering price,
however, is reduced by the aggregate offering price for all securities sold
within the last twelve months in reliance on section 3(b) or in violation of
section 5(a) of the Securities Act.
   (67) Question: An issuer preparing to conduct an offering of equity securities
under Rule 505 raised $2,000,000 from the sale of debt instruments under Rule
505 eight months earlier. How much may the issuer raise in the proposed equity
offering?
   Answer: $3,000,000. A specific condition to the availability to Rule 505 for
the proposed offering is that its aggregate offering price not exceed $5,000,000
less the proceeds for all securities sold under section 3(b) within the last 12
months.
   (68) Question: An issuer is planning a Rule 505 offering. Ten months earlier
the issuer conducted a Rule 506 offering. Must the issuer consider the previous
Rule 506 offering when calculating the allowable aggregate offering price for
the proposed Rule 505 offering?

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

(Cite as: 1983 WL 409415, *1 (S.E.C. Release No.))

Answer: No. The Commission issued Rule 506 under section 4(2), and Rule 505(b)(2)(i) requires that the aggregate offering price be reduced by previous sales under section 3(b). [FN48]

(69) Question: Seven months before a proposed Rule 504 offering the issuer conducted a rescission offer under Rule 504. The rescission offer was for securities that were sold in violation of section 5 more than 12 months before the proposed Rule 504 offering. Must the aggregate offering price for the proposed Rule 504 offering be reduced either by the amount of the rescission offer or the earlier offering in violation of section 5?

Answer: No. The offering in violation of section 5 took place more than 12 months earlier and thus is not required to be included when satisfying the limitation in Rule 504(b)(2)(i). The staff is of the view that the rescission offer relates back to the earlier offering and therefore should not be included as an adjustment to the aggregate offering price for the proposed Rule 504 offering.

(70) Question: Rules 504 and 505 contain examples as to the calculation of the allowed aggregate offering price for a particular offering. Do these examples contemplate integration of the offerings described?

Answer: No. The examples have been provided to demonstrate the operation of the limitation on the aggregate offering price in the absence of any integration questions.

(71) Question: Note 2 to Rule 504 is not restated in Rule 505. Does the principle of the note apply to Rule 505?

Answer: Yes. Note 2 to Rule 504 sets forth a general principle to the operation of the rule on limiting the aggregate offering price which is the same for both Rules 504 and 505. It provides that if, as a result of one offering, an issuer exceeds the allowed aggregate offering price in a subsequent unintegrated offering, the exemption for the first offering will not be affected.

D. Rule 506

(72) Question: May an issuer of securities with a projected aggregate offering price of $3,000,000 rely Rule 506?

Answer: Yes. The availability of Rule 506 is not dependent on the dollar size of an offering.

(73) Question: Rule 506 requires that the issuer shall reasonably believe that each purchaser who is not an accredited investor either alone or with a purchaser representative has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospectve investment. Former Rule 146 required the issuer to make a similar determination with respect to each offeree. Rule 506 is not an exclusive basis for satisfying the requirements of the private offering exemption in section 4(2). See Preliminary Note 3 to Regulation D. What is the Commission's view of the relevance of the nature of the offerees in an offering that relies exclusively on section 4(2) as its basis for exemption from registration?

Answer: Clearly, in an offering relying exclusively on section 4(2) for an exemption from registration, all offerees who purchase must possess the requisite level of sophistication. The sophistication of each of those to whom the securities are offered who do not purchase is not a fact that in and of itself should determine mechanically the availability of the exemption; the number and the nature of the offerees, however, are relevant in determining

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

whether an issure has engaged in a general solicitation or general advertising that would preclude reliance on the exemption in section 4(2).

E. Questions Relating to Rules 504-506

(74) Question: If an issuer relies on one exemption, but later realizes that exemption may not have been made available, may it rely on another exemption after the fact?
Answer: Yes, assuming the offering met the conditions of the new exemption. No one exemption is exclusive of another.
(75) Question: May foreign issuers use Regulation D?
Answer: Yes. Recent amendments to Regulation D have clarified the disclosure requirements for foreign issuers. [FN49]
(76) Question: Is Regulation D available to an underwriter for the sale of securities acquired in a firm commitment offering?
Answer: No. As Preliminary Note 4 indicates, Regulation D is available only to the issuer of the securities and not to any affiliate of that issuer or to any other person for resales of the issuer's securities. See also Rule 502(d) which limits the resale of Regulation D securities.
(77) Question: Regulation T (12 CFR 220.1-.8) of the Federal Reserve Board imposes certain restrictions on brokers and dealers for the use of credit in the purchase of securities. Regulation T provides an exemption from those provisions for the arrangement of credit in a sale of securities that is exempt from the registration requirements of the Securities Act under section 4(2). See 12 CFR 220.7(g). What is the applicability of this provision to offerings conducted under Regulation D?
Answer: Regulation T is interpreted by the Federal Reserve Board which has expressed the view that the exemption from Regulation T in 12 CFR 220.7(a) is available for offerings conducted in reliance on Rules 505 and 506, [FN50] but not for those under 504. [FN51]
(78) Question: A corporation proposes to implement an employee stock option plan for key employees. Can the issuer rely on Regulation D for an exemption from registration for the issuance of securities under the plan?
Answer: The corporation may use Regulation D for the sale of its securities under the plan to the extent that such offering complies with Regulation D. In a typical plan, the grant of the options will not be deemed a sale of a security for purposes of the Securities Act. The issuer, therefore, will be seeking an exemption for the issuance of the stock underlying the options. The offering of this stock generally will commence when the options become exercisable and will continue until the options are exercised or otherwise terminated. Where the key employees involved are directors or executive officers, such individuals will be accredited investors under Rule 501(a)(4) if they purchase securities through the exercise of their options. Other key employees may be accredited as a result of net worth or income under Rules 501(a)(6) or (a)(7).
(79) Question: In an "all or none" or minimum-maximum Regulation D offering of interests in a limited partnership, the general partner proposes, if necessary, to purchase enough interests for the issuer to sell a specified level of interests by the specified expiration date of the offering. What disclosure and other considerations are relevant?
Answer: The staff is of the view that pursuant to Rule 10b-9 under the Exchange Act, the issuer must disclose the possibility that the general partner

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

may make purchases of the limited partnership interests in order to meet the specified minimum. In addition, the issuer should disclose the maximum amount of the possible purchases. Finally, these purchases must be for investment and not resale. Questions regarding these views should be directed to the Division of Market Regulation, Office of Trading Practices, (202) 272-2874.

(80) Question: An issuer will conduct a Regulation D offering on an "all or none" basis within a specified time. What considerations are there for the issuer if it wishes to extend the offering beyond the specified time in order to sell the specified amount of securities?

Answer: The staff is of the view that an offering may be extended beyond the specified time without resulting in a violation of Rule 10b-9 under the Exchange Act or, in the case of an offering in which a broker-dealer is a participant, Rule 15c2-4 under the Exchange Act, under the following conditions:

a. Prior to the specified expiration date, a reconfirmation offer must be made to all subscribers that discloses the extension of the offering and any other material information necessary to update previously provided disclosure.

b. The reconfirmation offer must be structured so that the subscriber affirmatively elects to continue his investment and so that those subscribers who take no affirmative action will have their funds returned to them.

c. The reconfirmation offer must be made far enough in advance of the specified expiration date so that any subscriber who does not elect to continue his investment will have his funds returned to him promptly after the specified expiration date.

Questions regarding these views should be directed to the Division of Market Regulation, Office of Trading Practices, (202) 272-2874.

V. Notice of Sale--Form D

Rule 503 requires the issuer to file a notice of sale on Form D. The notice must be filed not later than 15 days after the first sale, every six months thereafter, and no later than 30 days after the last sale. [FN52]

(81) Question: Where can an issuer obtain copies of Form D and where must the form be filed?

Answer: Form D is available through the Public Reference Branch of the Commission's main office, 450 5th Street, NW., Washington, D.C. 20549, (202) 272-7460, or any of its regional or branch offices. The form should be filed at the Commission's main office. There is no filing fee.

(82) Question: In a minimum-maximum offering where subscription funds are held in escrow pending receipt of minimum subscriptions, when is the first Form D required to be filed?

Answer: In the context of Rule 503, the first sale takes place upon receipt of the first subscription agreement and the deposit of the first funds into escrow. The issuer, therefore, should file its first Form D not later than 15 days after the receipt of the first subscription agreement.

(83) Question: An issuer conducting a minimum-maximum offering has received subscriptions for the minimum number of interests needed to form the limited partnership. Subsequent to closing and formation of the partnership, the issuer continues to offer interests. After two months in which no sales take place, the issuer decides to terminate the offering. Because more than 30 days have elapsed since the last sale, how can the issuer comply with Rule 503 in the filing of its final Form D?

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

(Cite as: 1983 WL 409415, *1 (S.E.C. Release No.))

Answer: The staff is of the view that a final Form D may be filed not later than 30 days after the last sale or after the termination of the offering, whichever occurs later.

(84) Question: In an employee stock option plan, when would the first and last Form D be filed?

Answer: The first Form D should be filed not later than 15 days after the exercise of the first option. The final Form D would be due not later than 30 days after the exercise or expiration of the last outstanding option, whichever occurs later.

(85) Question: An issuer commences a Regulation D offering and files an original Form D not later than 15 days after the first sale. Subsequently, because no further sales are made, the issuer returns the money to the one investor and terminates the offering. How should the issuer reflect the unsuccessful offering on its Form D?

Answer: The issuer should file a final Form D indicating zero sales, investors, and proceeds.

(86) Question: If the issuer is a limited partnership, who would be considered the chief executive officer for purposes of Form D questions?

Answer: The chief executive officer of a limited partnership is that individual who fulfills the function of chief executive officer. That individual may be the chief executive officer of a corporate general partner.

(87) Question: What is a Standard Industrial Classification ("SIC") and where is it obtained?

Answer: The SIC is a code associated with a particular economic activity. The SIC system, developed by the Bureau of the Census under the auspices of the Office of Management and Budget, is used in classification of establishments by the type of activities in which they are engaged. An issuer's SIC can be found in the Standard Industrial Classification Manual, a publication of the U.S. Government that may be obtained from the Superintendent of Documents and is generally available in public and university libraries.

(88) Question: Question 8 of Part A asks for the issuer's CUSIP number. What is a CUSIP number?

Answer: CUSIP [FN53] is the trademark for a system that identifies specific security issuers and their classes of securities. Under the CUSIP plan, a CUSIP number is permanently assigned to each class and will identify that class and no other. Generally, a CUSIP number will be assigned only to a class for which there is a secondary trading market. The operation of the CUSIP numbering system is controlled by the CUSIP Board of Trustees which awarded a contract to Standard & Poor's Corporation to function as the CUSIP Service Bureau, the operational arm of the system. Issuers relying on Regulation D that do not have a class of securities with a secondary trading market and thus do not have a CUSIP number should answer Question 8 in the negative.

(89) Question: Part B of Form D requests statistical information about the issuer. In an offering of interests in a limited partnership to be formed, how should this part be answered?

Answer: The answers to Part B should be with respect to the partnership to be formed and will be zero or "not applicable." This will reflect the statistical profile of a start-up issuer.

(90) Question: Question 2 to Part C requests certain information as to the number of accredited and non-accredited investors in a Rule 505 or 506 offering. Must an issuer make a finding as to accredited investors even if the issuer is

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

not relying on the accredited investor concept in its offering?
   Answer: No. Where an issuer under Rule 505 or 506 is not relying on the
accredited investor concept for all or certain investors, it should treat those
investors as non-accredited for purposes of this question.
   (91) Question: Questions 5 and 6 to Part C request certain information
regarding the offering expenses and the use of proceeds. May the issuer attach a
separate schedule listing expenses and use of proceeds in lieu of completing
these questions?
   Answer: No. The Form D has been formulated for keypunching and entry of the
information into an automatic data storage system. Failure to complete the
questions on the form in the space provided frustrates the objectives of the
form.
   (92) Question: May the Form D be signed by the issuer's attorney?
   Answer: Form D may be signed on behalf of the issuer by anyone who is duly
authorized.

Text of Amendment

List of Subjects in 17 CFR Part 231

   Reporting requirements, Securities.
   In accordance with the foregoing, Title 17, Chapter II, of the Code of Federal
Regulations is amended as follows:

PART 231--INTERPRETIVE RELEASES RELATING TO THE SECURITIES ACT OF 1933 AND
GENERAL RULES AND REGULATIONS THEREUNDER.

   1. Part 231 is amended by adding this Release No. 33-6455 (March 3, 1983) to
the list of interpretive releases.

By the Commission.

George A. Fitzsimmons,
Secretary

FN1. Prior releases leading to the adoption of Regulation D included Release No.
33-6274 (December 23, 1980) (46 FR 2631) in which the Commission considered and
requested comments on various exemptions under the Securities Act and Release
No. 33-6339 (August 7, 1981) (46 FR 41791) in which the Commission published
proposed Regulation D for comment.

FN2. The term also is essential to the operation of section 4(6) of the
Securities Act which exempts certain transactions involving sales solely to
accredited investors. The definition of accredited investor for section 4(6) is
found at section 2(15) of the Securities Act and Rule 215 (17 CFR 230.321). Rule
501(a) combines and repeats those provisions. As a result, interpretations
regarding the definition of "accredited investor" in Regulation D also apply to
the definition of that term under section 4(6).

FN3. Preliminary Note 6 to Regulation D would support a different analysis if it
could be shown that the director's appointment or resignation was "part of a

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

plan or scheme to evade the registration provisions of the Act."

FN4. Rule 501(a)(1) refers to "[a]ny bank as defined in section 3(a)(2) of the Act." Section 3(a)(2) provides that the term "bank" includes "any national bank." Section 3(a)(2) also provides that where a common or collective trust fund is involved, the term "bank" has the same meaning as in the Investment Company Act of 1940 (the "Investment Company Act") (15 U.S.C. 80a-1- 80a-6.5 (1976 & Supp. IV 1980)). Section 2(a)(5) of the Investment Company Act defines ""bank."

FN5. See letter re Voluntary Hospitals of America, Inc. dated November 30, 1982.

FN6. See letter re Voluntary Hospitals of America, Inc. dated September 10, 1982.

FN7. See Question 37.

FN8. Section 2(2) of the Securities Act includes corporations and partnerships within the definition of "person."

FN9. See letter re Intuit Telecom Inc. dated March 24, 1982.

FN10. See letter to Kim R. Clark, Esq. dated December 8, 1982.

FN11. See letter to Kim R. Clark, Esq. dated December 8, 1982.

FN12. See letter re Winthrop Financial Co., Inc. dated May 25, 1982.

FN13. Note that this $50,000 is not deemed to be "an unconditional obligation to pay" and cannot be included in calculating whether or not the investor meets the $150,000 purchase test of Rule 501(a)(5). See Question 10.

FN14. See letter to Lola M. Hale, Esq. dated July 1, 1982.

FN15. See letter re Smith Barney, Harris Upham & Co. dated July 14, 1982.

FN16. See CFR 230.405 for the difinition of "totally held subsidiary."

FN17. See letter re Federated Financial Corporation dated May 13, 1982.

FN18. Section 2(2) of the Securities Act includes "a trust" within the definition of "person" but limits that inclusion to "a trust where the interest or interests of the beneficiary or beneficiaries are evidenced by a security." The Division does not view that limitation as being necessary in the context of a trust as a purchaser of securities under Rule 501(a)(5).

FN19. The result would also be different in the case of a business trust, a real estate investment trust, or other similar entities.

FN20. See letter re Rule 501(a)(8) of Regulation D dated July 16, 1982.

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

FN21. The basis for a limitation on the aggregate offering price derives from section 3(b) of the Securities Act. Section 3(b) accords authority to the Commission to adopt rules exempting any class of securities as long as no issue of securities is exempted "where the aggregate amount at which such issue is offered to the public exceeds $5,000,000." See also section 4(6) which exempts a transaction involving offers and sales solely to one or more accredited investors "if the aggregate offering price of an issue" does not exceed the amount allowed under section 3(b).

FN22. This presumes that the payments are in fact for interest. See Preliminary Note 6 to Regulation D.

FN23. See letter to Kim R. Clark, Esq. dated November 8, 1982.

FN24. See letters to Winstead, McGuire, Sechrest & Trimble dated February 21 and 25, 1975 and re Kenisa Oil Company dated April 6, 1982. Questions regarding registration as a broker-dealer should be directed to the Office of Chief Counsel, Division of Market Regulation. (202) 272-2844. Questions regarding registration as an investment adviser should be directed to the Office of Chief Counsel, Division of Investment Management, (202) 272-2030.

FN25. Note 3 to Rule 501(h) points out that disclosure of a material relationship between the purchaser representative and the issuer will not relieve the purchaser representative of the obligation to act in the interest of the purchaser.

FN26. As noted in Preliminary Note 1, Regulation D transactions are exempt from the registration requirements of the Securities Act, not the antifraud provisions. Thus, nothing in Regulation D states that an issuer need not give disclosure to an investor. Rather, the regulation provides that in certain instances the exemptions from registration will not be conditioned on a particular content, format or method of disclosure.

FN27. An issuer is subject to section 13 reporting obligations if it has a class of securities registered under section 12 of the Exchange Act. An issuer is subject to section 15(d) reporting obligations if it has had a Securities Act registration statement go effective, or if in any year after the year of effectiveness, it has at least 300 holders of the class of securities to which the registration statement applied. In the latter instance, however, even if the issuer has 300 or more shareholders, it may not be subject to section 15(d) reporting obligations if it has had less than 500 shareholders and less than $3,000,000 in assets during the last three years. See Rule 15d-6 (17 CFR 240.15d-6) under the Exchange Act.

FN28. See 17 CFR 239.28. Form S-18 is an abbreviated registration form for certain offerings not exceeding $5,000,000. The form is not available to issuers that report under the Exchange Act.

FN29. Rules 502(b)(2)(i)(C) and 502(b)(2)(ii)(D) contain special provisions for foreign issuers recently adopted by the Commission. See Release No. 33-6437 (November 19, 1982) (47 FR 54764).

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

FN30. The Commission adopted 53 Securities Act Guides in 1968 (Release No. 33-4936 (December 9, 1968) (33 FR 18617)) and 10 additional ones subsequently. The Guides served as an expression of the policies and practices of the Division of Corporation Finance. Most of those Guides have been incorporated into Regulation C (17 CFR 230.400-.494) and Regulation S-K (17 CFR 229.10-.802) (see Release No. 33-6383 (March 3, 1982) (47 FR 11380)) and thus were rescinded (see Release No. 33-6384 (March 3, 1982) (47 FR 11476)). Five of the Guides applicable to specific industries were not rescinded, however, and were redesignated. Guide 5, which was Guide 60, applies to the preparation of registration statements relating to interests in real estate limited partnerships. Guide 5 was revised in Release No. 33- 6405 (June 3, 1982) (47 FR 25140).

FN31. Form S-18 has been amended recently to permit its use by limited partnerships. Release No. 33-6406 (June 4, 1982) (47 FR 25126).

FN32. The same general rule would be applicable to an offering in excess of $5,000,000. See Release No. SAB-40, Topic 6.D.3.d. (January 23, 1981).

FN33. The parallel to this instruction under other forms of registration is Rule 3-14 of Regulation S-X (17 CFR 210.3-14). Rule 3-14 requires income statements for the three most recent fiscal years, unless the issuer meets certain conditions, in which case the issuer need present only one year of audited income statements.

FN34. See letter re Winthrop Financial Co., Inc. dated May 25, 1982. In response to inquiries regarding the appropriateness of tax basis financial statements, issuers should refer to Statement on Auditing Standards No. 14, Special Reports, American Institute of Certified Public Accountants, December 1976.

FN35. The issuer should refer to Rule 3-05 of Regulation S-X (17 CFR 210.3- 05) for the disclosure guidelines on businesses to be acquired. If the offering were for less than $5,000,000 and the issuer were thus referring to Form S-16, Item 21(d) of that form provides a parallel rule on businesses to be acquired.

FN36. See letter re Walnut Valley Special Cable TV Fund dated May 13, 1982.

FN37. This provision is similar to that found in former Rule 146 at paragraph (e)(1)(ii)(c).

FN38. See letters to Hecker & Phillips dated December 22, 1982 and Hopper, Kanouff, Smith and Peryam dated September 10, 1982.

FN39. See Release No. 33-6253 (October 28, 1980) (45 FR 72644); letters re Security Bancorp, Inc. dated January 21, 1980 and Kearney Plaza Company dated March 8, 1979.

FN40. The Note to Rule 502(a) also points out that certain foreign offerings are not integrated with domestic exempt offerings.

FN41. Rule 502(a), however, does not provide a safe harbor to the possible integration of offering (C) with either offering (A) or (B). In resolving that

Westlaw.

**(Cite as: 1983 WL 409415, \*1 (S.E.C. Release No.))**

question, the issuer should consider the factors listed in the Note to Rule 502(a).

FN42. The Note to Rule 501(e) provides that the issuer must satisfy all other conditions of Regulation D with respect to purchasers that have been excluded from the count. Thus, for instance, the issuer would have to ensure the sophistication of the first cousin under Rule 506(b)(2)(ii).

FN43. See Release No.33-4708 (July 9, 1964) (29 FR 828), Preliminary Note 7 to Regulation D and Note to Rule 502(a).

FN44. See letter re Madison Partners Ltd. 1982-1 dated January 13, 1982. See also letter re Kenai Oil & Gas, Inc. dated April 27, 1979.

FN45. The Division is of the view that the provision in Rules 504 and 505 that bars an investment company from using the exemptions should be construed to mean an investment company as that term is defined in section 3 of the Investment Company Act.

FN46. See letter to Geraldine D. Green dated November 22, 1982.

FN47. See letter re Freeport Resources. Inc. dated December 9, 1982.

FN48. Note that under Rule 502(a) these offerings may not have to be integrated because they are separated by six months.

FN49. See Release No. 33-6437 (November 19, 1982) (47 FR 54764).

FN50. Letters from Laura Homer, Securities Credit Officer, Board of Governors of the Federal Reserve System to Ardith Eymann, Esq., Chief Counsel, Division of Market Regulation, Securities and Exchange Commission (April 10, 1982) and to Mrs. Mary E.T. Beach, Associate Director, Securities and Exchange Commission (January 8, 1982).

FN51. Letter from Laura Homer, Securities Credit Officer, Board of Governors of the Federal Reserve System to Alan G. Rosenberg, Esq. (May 20, 1982).

FN52. A Form D is also required to be filed in connection with an offering conducted pursuant to section 4(6). See 17 CFR 239.500.

FN53. The acronym "CUSIP" derives from the title of the American Banker's Association committee that developed the CUSIP system--Committee on Uniform Security Identification Procedures.
Release No. 6455, Release No. 33-6455, 1983 WL 409415 (S.E.C. Release No.)
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw